1   ANDREW R. LIVINGSTON (SBN 148646)
    alivingston@orrick.com
2   RACHEL CAPLER (SBN 307582)
    rcapler@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA  94105-2669
5   Telephone:    +1 415 773 5700
    Facsimile:    +1 415 773 5759
6
    Attorneys for Defendant
7   DATAROBOT, INC.

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11
    RAQUEL VAZQUEZ,                      Case No.  3:22-cv-07619
12
                  Plaintiff,            [San Francisco Superior Court Case No.
13                                      CGC-22-602949]

14           v.                        **DEFENDANT DATAROBOT, INC.'S**
                                       **NOTICE OF REMOVAL**
    DATAROBOT, INC.; DAN WRIGHT; and
15  DOES 1 through 20, inclusive,

16                Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

**TO THE UNITED STATES DISTRICT COURT FOR THE NOTHERN DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND HER COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Defendant DataRobot, Inc. ("DataRobot") files this Notice of Removal pursuant to 28 U.S.C. §§ 1332(a) and 1446 to effect the removal of the above-captioned action, which was commenced in the Superior Court of the State of California for the County of San Francisco, and states that removal is proper for the reasons stated below.

## I.    BACKGROUND

1.     On November 15, 2022, Plaintiff Raquel Vazquez filed a Complaint in the Superior Court of California for the County of San Francisco, entitled *Raquel Vazquez v. DataRobot, Inc. et al.*, Case No. CGC-22-602949.  A true and correct copy of the Complaint is attached hereto as **Exhibit A**.  The allegations in the Complaint are incorporated by reference in this Notice of Removal without admitting any of them.

2.     The Complaint asserted nine causes of action against DataRobot: (1) promissory fraud, (2) intentional misrepresentation, (3) misrepresentation by concealment, (4) negligent misrepresentation, (5) discrimination based on sex, race/national origin, veteran status, and disability, (6) failure to prevent discrimination, (7) wrongful termination in violation of public policy, (8) whistleblower retaliation, and (9) intentional infliction of emotional distress.

3.     The Complaint also named DataRobot's former CEO, Dan Wright ("Wright"), as a Defendant, asserting the following causes of action against Wright in his individual capacity: (1) promissory fraud, (2) intentional misrepresentation, (3) misrepresentation by concealment, (4) negligent misrepresentation, and (9) intentional infliction of emotional distress.

4.     The Complaint asserted all nine causes of action against DOES 1 through 20, inclusive.

5.     As of the date this Notice is filed, based upon a review of the online docket, Plaintiff has not filed a proof of service of the Summons or the Complaint.  (Capler Decl. ¶ 4.)  Upon information and belief, the only other named Defendant, Wright, has not been served with the Summons and Complaint.  (Capler Decl. ¶¶ 3-4.)  If a defendant has not yet been served in the action, that defendant need not join in or consent to the removal.  28 U.S.C. § 1446(b)(2)(A);

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1  *Destfino v. Reiswig,* 630 F.3d 952, 957 (9th Cir. 2011).  Moreover, unidentified "Doe" defendants

2  need not join in a Notice of Removal.  *See Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213

3  (9th Cir. 1980).  Thus, this Notice of Removal is timely and proper.

4  **II.    DIVERSITY OF CITIZENSHIP**

5       **A.    Complete Diversity Exists Between Plaintiff and DataRobot**

6       6.    **Plaintiff's Citizenship**.  For purposes of diversity jurisdiction, a person is a

7  "citizen" of the state in which she is domiciled.  28 U.S.C. § 1332(a)(1); *see also Kanter v.*

8  *Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (confirming that a person's domicile is

9  the place she resides with the intent to remain).  Plaintiff's Complaint alleges that she currently

10  resides in California.  (Compl. ¶¶ 1, 5.)  Residence is prima facie evidence of domicile.

11  *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 886 (9th Cir. 2013).  Thus, DataRobot is

12  informed and believes, and on that basis alleges, that Plaintiff is now, and has been since the

13  commencement of this action, domiciled in and a citizen of the State of California.

14       7.    **DataRobot's Citizenship**.  For diversity purposes, a corporation is deemed to be a

15  citizen of its state of incorporation and where it has its principal place of business.  28 U.S.C.

16  § 1332(c)(1).  The phrase "principal place of business" refers to "where the corporation's high-

17  level officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*,

18  559 U.S. 77, 80 (2010).  Also referred to as the "nerve center," the principal place of business is

19  normally "the place where the corporation maintains its headquarters."  *Id.* at 93.  DataRobot is

20  now, and has been since the commencement of this action, incorporated in the State of Delaware

21  with its principal place of business in Boston, Massachusetts.  (Suchanek-Vacca Decl. ¶¶ 4-5.)  At

22  all relevant times, DataRobot's headquarters and principal executive office was its Boston office,

23  as it performs the vast majority of its executive and administrative functions from that location.

24  (Suchanek-Vacca Decl. ¶ 5.)  Thus, DataRobot is a citizen of Massachusetts and Delaware.

25       **B.    Wright's Citizenship Must Be Disregarded Because He Has Not Been Served**

26            **and He Was Fraudulently Joined**

27       8.    **Wright's Citizenship**.  Plaintiff alleges that Wright is domiciled in California.

28  (Compl. ¶ 4.)  However, Wright's citizenship must be disregarded for purposes of this Notice of

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1  Removal, and complete diversity nonetheless exists, because Wright has not been served with

2  process and because Wright has been fraudulently joined.

3      9.      **The Forum Defendant Rule**.  The provisions of 28 U.S.C. § 1441(b)(2),

4  commonly known as the "forum defendant rule," prohibit removal by a forum-state defendant

5  who has been "properly joined and served."  The rule is inapplicable to the instant matter because

6  Wright, although an alleged California domiciliary, has not been "properly joined and served."

7  *See e.g.*, *Regal Stone Ltd. v. Longs Drug Stores Cal., LLC*, 881 F. Supp. 2d 1123, 1127 (N.D. Cal.

8  2012) (recognizing that courts in the Northern District "hold that the clear and unambiguous

9  language of the statute only prohibits removal after a properly joined forum defendant has been

10  served")[1]; *Waldon v. Novartis Pharms. Corp.*, No. 07-cv-01988, 2007 WL 1747128, at *2 (N.D.

11  Cal. June 18, 2007) (denying motion to remand because "McKesson's citizenship should not be

12  considered because McKesson was not properly joined and served at the time of removal"); *see*

13  *also Sherman v. Haynes & Boone*, No. 5:14-CV-01064-PSG, 2014 WL 4211118, at *1 & n.8

14  (N.D. Cal. Aug. 22, 2014) (holding that "a defendant may remove an action prior to receiving

15  proper service, even when the defendant resides in the state in which the plaintiff filed the state

16  claim" and citing cases).  Defendant Wright has not been served with the Summons or the

17  Complaint.  (Capler Decl. ¶ 4.)  Therefore, removal is proper.

18      10.     **Fraudulent Joinder**.  Moreover, Wright's alleged citizenship must be disregarded

19  because he is a sham defendant against whom Plaintiff cannot establish a cause of action.  Joinder

20  "of a non-diverse defendant is deemed fraudulent, and the defendant's presence in the lawsuit is

21  ignored for purposes of determining diversity, if the plaintiff fails to state a cause of action

22  against a resident defendant, and the failure is obvious according to the settled rules of the state."

23  *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (citing *McCabe v. General*

24  *Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) (internal marks omitted).  A defendant is

---

[1] While the court acknowledged disagreement amongst other district courts over the proper application of the
"properly joined and served" language when it comes to pre-service removal, it is well-established that a defendant
may invoke diversity jurisdiction where the non-diverse defendant has been fraudulently joined.  *Grancare, LLC v.*
*Thrower by and through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (recognizing that "[d]iversity removal requires
complete diversity" but that "district courts may disregard the citizenship of a non-diverse defendant who has been
fraudulently joined") (citation omitted).

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

"entitled to present the facts showing the joinder to be fraudulent." *Id.* As set forth above, Plaintiff asserts five causes of action against Wright, all of which are incurably deficient.

a. <u>Counts 1-4 Do Not Plead Fraud With Sufficient Particularity</u>. Both the California and federal rules require that fraud be pled with sufficient particularity. Fed. R. Civ. P. 9(b); *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 645 (1996). Counts 1-4 of the Complaint assert different species of fraud, but the Complaint fails to allege the "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal marks and citations omitted). Plaintiff's failure to plead her fraud claims against Wright with sufficient particularity is evidence of fraudulent joinder. *See Lantz Retirement Investors, LLC v. Glover*, No. 1:19-cv-00379-NONE-SAB, 2021 WL 6118182, at *3 (E.D. Cal. Dec. 27, 2021) (recognizing that "[t]he purpose of Rule 9(b) is to protect defendants from factually baseless claims of fraud inasmuch as it is meant to give defendants notice of the claims asserted against them") (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)).

b. <u>Plaintiff Cannot Show Detrimental Reliance</u>. All fraud claims (i.e., Counts 1-4) require that Plaintiff plead, with sufficient particularity, that she reasonably relied on Wright's alleged promise, representation, or concealment, and that her reliance resulted in damage. *See Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972, 978 (N.D. Cal. 2016) (recognizing that fraud-based claims "must sufficiently allege an actionable misrepresentation and reliance on that representation"). Plaintiff has not, and cannot, do so here. The gravamen of Plaintiff's four overlapping fraud claims against Wright is that Wright made or directed some promise, representation, or concealment relating to the timing and readiness of DataRobot's IPO and the company's financial outlook, which allegedly induced Plaintiff to quit her job at Cisco and join DataRobot. Plaintiff joined DataRobot in May 2021 and alleges that when she arrived, she (i) was "surprised that basically nothing seemed to be going on in service to the 'imminent' IPO," (ii) discovered that DataRobot's practices "were not consistent with the promise of an imminent IPO," and (iii) reported conditions that stood between DataRobot and any possibility of an IPO,

1    including errors during an important audit.  (Compl. ¶¶ 25, 29, 30.)  Despite these alleged

2    discoveries, Plaintiff remained employed at DataRobot until she was part of a reduction in force

3    over a year later.  (Compl. ¶ 36.)  It is settled law that an employee cannot claim detrimental

4    reliance where the employee subsequently discovers the truth of the misrepresentations, but

5    nevertheless decides to remain employed anyways.  *Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th

6    201, 215-16 (1993) (disapproved on other grounds by *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th

7    1238 (1994)).

8                    c.        Count One: Promissory Fraud.  Plaintiff's claim against Wright for

9    promissory fraud further elucidates that he is a sham defendant.  The requirements for a claim of

10   promissory fraud are stringent, and Plaintiff must allege facts showing: (1) Wright made a

11   promise regarding a material fact without any intent to perform it, (2) Wright intended not to

12   perform at the time he made the promise, (3) Wright intended to deceive or induce Plaintiff to

13   enter into a transaction, (4) Plaintiff's reasonable reliance, (5) Wright's nonperformance, and (6)

14   resulting damages.  *Rossberg v. Bank of Am., N.A.*, 219 Cal. App. 4th 1481, 1498 (2013) (citation

15   omitted).

16           Plaintiff has not, and cannot, sufficiently plead the first element, that Wright made a

17   promise regarding a material fact without intent to perform it.  Plaintiff's Complaint attributes the

18   following statements to Wright, none of which were made to Plaintiff and all of which occurred

19   before Plaintiff began interviewing at DataRobot: (i) Wright stated at a companywide meeting

20   that DataRobot would be ready and able to fast track an IPO in ten months, (ii) Wright made

21   statements regarding DataRobot's recurring revenue forecast for 12, 24, and 36 months into the

22   future, and (iii) Wright instructed recruiters to tell candidates that the company's finances looked

23   solid for an IPO (and to use the expression "fast tracking an IPO") and that an IPO would make

24   employees incredibly wealthy.  (Compl. ¶¶ 13, 18.)  Wright's alleged statements are not

25   actionable promises as a matter of settled law because they are not affirmative undertakings.  *See,*

26   *e.g.*, *Baldwin Park Unified Sch. Dist. v. Genesis Mgmt. & Ins. Servs. Corp.*, No. CV 16-9349-

27   DMG (EX), 2017 WL 5635018, at *6 (C.D. Cal. July 10, 2017) (holding that the plaintiff could

28   not state a claim for promissory fraud because the disputed statement did "not indicate any

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1    affirmative undertaking or commitment on the part of [defendant] whatsoever").  Even if these

2    statements could be construed as promises, they are too vague to support a fraud claim.  *Rochlis*,

3    19 Cal. App. 4th at 216.

4            To the extent Plaintiff contends that Wright's alleged statements constitute

5    misrepresentations that induced Plaintiff into leaving her job at Cisco and joining DataRobot, that

6    theory of promissory fraud also fails as a matter of settled law.  Wright's alleged statements are

7    not actionable because they are not representations of past or present material facts, but rather

8    "statements or predictions regarding future events" which are inactionable opinions.  *Cansino v.*

9    *Bank of America*, 224 Cal. App. 4th 1462, 1469-71 (2014) (affirming demurrer of promissory

10   fraud claim *without leave to amend* as "the law is well established that actionable

11   misrepresentation must pertain to past or existing material facts" and not merely "[s]tatements or

12   predictions regarding future events"); *see also Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th

13   594, 606-07 (2014) ("A representation is an opinion if it expresses only (a) the belief of the

14   maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value . . .

15   or other matters of judgment") (internal marks and citation omitted).  That Plaintiff may have

16   interpreted these statements to be ones of fact does not change their nature.

17           d.      Count Two: Intentional Misrepresentation.  Plaintiff's intentional

18   misrepresentation claim overlaps with her promissory fraud claim, and likewise fails.  To state a

19   claim for intentional misrepresentation, Plaintiff must allege with particularity that: (1) Wright

20   misrepresented a fact, (2) Wright knew the representation was false, (3) Wright intended that

21   Plaintiff rely on this misrepresentation, (4) justifiable reliance, and (5) resulting damage.  *Yastrab*,

22   173 F. Supp. 3d at 977-78 (citation omitted).  Because the alleged representations underlying this

23   claim are Wright's opinions, not facts, they cannot support Plaintiff's claim as a matter of law.

24   *See Cansino*, 224 Cal. App. 4th at 1470 ("Any future market forecast must be regarded not as fact

25   but as prediction or speculation").

26           e.      Count Three: Misrepresentation by Concealment.  Plaintiff attempts to

27   sidestep the fact that Wright's alleged statements are opinions by claiming he concealed material

28   facts.  But this claim also fails under settled law.  A claim for fraudulent concealment requires

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

allegations that: (1) Wright concealed or suppressed a material fact that he was under a duty to disclose to Plaintiff, (2) Wright intended to defraud Plaintiff, (3) Plaintiff was unaware of the fact and would not have acted as she did if she had known of the fact, and (4) Plaintiff sustained damage as a result of the concealment or suppression of the fact. *Graham*, 226 Cal. App. 4th at 606. The gravamen of Plaintiff's claim is that Wright concealed or suppressed certain material facts, which had she been aware of, she would not have left her employment at Cisco to join DataRobot.

At the outset, Plaintiff's claim fails because, among other reasons, Wright did not owe Plaintiff any legal duty when he allegedly made the statements in March 2021. A duty to disclose only arises where the defendant is in a fiduciary or some other relationship with the plaintiff. *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 888 (E.D. Cal. 2019). As even Plaintiff acknowledges, Wright did not owe Plaintiff a fiduciary duty at the time of her alleged reliance.[2] (Compl. ¶ 3.) Absent a fiduciary relationship, in the context of an employer and prospective employee relationship, the duty to disclose only arises in certain instances, and only if the defendant has exclusive knowledge of a material fact, actively conceals a material fact, or makes only partial representations while suppressing other material facts. *Id.* at 888-89. But again, as Plaintiff acknowledges, Wright's alleged March 2021 statements occurred *before* Plaintiff became a prospective employee in April 2021.[3] (Compl. ¶¶ 11-12.) Thus, at the time of Wright's alleged statements, no employer and prospective employee relationship existed between

---

[2] DataRobot does not concede that Wright ever had a fiduciary relationship with Plaintiff. *See Evenfe v. Esalen Inst.*, No. 15-CV-05457-LHK, 2016 WL 3965167, at *7 (N.D. Cal. July 24, 2016) (noting that as "a general matter, the fact of an employer-employee relationship alone is insufficient to create a fiduciary relationship" (internal marks & citation omitted)). However, the issue of whether Wright had a fiduciary duty to Plaintiff after she became a DataRobot employee is not relevant to Plaintiff's claim, which is premised on the alleged pre-employment representations/concealment.

[3] While Plaintiff tries to cleverly plead her way around this issue by alleging that an unnamed DataRobot recruiter told her that Wright was "backing" an IPO, that an IPO would be launched later in 2021, and that the IPO was being "fast tracked," there are no allegations that connect this mystery recruiter's alleged statements to Wright, and the statements cannot simply be inferentially imputed to him under the heightened pleading standard for fraud.

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1  DatatRobot and Plaintiff,[4] and neither DataRobot, nor Wright as its CEO, had any duty of

2  disclosure.

3      Even if Plaintiff could overcome this hurdle and show there was some relationship

4  between her and DataRobot when Wright allegedly made these statements in March 2021, it is

5  hornbook law that a duty to disclose only arises where the defendant had "exclusive knowledge."

6  *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997); *Magpali v. Farmers Group, Inc.*, 48 Cal.

7  App. 4th 471, 482 (1996) (rejecting the plaintiff's concealment claim because, as a matter of law,

8  the alleged failure to disclose information that was already available to the plaintiff is not

9  actionable fraud).  As a matter of law, there can be no concealment of publicly-available

10  information, such as publicly-filed lawsuits, NLRB complaints, or widely-reported comments by

11  a company's former CEO.  (Compl. ¶ 17(a)-(c).)  Similarly, it is axiomatic that a claim for

12  fraudulent concealment cannot be premised on alleged material facts (e.g., the hiring of a new

13  CFO) arising *after* Plaintiff's claimed reliance in April 2021.  (Compl. ¶ 17(g).)  Relatedly,

14  Plaintiff must show Wright had *actual knowledge* of the material facts in order to trigger a duty to

15  disclose; it is not enough that Wright should have known of the fact or might have discovered it,

16  or that knowledge might be imputed to him.  *See Marketing West, Inc. v. Sanyo Fisher (USA)*

17  *Corp.*, 6 Cal. App. 4th 603, 613 (1992).  Plaintiff has not done so here.

18      f.   Count Four: Negligent Misrepresentation.  Plaintiff's negligent

19  misrepresentation claim parrots her intentional misrepresentation claim, and it fails for the same

20  (and additional) reasons.  The primary distinction between claims for intentional and negligent

21  misrepresentation is the requisite scienter.  Intentional fraud requires knowledge of falsity, while

22  negligent misrepresentation requires the lack of a reasonable ground for believing a statement to

23  be true.  *See Moncada v. West Coast Quartz Corp.*, 221 Cal. App. 4th 768, 781 (2013).  But there

24  is another significant distinction that is well settled in the law, which is that "[a]lthough a false

25  promise to perform in the future can support an *intentional* misrepresentation claim, it does not

26  support a claim for *negligent* misrepresentation."  *Stockton Mortgage, Inc. v. Tope*, 233 Cal. App.

27  _____

28  [4] It is without dispute that Wright was never Plaintiff's "employer" and thus at no point was in an "employer and prospective employee" relationship with Plaintiff.

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1   4th 437, 458 (2014) (original emphasis) (citing *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.

2   App. 4th 153, 158-59 (1991)).  Plaintiff's negligent misrepresentation claim against Wright is

3   premised on his alleged statements that DataRobot would have an IPO at the end of the year and

4   that employees would gain wealth from that IPO.  These statements, as a matter of law, cannot

5   support a claim for negligent misrepresentation.

6               g.     Count Nine: Intentional Infliction of Emotional Distress.  For Plaintiff to

7   assert a claim for intentional infliction of emotional distress ("IIED"), she must allege that Wright

8   engaged in extreme and outrageous conduct that "exceed[s] all bounds of that usually tolerated in

9   a civilized community."  *Light v. California Dept. of Parks & Recreation*, 14 Cal. App. 5th 75,

10  101 (2017) (internal marks & citation omitted).  Plaintiff's inability to allege such conduct is fatal

11  to her claim.  Liability "does not extend to mere insults, indignities, threats, annoyances, petty

12  oppressions, or other trivialities."  *Id.* (internal marks & citation omitted).  Claims that an

13  employer merely misled an individual "into believing they would be compensated in an amount

14  that would allow them to retire" cannot support an IIED claim.  *Moncada*, 221 Cal. App. 4th at

15  780-81.  Moreover, a "simple pleading of personnel management activity is insufficient to sustain

16  [an IIED claim]."  *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996).  The only

17  conduct by Wright that is alleged in the Complaint is: (i) Wright's March 2021 statements

18  discussed above, and (ii) that Wright told Elise Cole that "everyone hates Plaintiff."  (Compl. ¶¶

19  13, 18, 32(m).)  Even if true, this conduct is not actionable.  Numerous federal courts have

20  foreclosed IIED claims where the supervisor's alleged conduct falls within the confines of his

21  role.  *See e.g.*, *Buscemi v. McDonnell Douglas Corp.,* 736 F.2d 1348, 1352 (9th Cir.1984)

22  (employee's termination without good cause fails to sustain an IIED claim, even if done in a

23  "callous and insensitive manner"); *Mohammed v. American Airlines, Inc.*, No. C 19-01946 WHA,

24  2019 WL 3577160, at *2-5 (N.D. Cal. Aug. 6, 2019) (denying remand and finding fraudulent

25  joinder where the plaintiff's IIED claim alleged only personnel actions); *Schreiner v. Lockheed*

26  *Martin Corp.*, No. CV 14-02847 BRO SSX, 2014 WL 6630055, at *5 (C.D. Cal. Nov. 20, 2014)

27  (denying remand and finding fraudulent joinder where alleged conduct plainly did not constitute

28  "extreme or outrageous conduct" under well-settled California law).  Further, because Wright's

- 10 -

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

alleged conduct falls within the confines of his role, Plaintiff's claim is barred by operation of the California Workers Compensation Act's exclusivity provision. *Cole v. Fair Oaks Fire Protection District*, 43 Cal. 3d 148, 159-60 (1987).

       h.     <u>Wright is a Sham Defendant</u>

It is apparent from the face of the Complaint that Plaintiff cannot sustain any fraud or IIED claim against Wright (or DataRobot).  Instead, Plaintiff has fraudulently joined Wright as a defendant in an effort to avoid this Court's jurisdiction.  Wright is a sham defendant, and his citizenship must be disregarded.

       **C.**     **<u>The Citizenship of Doe Defendants Must Also Be Disregarded</u>**

11.    The citizenship of fictitious defendants is disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332.  *See* 28 U.S.C. § 1441(b)(1) ("... citizenship of defendants sued under fictitious names shall be disregarded").

**III.**    **<u>AMOUNT IN CONTROVERSY</u>**

12.    In considering the amount in controversy, what matters is the amount put in controversy by the plaintiff's complaint, not what amount the defendant will actually owe (if anything).  *See Lewis v. Verizon Commc'ns., Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) ("[T]he amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability").

13.    The alleged amount in controversy in this action exceeds, in the aggregate, $75,000, exclusive of interest and costs.  DataRobot denies Plaintiff's claims in their entirety, but provides the following analysis of potential damages (without admitting liability) based on the allegations in the Complaint in order to demonstrate that Plaintiff's Complaint puts a sufficient amount "in controversy" to warrant removal under 28 U.S.C. § 1332(a).  Though the Complaint does not seek a specific dollar amount of damages, it requests special damages against each Defendant (including medical expenses, lost wages, lost bonuses, lost deferred compensation, lost employment benefits, lost earning capacity, and lost opportunities for employment advancement and work experience), general damages for physical and mental pain and suffering and emotional

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

distress, punitive damages, and reasonable attorneys' fees.  (Compl. ¶¶ 48-49, 59, 70, 77-78, 84, 86, 92, 94, 100, 103, 113, 116, 120, & "Prayer for Relief".)

14.     When the amount in controversy is not readily apparent from a complaint, "the court may consider facts in the removal petition" to determine the potential damages at issue. *Kroske v. US Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005) (*quoting Singer v. State Farm Mut. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)).  The burden is not "daunting," and "a removing defendant is not obligated to 'research, state, and prove the plaintiff's claims for damages.'" *Muniz v. Pilot Travel Ctrs. LLC*, No. CIV. S-07-0325 FCD EFB, 2007 WL 1302504, at *2 (E.D. Cal. May 1, 2007) (citation omitted); *Ray v. Wells Fargo Bank, N.A.*, No. CV 11-01477 AHM (JCx), 2011 WL 1790123, at *5 (C.D. Cal. May 9, 2011) (same).  The preponderance burden is satisfied where the defendant's calculations are conservative, made in good faith, and based on evidence wherever possible.  *Behrazfar v. Unisys Corp.*, 687 F. Supp. 2d 999, 1004 (C.D. Cal. 2009).  Thus, DataRobot is only required to establish that it is more likely than not that the amount in controversy exceeds $75,000.

15.     **Lost Base Salary**.  Plaintiff is seeking backpay in the form of her lost base salary.  At the time Plaintiff was terminated, she earned an annual salary of $240,000.  (Suchanek-Vacca Decl. ¶ 3.)  The Complaint does not allege the length of time for which Plaintiff is seeking backpay; however, Plaintiff also seeks damages for future lost wages.  (Compl. p.35 - "Prayer for Relief".)  Conservatively estimating that Plaintiff is seeking lost base salary for at least the 184 days that passed from the date of her last payroll (May 15, 2022) through the date she filed the Complaint (November 15, 2022), the amount of backpay in the form of lost base salary that is in controversy totals **$120,986.30**.

16.     **Lost Bonuses**.  Plaintiff is also seeking backpay in the form of lost bonuses.  At the time Plaintiff was terminated, she was eligible to earn quarterly bonuses with a $15,000 target per quarter.  (Suchanek-Vacca Decl. ¶ 3.)  Conservatively estimating that Plaintiff is seeking the two quarterly bonuses that she would have earned from the time of her termination through the date she filed the Complaint, the amount of backpay in the form of lost quarterly bonuses that is in controversy totals **$30,000**.

17.     **Front Pay**.  Plaintiff is seeking future lost earnings.  While an award of front pay may be speculative, juries have awarded such damages in similar cases, and courts have held that a plaintiff could receive at least two years of front pay.  *See Horsford v. Board of Trustees of Calif. State Univ.*, 132 Cal. App. 4th 359, 388-89 (2005) (affirming remittitur of jury's award of 10 years of front pay to two years of front pay).  Therefore, Plaintiff could potentially recover at least another **$600,000** in front pay alone.

18.     **Emotional Distress**.  Plaintiff brings a claim for IIED, and her Complaint also purports to seek emotional distress damages for every cause of action asserted.  (Compl. ¶¶ 47, 48, 58, 59, 69, 70, 76, 77, 84, 92, 100, 113, 118-122.)  Plaintiff claims she suffered "humiliation, mental anguish, and severe physical and/or emotional distress" and that, as a result, she incurred medical expenses for psychotherapy treatment.  (*Id.*)  A defendant may use damage awards in similar cases to establish that the amount in controversy exceeds $75,000.  *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1033-34 (N.D. Cal. 2002).  Juries in California have awarded well in excess of $75,000 for emotional distress damages in discrimination and wrongful termination cases similar to this action.  *See, e.g.*, *Qiu v. Three Rivers Provider Network, Inc.*, Case No. 37-2017-00035446-CU-WT-CTL, 2019 WL 7762121 (Cal. Super. Ct. Oct. 15, 2019) (awarding $2.5 million for retaliation claim under Labor Code section 1102.5 and wrongful termination); *Williams v. Wyndham Vacation Ownership*, No. CGC-12-526187, 2017 WL 1045193 (Cal. Super. Ct. Jan. 23, 2017) (awarding $1.3 million on retaliation claim brought under Labor Code section 1102.5); *Roby v. McKesson*, 47 Cal. 4th 686, 699 (2009) (awarding $2.4 million for three counts of wrongful termination and one count of harassment); *Bradley v. Cal. Dep't of Corrections & Rehab.*, 158 Cal. App. 4th 1612, 1618 (2008) (awarding $300,000 for harassment claim).  Thus, in light of Plaintiff's claimed lost wages, it is reasonable to conclude that a jury may award in excess of $75,000 for emotional distress damages alone.  *See, e.g.*, *Kroske*, 432 F.3d at 980 (affirming determination that, in light of the plaintiff's alleged lost wages of at least $55,000, emotional distress damages could be valued at $25,000).

19.     **Punitive Damages**.  The amount in controversy "may include punitive damages when they are recoverable as a matter of law."  *Simmons*, 209 F. Supp. 2d at 1033 (citations

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

1  omitted).  Punitive damages are available under the FEHA, for claims brought under Labor Code

2  section 1102.5, and for claims of fraud.  *Id.*; *Matthews v. Happy Valley Conf. Center, Inc.*, 43 Cal.

3  App. 5th 236, 268 (2019); Cal. Gov't Code § 3294.  District courts within the Ninth Circuit have

4  described a 1:1 ratio of punitive to compensatory damages as "conservative" for purposes of

5  assessing the amount in controversy requirement.  *E.g.*, *Guglielmino v. McKee Foods Corp.*, 506

6  F.3d 696, 698 (9th Cir. 2007); *see also Zapata Fonseca v. Vigo Importing Co.*, No. 5:16-cv-

7  02055-EJD, 2016 WL 6249006, at *2 (N.D. Cal. Oct. 26, 2016); *Bayol v. Zipcar, Inc.*, No. 14-cv-

8  02483-THE, 2015 WL 4931756, at *9 (N.D. Cal. Aug. 18, 2015). Thus, in light of Plaintiff's

9  claimed lost wages, it is reasonable to conclude that a jury may award in excess of $75,000 for

10  punitive damages.

11       20.     **Attorneys' Fees**.  Attorneys' fees must be included in determining whether the

12  amount in controversy is satisfied, which in the Ninth Circuit is reasonably assumed to be at least

13  25% of any judgment in favor of the plaintiff.  *Altamirano v. Shaw Indus, Inc.*, No. C-13-0939

14  EMC, 2013 WL 2950600, at *13 (N.D. Cal., June 14, 2013) (for amount in controversy, it is

15  reasonable to include 25% of the amount in controversy on the claims for relief to account for

16  attorneys' fees) (*citing Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).  Here, the

17  potential attorneys' fees on Plaintiff's claim for back salary and bonuses alone ($150,986.30) is

18  **$37,746**.

19       21.     **Total Amount in Controversy**.  Without even taking into account Plaintiff's

20  claims for future lost earnings, emotional distress damages, or punitive damages, the above

21  conservative calculations show that the amount in controversy for Plaintiff's claims for back

22  wages and attorneys' fees, as alleged, is at least **$188,732.87**.  The amount in controversy

23  requirement is clearly met here.

24  **IV.**    **VENUE IS PROPER**

25       22.     Venue lies in the Northern District of California pursuant to 28 U.S.C. §§ 1441(a)

26  and 84(a).  This action was originally brought in the Superior Court of the State of California,

27  County of San Francisco, which is embraced by the Northern District of California.

28  //

4163-4267-4499.6

1    **V.**      **NOTICE OF REMOVAL**

2          23.      Pursuant to 28 U.S.C. § 1446(d), this Notice of Removal shall be served promptly

3    on Plaintiff's Counsel of Record and filed with the Clerk of the Superior Court of the State of

4    California in and for the County of San Francisco.

5

6    Dated: December 2, 2022                                    ANDREW R. LIVINGSTON
                                                                RACHEL CAPLER
7                                                               Orrick, Herrington & Sutcliffe LLP

8

9                                                     By: _____
                                                               ANDREW R. LIVINGSTON
10                                                             Attorneys for Defendant
                                                              DATAROBOT, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT DATAROBOT, INC.'S
NOTICE OF REMOVAL

4163-4267-4499.6

# EXHIBIT A

John D. Winer, Esq. (SBN: 91078)
Matthew P. Vandall, Esq. (SBN: 196962)
WINER, BURRITT & SCOTT, LLP
1901 Harrison Street, Suite 1100
Oakland, CA 94612
Tel: 510.543.1000
Fax: 510.433.1001
Email: matthew@wmlawyers.com

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**11/15/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

Attorneys for Plaintiff
RAQUEL VAZQUEZ,

## IN THE SUPERIOR COURT OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

CGC-22-602949

| | |
|---|---|
| RAQUEL VAZQUEZ,<br><br>        Plaintiff,<br><br>vs.<br><br>DATAROBOT, INC.; DAN WRIGHT; and DOES 1 through 20, inclusive,<br><br>        Defendants. | **CASE NO.**<br><br>**COMPLAINT FOR DAMAGES**<br>**(Unlimited Civil Case)**<br><br>1. PROMISSORY FRAUD<br>2. INTENTIONAL MISREPRESENTATION (Civil Code Section 1710(1))<br>3. MISREPRESENTATION BY CONCEALMENT<br>4. NEGLIGENT MISREPRESENTATION<br>5. DISCRIMINATION (Cal. Govt. Code Section 12940(a)<br>6. FAILURE TO PREVENT DISCRIMINATION (Cal. Govt. Code Section 12940(k)<br>7. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (Protected Category)<br>8. WHISTLEBLOWER RETALIATION (Labor Code Section 1102.5)<br>9. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>**JURY TRIAL DEMANDED; PUNITIVE DAMAGES SOUGHT** |

PLAINTIFF RAQUEL VAZQUEZ ("PLAINTIFF") for her complaint against Defendants DATAROBOT, DAN WRIGHT, and DOES 1-20, inclusive (referred to, collectively, as "Defendants"), alleges ON INFORMATION AND BELIEF as follows:

### JURISDICTION AND VENUE

1.      Venue is proper because DEFENDANT DAN WRIGHT at all relevant times, including at the time this complaint was filed, was domiciled in San Francisco, California. Further, most if not all of the acts or omissions that give rise to the claims in this case arose out of DATAROBOT's San Francisco-based office locations at 1130 Montgomery Street and 140 New Montgomery Street.  PLAINTIFF, who is a resident of Contra Costa County, was at all times required to report to a DATAROBOT's offices in San Francisco.

2.      Jurisdiction is proper in this Court, as the action incorporates an amount in controversy, as set forth in the complaint, which exceeds $25,000.00. PLAINTIFF timely obtained a right to sue from the California Department of Fair Employment and Housing which is attached to this Complaint as **Exhibit "A."**

### PARTIES TO THE ACTION

3.      DEFENDANT DATAROBOT ("DATAROBOT") is a Delaware Corporation that operates on a regular basis within California, employing people who reside in California, working with clients within California, and receiving goods and services from vendors located in California.  DATAROBOT, at all relevant times, operated its California-based business out of offices located at 1130 Montgomery Street and currently at 140 New Montgomery Street, San Francisco, CA. DATAROBOT was at all times the prospective and actual employer of PLAINTIFF. Once PLAINTIFF was issued stock in the company, the board and executive team of DATAROBOT assumed a duty of fiduciary loyalty to PLAINTIFF; they were obligated to put the financial wellbeing of the company above their own personal, pecuniary, and private/or interests.

4.      DEFENDANT DAN WRIGHT, an individual, was at all relevant times the CEO of DATAROBOT and is domiciled in San Francisco, California.

5.      PLAINTIFF is a single mother of four children over the age of 40 and of Latin Heritage.  She is a retired combat veteran from the United States Air Force with a residual PTSD disability. She resides in Contra Costa County, California and was at all relevant times considering employment or employed with DATAROBOT as an employee and shareholder of DATAROBOT.  Plaintiff worked at the San Francisco office locations of DATAROBOT at all relevant times.

6.      The true names or capacities, whether individual, corporate, or otherwise, of DOES 1-20, inclusive, are unknown to PLAINTIFF, who therefore sues such DEFENDANTS by such fictitious names. Each DOE is legally responsible in some manner (as the agent, partner, and/or employee of the co-defendants) for the events and happenings herein referred to, and in doing the actions mentioned below was acting individually and as an agent of every other DEFENDANT. PLAINTIFF will amend this Complaint to allege the true names and capacities of such defendants if and when they are ascertained.

7.      At all times relevant herein, each of the Defendants was the agent, employee, supervisor, servant, and/or joint venturer of each of the remaining Defendants, and in doing the things hereinafter alleged, each Defendant was acting within the course, scope and authority of such agency, employment and/or joint venture, and with the consent and permission of each of the other Defendants. All actions of each Defendant alleged in the causes of action in which this paragraph is incorporated by reference were ratified and approved by the officers and/or managing agents of every other Defendant.

8.      Each defendant, when acting as a principal, was negligent or reckless in carrying out his, her, its, or their duties. All defendants are jointly and severally liable for the actions of every other defendant. All defendants had obligations to PLAINTIFF as her fiduciary, representative, agent, employer, and/or by contract.

## FACTS ALLEGED

9.   PLAINTIFF joined the U.S. Air Force in 1998, becoming staff sergeant and security forces leader through two war campaigns -- Operation Enduring Freedom and Operation Iraqi Freedom. Honorably discharged in 2004, PLAINTIFF earned a college degree

in business and began working at Cisco Systems, Inc. ("Cisco") where she was repeatedly promoted, eventually assuming the position of Chief of Staff & Director, Performance Center of Excellence.  She was actively working at Cisco and enjoying and succeeding at her job when she was recruited to come to work for DATAROBOT.

10. PLAINTIFF is a highly pragmatic, detail oriented financial strategist who historically operated and operates with the goal of successful systems being repeatable, scalable, and managed responsibly.  In positions prior to working at DATAROBOT, including her time at Cisco, PLAINTIFF discovered millions of dollars in accounting errors – some made unintentionally, and other made with apparent intention.  On information and belief, PLAINTIFF's experience was a major factor in DATAROBOT's ultimate decision to hire her.

11. Between April 14-May 1, 2021, when she was hired at DATAROBOT, PLAINTIFF was actively recruited and interviewed by senior executive leaders and internal recruiters at DATAROBOT.

### DATAROBOT CEO Defendant Dan Wright Announces Without Basis in Fact that DATAROBOT is going IPO.

12. In or around February 2021, two months before PLAINTIFF was first contacted about employment with DATAROBOT, DATAROBOT abruptly discharged its founder CEO, Jeremy Achin, after ten years of Achin controlling the company. Achin had been clear with the executive leadership team at DATAROBOT and the board of directors that DATAROBOT was not ready for an IPO at the time of his abrupt discharge.  Achin was swiftly replaced by DEFENDANT DAN WRIGHT, an attorney who had been President and COO of DATAROBOT since January 2020. At the time DEFENDANT WRIGHT was elevated to CEO, WRIGHT had worked at DATAROBOT for approximately fourteen months. Prior to DATAROBOT, DEFENDANT WRIGHT was employed at AppDynamics ("AppD".)

13.     Within days of becoming CEO, and, on information and belief, with the support of at least some of the members of the Board of Directors of DATAROBOT, DEFENDANT WRIGHT stated at public company meetings that DATAROBOT was ready and able to fast-track an IPO by the end of 2021, ten months away. Using communication platforms available to him as CEO, DEFENDANT WRIGHT repeated that, based upon his review of the Company's current finances, that DATAROBOT's annual recurring revenue was going to undergo remarkable growth: 80% to $255 million in 12 months ending in January 2022, 70% to $435 million in the 12 months to Jan. 31, 2023, and 61% to $700 million in the 12 months ending in January 2024. There was no reasonable basis in fact to make these statements or the statements about DATAROBOT's financial readiness to go public, as, on information and belief, there was no SOX compliance work going on at the time that WRIGHT made the false statement of fact that DATAROBOT was fast-tracking an IPO in 2021. In addition, WRIGHT's statements were contradicted by the fact that there was no prospectus for an IPO and DATAROBOT had inadequate IPO staffing at the time his statements were made.  Indeed, in 2022 it was reported that DATAROBOT missed one of DEFENDANT WRIGHT'S 2021 revenue targets by 75%, which he knew or reasonably should have known was likely at the time that he made the statements.  None of WRIGHT's projections panned out by the time this Complaint was filed, which he knew or should have known was likely at the time he made the statements.

14.     For various reasons, the claim that DATAROBOT was imminently going IPO was reckless and/or negligent. Because of his professional experience and the importance of his position, WRIGHT knew or should have known that making an announcement that a company was going IPO without having even initiated or substantially initiated the required groundwork necessary to fast track an IPO in the first place, could or would destabilize the company.

15.     On information and belief, WRIGHT had never led an IPO prior to becoming CEO of DATAROBOT.   The closest he got was participating on an unknown level in an

attempted IPO while he was working  for AppD which  was in the process of making an

initial public offering before being bought by Cisco.  The AppD IPO never happened.

16.    At the same time, in a move that was highly counterproductive to preparing for

an IPO, DEFENDANT WRIGHT implemented policies and programs that caused the

company to start to hemorrhage money which made the likelihood of an imminent IPO

unrealistic if not impossible.

**Defendant Wright was or should have been aware of a multitude of facts indicating that an IPO was not going to happen.**

17.    At and prior to the time DEFENDANT WRIGHT began announcing an

imminent IPO, DEFENDANT WRIGHT and the Board of Directors of DATAROBOT were

or should have been aware of information that made an IPO impossible to achieve on

DEEFENDANT WRIGHT's stated timeline. The information that WRIGHT and the Board of

Directors either knew and concealed, were reckless to, or negligently unaware of, included,

but was not limited to:

(a) That Jeremy Achin, who had owned and run the company for ten years and was in the best position to know all of its accounts and sources of revenue, had been clear with the executive leadership team and the board of directors that DATAROBOT was not ready for an IPO;

(b) That four civil lawsuits had been filed against DATAROBOT by former employees in 2020, several of which, on information and belief, were still being litigated at the time WRIGHT made the comments about the imminence of the IPO;

(c) That the National Labor Relations Board ("NLRB") had filed a complaint against DATAROBOT for its anti-union activities and that such complaint was still being litigated at the time WRIGHT made the false factual statement that DATAROBOT was ready to fast track an IPO;

(d) That steps necessary to ensure SOX compliance had either not been initiated or were in their infancy at the time WRIGHT stated that DATAROBOT was ready to fast track an IPO;

(e) That a key federal contract with Health and Human Services was "churning" by March of 2021. Churning is an expression used to describe the failure of a business relationship. Part of the reasons were related to alliances that shifted within the federal government once President Trump left office. The H&HS contract provided a significant percentage of gross revenue to DATAROBOT and was part of the

financial projections that WRIGHT supplied in support of his statement that the IPO was imminent. WRIGHT knew or should have known at the time he made those statements that this contract was at least in jeopardy and could not be relied upon as a signal of the financial health of the company. Without the contract, revenues would not support an imminent IPO making the likelihood of an imminent IPO nearly impossible at the time WRIGHT made those statements of fact regarding the company's readiness to go IPO;

(f) That DATAROBOT had received gender-based complaints regarding discrimination and harassment, particularly from within DATAROBOT.gov, the branch of the company that handles government contracts, including the H&HS contract; and that the company was to some extent destabilized by unresolved personnel complaints that had not been addressed. WRIGHT knew or reasonably should have known that the existence of such complaints would seriously impede DATAROBOT's ability to go public much less on a fast-track basis; and

(g) That the new CFO whom DEFENDANT WRIGHT hired, Damon Fletcher, had a record of arrests for alcohol-fueled behavior such as drunk driving, drunk and disorderly conduct, assault and battery, and domestic violence. Such a record, once learned by potential investors, while not solely determinative of the likelihood of investor enthusiasm, was likely to impair IPO prospects. Such a record, given Fletcher's high profile within DATAROBOT as its Chief Financial Officer, was not consistent with a company that supposedly values women and it was not consistent with the example of ethical behavior that is expected of a Director.

18.     Upon becoming CEO, in March of 2021, before PLAINTIFF was hired, Wright began instructing recruiters and hiring agents to provide information about the company that he knew or should have known to be false, or which he had no reasonable basis to believe, and/or was reckless to the falsity of. The false information included but is not limited to:

(a) That DATAROBOT's finances looked solid for an IPO, which was false because an external audit and SOX compliance had not been started when WRIGHT began making that statement of fact, and there was therefore no basis for asserting that DATAROBOT's financials were solid when they were not even fully known or confirmed. In point of fact, at the time WRIGHT began making the above and other similar statements, he had not yet even hired a Chief Financial Officer to replace the CFO under Jeremy Achin. The Chief Financial Officer (Damon Fletcher) who was hired to oversee the pre-IPO auditing process was not hired until May of 2021;

(b) WRIGHT told recruiters to use the expression "fast tracking an IPO" when the foundational prerequisites for fast tracking an IPO had not been met or were in not in place at the time he issued this instruction and the expression was used for recruiting purposes; and

(c) That the imminent IPO would make employees incredibly wealthy and/or provide life-changing wealth at a time when DATAROBOT had not taken substantial enough steps to know whether an IPO was even a reasonable possibility;

19.     With actual or constructive knowledge of all of the above, and while claiming that he was fast-tracking an IPO,  DEFENDANT WRIGHT sold twenty million dollars of his DATAROBOT shares to a private investor, and later in the year of 2021 voted to authorize other members of the executive leadership team, including Damon Fletcher, to do the same. Employees that were not part of the executive teams, including those who had been at DATAROBOT since its founding, were not given the opportunity to sell shares.

**Plaintiff's Hiring**

20.     Statements that were made to PLAINTIFF by those employees who interviewed her and were involved in hiring her are ascribed to DATAROBOT for purposes of liability because of their status as managing agents and/or agents with apparent authority, and because they were instructed to do so by the executive team, including but not limited to DEFENDANT DAN WRIGHT.

21.     When Plaintiff was interviewing for a position at DATAROBOT she was provided a falsely rosy picture of everything at DATAROBOT that was not supported by the past and present facts described above, including:

(a) During an interview, Plaintiff asked the recruiter, "How sure are you that you'll go IPO?"  The recruiter responded, "Our CEO is backing this and the leadership is doubling down.  Your skill set is exactly what we need as we go IPO."

(b) That DATAROBOT was a place of diversity, inclusion, and support for women;

(c) That DATAROBOT was a financially robust company;

(d) that DATAROBOT was making steady progress towards a soon-to-be concluded IPO. The emphasis was on the certainty and imminence of the IPO.

(e)  That the IPO would be launched later in 2021.

(f) That IPO was being "fast tracked;"

(g) That because of the timing, "the valuation of stock is going to go through the roof. Now is a great time to join the company;"

(h) that "although we are a private company *now*…when we go public *this year*…."

(i) that "You're going to be very wealthy" by the end of 2021;

(j) that the value of her equity was going to be worth, conservatively, $500,000 in a year;

(k) That PLAINTIFF's 20,000 equity shares would go 10-20x within eighteen months to two years;

(l) That DATAROBOT needed talent like hers for *long-term* planning, operational excellence, and real time performance reporting;

(m) that DATAROBOT needed her particular skill set with budget alignment and cost management for *long-term* financial management projects.

(n) that her skills were needed in the *long term*. PLAINTIFF understood the statements concerning long term needs as an assurance that DATAROBOT had financial resources to employ her in the long term. In fact, under WRIGHT's management, DATAROBOT's finances spiraled out of control and by the end of 2021 DATAROBOT was planning a large layoff.

22.     Statements made to PLAINTIFF about the company's need for her skill set were false. When she in fact performed the job for which she was hired, which included pointing out serious, chronic errors in accounting, she was retaliated against.

23.     Statements made to PLAINTIFF about working at DATAROBOT were not presented as expressions of opinion or speculation about the future; they were stated as facts, and assurances.

24.     Nearly every representation to PLAINTIFF about what it would be like to work at DATAROBOT was false.

25.     PLAINTIFF reasonably relied on each and every one of the above statements to her detriment by accepting a position as Senior Director, Business Management and

Operations with DATAROBOT, giving notice at Cisco on April 19, 2021, accepting a position at DATAROBOT, and commencing work at DATAROBOT on May 1, 2021.

26.     For reasons relating to actual conditions at DATAROBOT, which were or should have been known to DEFENDANT WRIGHT at the time PLAINTIFF was hired, DATAROBOT was in no way, shape, or form ready for an IPO in 2021 or 2022. At the time the statements were made to PLAINTIFF, DEFENDANT WRIGHT had no reasonable basis for stating that the company was going to make an initial public offering any time soon. At the time the statements were made there was little objective evidence that an IPO at DATAROBOT would succeed, and substantial evidence, if WRIGHT had disclosed it, that it would fail.  As alleged above, the preliminary steps required to fast track an IPO had not been performed at the time that WRIGHT was making these false statements of fact.

27.     Numerous events and conditions existed or occurred prior to, contemporaneous with, and after the false representations were made to PLAINTIFF that reflected the impossibility of a successful IPO at DATAROBOT, of which DEFENDANT WRIGHT was or should have been aware, and as alleged above, included, but were not limited to:

(a)     Multiple troubling financial issues.

(b)     Management issues.

(c)     Legal issues.

(d)     Customer satisfaction issues and churning accounts.

(e)     Overspending.

(f)     Over hiring.

(g)     Poor accounting practices.

(h)     Persistent complaints about the creation and fostering of a hostile work environment for women.

28.     DATAROBOT never implemented a coherent pathway to IPO, never filed paperwork with the SEC, never finalized funding, never completed and external audit

**Plaintiff's reporting of serious deficiencies in marketing operations meets hostility.**

29.     Once PLAINTIFF began working for DATAROBOT, she observed longstanding operational chaos which she immediately set about fixing. Within the performance of her job duties, Plaintiff observed, reported, and set about fixing the following:

a)  Recruiters were making job offers to candidates without checking first to see if there was money in the budget for the hire. Recruiting was generating offers without checking with PLANTIFF to see if the organization could afford the salary proposed.

b)  Recruiters were making job offers and realized after an employee was hired that the offer letter compensation was wrong, and they therefore had to re-issue offer letters with lower compensation, resulting in devasting blows to morale right from the outset of employment.

c)  On multiple occasions, the CMO who replaced Nick King in January of 2022, Jennifer Hewlette, asked PLANTIFF why Marketing should operate within their assigned departmental budget if other departments did not. That attitude of refusal, which did not change, made it impossible for PLAINTIFF to perform the job for which she was hired. That CMO began hiding information from PLAINTIFF, presumably because she knew PLAINTIFF would call it out as a problem.

d)  Ms. Hewlette was very condescending to Plaintiff after Plaintiff called out the misuse of funds.  Ms. Hewlette also excluded Plaintiff from planning meetings and

conversations which impacted Plaintiff's ability to perform her job.  On information and belief, Ms. Hewlette did not treat male employees of DATAROBOT this way;

e)   Ms. Hewlette made comments to Plaintiff about her status as a single mother with PTSD.  For example, Plaintiff had shared with Ms. Hewlette her divorce status and the fact that she was a single mother.  Ms. Hewlette commented that "being a single mom must be hard", but that Plaintiff "could not bring that stress to the workplace." There was no indication that Plaintiff was bringing her personal life to work and the comment demonstrated a bias against Plaintiff.  Ms. Hewlette, on another occasion, told Plaintiff, "Let's breathe, we don't want to disturb your PTSD and stress" during a conversation about planning and being financially responsible in the marketing department.  The comment came from out of nowhere and had no bearing on the issues being discussed.  When Ms. Hewlette informed Plaintiff that she was targeted for the layoff, Plaintiff asked her if "now would be a good time to invest in a new car."  Ms. Hewlette responded by saying, "Right now, you need to deal with being a good single mom and seeing where this thing takes us."

f)   The master marketing employee roster was riddled with errors, listing employees as working in departments they did not work in, or living in countries they did not live in, or in some cases listed as working for the company when they no longer did, or not listed as employees at all when they did work for DATAROBOT. There were also employees with incorrect job titles that PLAINTIFF's team repeatedly had to monitor for corrections. The company roster was the responsibility of HR, which was run by Elise Cole. PLAINTIFF had a hard time understanding how an HR department with multiple employees could not keep the company roster up to date. An inaccurate roster presents security and safety issues, particularly because DATAROBOT

employed hundreds of Ukrainian citizens at the time Russia began its invasion of Ukraine. It was essential to be able to keep track of where everyone was. Not having such systems in place was factually inconsistent with the promise that DATAROBOT was imminently ready for an IPO.

g)   Accounting dollars in the marketing department during a weekly audit check were off by three million dollars, which would not be tolerated in a public company, and was potentially the result of intentional malfeasance. But the response PLAINTIFF got when she pointed that out, was hostility and push-back.

h)   Approximately fifteen times a month, bills came in and there were no purchase orders on file to assist with confirming the transactions, opening the possibility of internal or external fraud.

i)   There was no governance on corporate credit cards and when employees did not follow policy, there were no repercussions -- opening opportunities for misuse of company assets and theft.

j)   The Marketing department was charged when other departments believed Marketing should pay for something.

k)   Instead of cutting back on spending, some DATAROBOT employees "solved" the problem of overspending by dedicating the current quarter's expenses to the following quarter's budgets, a "pull fundings" which would not be allowed in a public company.  Pull fundings makes an audit extremely difficult and time consuming to do. An auditor would have to fix all the errant procedures and restate all their financials to fix these issues before getting a clean audit opinion.

l)   PLAINTIFF observed that bonuses were given out (by white men, generally to other white men) on an "on the spot" basis instead of being issued quarterly or annually, a

practice that does not afford a process for appropriate review, promotes favoritism, and strains budget.

m) Money that companies in the process of making an initial public offering set aside for marketing, re-branding, and PR was not set aside, despite what PLAINTIFF had been told about imminent IPO. When PLAINTIFF arrived, she was surprised that basically nothing seemed to be going on in service to the "imminent" IPO.

n) An accounting manager who worked at DATAROBOT for less than a couple of months told PLAINTIFF's team that he had been instructed by the Finance Department to go back in time and "adjust" numbers, something he was not comfortable doing.

o) These practices were not consistent with the promise of an imminent IPO and were known to DATAROBOT and DAN WRIGHT at the time those false promises were made.

30.     PLAINTIFF experienced retaliation for reporting failures in basic accounting, failures to adhere to standard hiring protocol, over hires, overspends, failures to keep an accurate roster, the three-million-dollar error, and other mistakes that were routinely made and which stood between DATAROBOT and any possibility of an IPO. The retaliation she experienced is exemplified by the following:

a.) PLAINTIFF comes from a military background where she addressed her superiors as "Sir" and "Ma'am." PLAINTIFF addressed Chief People Person Elise Cole as "Ma'am" once in an email. Cole responded that being addressed as "Ma'am" made her feel old. PLAINTIFF explained that it was part of her military background; however, Elise Cole ostracized Plaintiff after that.

b.) Elise Cole harassed PLAINTIFF on the basis of her gender by making sarcastic comments about PLAINTIFF's appearance during Zoom or Slack calls. Examples of the remarks include but are not limited to saying snidely, when Plaintiff was dressed professionally for a meeting, "Aren't we a wee bit overdressed today?"; "You have makeup on. You're making me look bad;" commenting about PLAINTIFF's hair color and staring at PLAINTIFF.

c.) Nick King nominated PLAINTIFF for a quarterly bonus after a major company initiative was achieved, which Elise Cole denied. Elise Cole stated words to the effect, "We don't give bonuses for people doing their jobs" -- despite the pattern and practice of doing exactly that, of giving discretionary bonuses on an on-the-spot basis, but only to men.

d.) On November 8, 2021 Nick King approved PLAINTIFF for a promotion, which Elise Cole denied.

e.) Elise Cole made the decision to terminate PLAINTIFF, allegedly as part of the massive layoff in May of 2022.

f.) While trying to provide accurate numbers during an important audit, PLAINTIFF was directed in an email from Lucas Brown, Senior Director of Financial Planning and Analysis, not to get "hung up" about discrepancies of "just" a few hundred thousand dollars, in a climate where budget integrity was vital. PLAINTIFF became known as someone who was difficult to work with, yet PLAINTIFF was astonished that someone in Brown's position could take such a cavalier attitude towards such a large sum of money, when huge amounts were missing, and their absence could not be explained.

g.) Plaintiff told Lucas Brown that she was not going to be involved in cooking the books.  Lucas had sent two employees who told her team members to change the labels on earlier financial records for marketing.  Plaintiff instructed them not to.  The next time she connected with Finance on a call, Plaintiff told Lucas that they were not going to go back and change records.  She said, "The spend is what it is; we weren't here.  We are not going to cook the books."  On information and belief, this complaint about not committing fraud resulted in retaliation against Plaintiff, including but not limited to her being included in the mass layoff despite being deemed a critical employee.

h.) Damon Fletcher was hostile to PLAINTIFF on the basis of her gender and her Latin heritage. It was known by some in the company that Fletcher had been hostile to some women at DATAROBOT and that he had passed up hiring qualified women of color in favor of hiring men. Fletcher became more hostile as PLAINTIFF pointed out ways that DATAROBOT was failing to adhere to standard accounting practices. PLAINTIFF's work apparently challenged Fletcher and put him on the defensive. He was critical of her process, at one point accusing her of trying to reorganize DATAROBOT's systems –yet he later adopted her planning and budget process without giving any attribution to PLAINTIFF or PLAINTIFF's team, who had written the procedures manual.

i.) Fletcher laughed at PLAINTIFF after she told him that Marketing would always do the right thing, and stay within budget, and work with his team to stay financially responsible, and operate like a public company.

j.) PLAINTIFF had a sense about Fletcher, that there was something "off" about him, before she was told by another employee that Fletcher had a criminal record. Had

PLAINTIFF known at the time she was interviewing that she would be reporting to someone with his arrests for domestic violence, assault, and battery, even though his record was by then twenty years old she would not have accepted employment at DATAROBOT. PLAINTIFF felt unsafe reporting to Fletcher at DATAROBOT, even remotely.

k.) Nick King left DATAROBOT in December 2021 after only 10 months of employment. Based on email exchanges where PLAINTIFF was cc'ed, there appeared to be tension between King and Fletcher over the fact that DATAROBOT was losing an important account, and Fletcher appeared to be taking that out on employees. After King left, Elise Cole coordinated with Damon Fletcher to remove PLAINTIFF, who had supported King, from meetings and calls. After King's departure, PLAINTIFF's authority was removed without any kind of disciplinary notice or action, and she was no longer invited to be part of planning conversations.

l.) During a period of time soon after PLAINTIFF tried to address the improper practice of pulling forward with Jennifer Hewlette, PLAINTIFF was mocked in early 2022 for her PTSD during stressful periods of time and told by Hewlette to "breathe" and to not let her PTSD "act up."

m.) Elise Cole repeatedly described PLAINTIFF as "a toxic bitch" and/or "a toxic, divisive bitch." DEFENDANT WRIGHT confirmed, "It's true. Everyone hates her."

### Plaintiff's Termination

31.     In February 2022, PLAINTIFF was informed that DATAROBOT was going to be laying off 7% of its workforce, and that she had been chosen for termination. The CMO

who replaced Nick King told PLAINTIFF, falsely, that the only reason for PLAINTIFF's termination was because of the downsizing and not for any other reason.

32.     Prior to the time PLAINTIFF was chosen for layoff, as part of the layoff selection process she was shown a spreadsheet of employees in the company. The spreadsheet showed employee, salary, rank, importance, performance rating, and result to DATAROBOT if termination were to occur. Under "ranking," PLAINTIFF's performance was described as "exceptional." Under importance to the company, PLAINTIFF was listed as being a "critical" employee.

33.     PLAINTIFF's termination was substantially motivated by animus towards PLAINTIFF's gender, ethnicity and as retaliation for reporting serious accounting deficiencies and resisting efforts to commit fraud in her own department.

34.     Although aggressive and unpleasant white males such as Damon Fletcher were not only retained but allowed to participate in a secret deal to sell millions of dollars in stocks, high-performing authoritative women such as but not limited to PLAINTIFF were viewed as "toxic" and terminated.

35.     DATAROBOT failed to take every reasonable step, once on notice, to prevent harassment and discrimination from occurring, in violation of California law. The fact that PLAINTIFF was laid off despite exceptional performance ratings, because she was allegedly "a toxic bitch," while Damon Fletcher with a history of violence remained the CFO until other events occurred that forced his resignation, exemplifies the double standard that exists for men and women at DATAROBOT.

36.     PLAINTIFF's employment was terminated on May 13, 2022 along with approximately 70 other employees.  Due to Plaintiff's strong performance and classification as a critical employee, the inclusion of her in the layoff was a mere pretext for discrimination based on her protected characteristics.

**CAUSES OF ACTION**

**First Cause of Action**
PROMISSORY FRAUD
Against ALL DEFENDANTS and DOES 1-20

37.     The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein, except those that are inconsistent with a cause of action for fraud in inducement.

38.     Promissory fraud is a subspecies of deceit:  "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable as fraud." *Lazar v. Sup. Ct. (Rykoff-Sexton, Inc.)* (1996) 12 Cal.4th  631, 638.

39.     The statements made to PLAINTIFF by those employees who interviewed her and were involved in hiring her are ascribed to DATAROBOT for purposes of liability because of their status as managing agents and/or agents with apparent authority, and additionally because the statements were made at the behest and direction of DEFENDANTS, including DAN WRIGHT and the Board of Directors. As employees with authority to exert broad discretionary powers, including making, changing, and implementing policies, authority over budgeting, and decision-making authority over hiring and firing, those who made the actionable statements to PLAINTIFF were all managing agents for DATAROBOT. See *White v. Ultramar* (1999) 88 Cal.Rptr.2d 19.

40.     Through their managing agents such as DAN WRIGHT and those to whom DEFENDANTS gave apparent authority to represent them, DEFENDANTS represented material past and existing facts as true. DEFENDANTS knew the representations were not true at the time they were made. DEFENDANTS had an obligation to disclose the true past and existing facts. It was these misrepresentations of past and existing facts, and not the failure to go IPO, that establishes DEFENDANTS's intent to defraud Plaintiff into resigning her position with Cisco and joining DATAROBOT.

41.     DEFENDANTS intended that PLAINTIFF, current employees, and other prospective employees similarly situated would rely on the misrepresentations of past and existing facts, either by repeating the information or by accepting employment with DATAROBOT.

42.     PLAINTIFF reasonably relied on DEFENDANTS' misrepresentations of past and existing facts. PLAINTIFF would not have accepted employment with DEFENDANTS if she had known the information provided by DEFENDANTS was false and/or materially misleading.

43.     Defendants made the misrepresentations of past and existing facts with the intent to defraud Plaintiff, and others, into believing an IPO was imminent.

44.     Plaintiff reasonably relied on the misrepresentations of past and existing facts and/or the concealment of material facts when she decided to accept employment with DATAROBOT.

45.     DEFENDANTS's fraudulent intent may be shown by the circumstantial evidence such as its failure to take any material steps towards going IPO before the false promise was made, its failure to attempt performance of the IPO on a fast track basis, and its continued assurances that the company would go IPO after it was clear it would not be able to perform as promised.  *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30.

46.     Plaintiff's reliance on the misrepresentations of past and existing facts as described herein was a substantial factor in causing legally cognizable harm to Plaintiff, including, but not limited to, giving up her steady employment with Cisco and accepting the job at DATAROBOT only to discover that DATAROBOT was nowhere near ready, as advertised, to go public and the ultimate termination of her employment.

47.     DEFENDANTS and/or Does 1-20's conduct alleged herein was intentional, outrageous, malicious, and committed for the purpose of causing PLAINTIFF to suffer humiliation, mental anguish, and severe physical and/or emotional distress, or with reckless disregard to the probability that humiliation, mental anguish, severe physical and/or

emotional distress would occur. PLAINTIFF was in fact harmed, and Defendants' conduct was a substantial factor in causing PLAINTIFF harm.

48.     As a direct and proximate result of DEFENDANTS' conduct as herein above alleged, PLAINTIFF was injured in her strength, health, and activity, sustaining shock and injury to her nervous system, all of which have caused and continue to cause PLAINTIFF substantial emotional distress, and to incur medical expenses, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement and work experience, and other damages to be proven at the time of trial.

49.     Defendants and/or Does 1-20 committed the acts herein alleged maliciously, fraudulently and oppressively in conscious disregard for PLAINTIFF's rights and such acts were committed by and/or ratified by, and/or were committed with the knowledge of employees' lack of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing agents of DEFENDANTS. PLAINTIFF is therefore entitled to recover punitive damages from DEFENDANTS and/or Does 1-20 in an amount according to proof at trial.

50.     WHEREFORE PLAINTIFF prays for judgment as set forth below.

**Second Cause of Action for**
INTENTIONAL MISREPRESENTATION Civil Code § 1710(1)
Against ALL DEFENDANTS and DOES 1-20

51.     The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein, except those that are inconsistent with a cause of action for intentional misrepresentation.

52.     The statements that were made to PLAINTIFF by those employees who interviewed her and were involved in hiring her are ascribed to DATAROBOT for purposes of liability because of their status as managing agents and/or agents with apparent authority. Those statements were made at the behest and direction of DEFENDANTS, including DAN WRIGHT and the Board of Directors. As employees with authority to exert broad

discretionary powers, including making, changing, and implementing policies, authority over budgeting, and decision-making authority over hiring and firing, those who made the actionable statements to PLAINTIFF were all managing agents for DATAROBOT. See *White v. Ultramar* (1999) 88 Cal.Rptr.2d 19.

53.     DEFENDANTS including DAN WRIGHT made false representations of material past and existing facts and/or intentionally concealed material facts from Plaintiff during the hiring process. DEFENDANTS either knew the representations were false when they were made or made the representations recklessly and without regard for the truth. DEFENDANTS also knew that if they did not conceal the actual facts to PLAINTIFF that she would not have quit her job with Cisco to join DATAROBOT pursuant to an employment agreement.

54.     DEFENDANTS intended that PLAINTIFF, current employees, and other prospective employees similarly situated would rely on the representations, by repeating the information and/or by accepting employment with DATAROBOT.

55.     The representations were oral, in writing, and by nonverbal conduct.

56.     PLAINTIFF reasonably relied on the representations by giving notice at Cisco on April 19, 2021, accepting a position at DATAROBOT, and commencing work at DATAROBOT on May 1, 2021.

57.     PLAINTIFF's reliance on DEFENDANTS' representations was a substantial factor in causing PLAINTIFF's harms.

58.     DEFENDANTS' and/or Does 1-20's conduct alleged herein was intentional, outrageous, malicious, and committed for the purpose of causing PLAINTIFF to suffer humiliation, mental anguish, and severe physical and/or emotional distress, or with reckless disregard to the probability that humiliation, mental anguish, severe physical and/or emotional distress would occur. PLAINTIFF was in fact harmed, and Defendants' conduct was a substantial factor in causing PLAINTIFF harm.

59.     As a direct and proximate result of DEFENDANTS' conduct as herein above alleged, PLAINTIFF was injured in her strength, health, and activity, sustaining shock and

injury to her nervous system, all of which have caused and continue to cause PLAINTIFF severe emotional distress, and to incur medical expenses, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement and work experience, and other damages to be proven at the time of trial.

60.     WHEREFORE PLAINTIFF prays for judgment as set forth below.

**Third Cause of Action**

MISREPRESENTATION BY CONCEALMENT (CC § 1710(1))
(Against All Defendants and DOES 1-20)

61.     The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein, except those that are inconsistent with a cause of action for intentional misrepresentation by concealment.

62.     DEFENDANTS either:

(a)  intentionally failed to disclose certain facts to PLAINTIFF;

(b)  disclosed some facts to PLAINTIFF but intentionally failed to disclose other facts, making the disclosure deceptive;

(c)  intentionally failed to disclose certain facts that were known only to DEFENDANTS and that PLAINTIFF could not have discovered; or

(d)  DEFENDANTS prevented PLAINTIFF from discovering certain facts.

63.     PLAINTIFF did not know of the concealed facts;

64.     DEFENDANTS intended to deceive PLAINTIFF by concealing the past or present facts;

65.     Had the omitted information been disclosed, PLAINTIFF reasonably would have behaved differently by not giving notice at Cisco and accepting employment with DATAROBOT;

66.     PLAINTIFF was thereby harmed; and

67.     DEFENDANTS' concealment was a substantial factor in causing PLAINTIFF's harm.

68.     Statements made to PLAINTIFF by those employees who interviewed her and were involved in hiring her are ascribed to DATAROBOT for purposes of liability because of their status as managing agents and/or agents with apparent authority.

69.     DEFENDANTS and/or Does 1-20's conduct alleged herein was intentional, outrageous, malicious, and committed for the purpose of causing PLAINTIFF to suffer humiliation, mental anguish, and severe physical and/or emotional distress, or with reckless disregard to the probability that humiliation, mental anguish, severe physical and/or emotional distress would occur. PLAINTIFF was in fact harmed, and Defendants' conduct was a substantial factor in causing PLAINTIFF harm.

70.     As a direct and proximate result of DEFENDANTS' conduct as herein above alleged, PLAINTIFF was injured in her strength, health, and activity, sustaining shock and injury to her nervous system, all of which have caused and continue to cause PLAINTIFF severe emotional distress, and to incur medical expenses, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement and work experience, and other damages to be proven at the time of trial.

71.     WHEREFORE PLAINTIFF prays for judgment as set forth below.

**Fourth Cause of Action for**
NEGLIGENT MISREPRESENTATION (Civil Code Section 1710(2)
Against ALL DEFENDANTS and DOES 1-20

72.     The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein, except those that are inconsistent with a cause of action for negligent misrepresentation.

73.     DEFENDANTS represented to PLAINTIFF that the foregoing facts were true.

74.     DEFENDANTS' representations were not true. DEFENDANTS had no reasonable grounds for believing the representations when the representations were made. DEFENDANTS intended that PLAINTIFF rely on their representations. PLAINTIFF reasonably relied on DEFENDANTS' representations when deciding to accept employment. PLAINTIFF was harmed thereby. PLAINTIFF'S reliance on DEFENDANTS' representations was a substantial factor in causing her harm.

75.     Statements made to PLAINTIFF by those employees who interviewed her and were involved in hiring her are ascribed to DATAROBOT for purposes of liability because of their status as managing agents and/or agents with apparent authority and additionally because the statements were made at the behest and direction of DEFENDANTS, including DAN WRIGHT and the Board of Directors. As employees with authority to exert broad discretionary powers, including making, changing, and implementing policies, authority over budgeting, and decision-making authority over hiring and firing, those who made the actionable statements to PLAINTIFF were all managing agents for DATAROBOT. See *White v. Ultramar* (1999) 88 Cal.Rptr.2d 19.

76.     DEFENDANTS' and/or Does 1-20's conduct alleged herein was negligent, committed with negligence and/or with negligent regard for the probability that humiliation, mental anguish, severe physical and/or emotional distress would occur. PLAINTIFF was in fact harmed, and Defendants' conduct was a substantial factor in causing PLAINTIFF harm.

77.     As a direct and proximate result of DEFENDANTS' conduct as herein above alleged, PLAINTIFF was injured in her strength, health, and activity, sustaining shock and injury to her nervous system, all of which have caused and continue to cause PLAINTIFF severe emotional distress, and to incur medical expenses, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement and work experience, and other damages to be proven at the time of trial.

78.     Defendants and/or Does 1-20 committed the acts herein alleged maliciously, fraudulently and oppressively in conscious disregard for PLAINTIFF's rights and such acts were committed by and/or ratified by, and/or were committed with the knowledge of

employees' lack of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing agents of DEFENDANTS. PLAINTIFF is therefore entitled to recover punitive damages from DEFENDANTS and/or Does 1-20 in an amount according to proof at trial.

79.     WHEREFORE PLAINTIFF prays for judgment as set forth below.

**Fifth Cause of Action**
**DISCRIMINATION (Gov. Code §§12940 *et seq.*)**
(Against All DATAROBOT and DOES 1-20)

80.     PLAINTIFF realleges and incorporates into this cause of action each and every allegation set forth in each and every paragraph of this Complaint except those which are inconsistent with a cause of action for Discrimination in Violation of Gov. Code §§12940 *et seq.*

81.     DEFENDANTS, and/or Does 1-20 and each of them, either individually and/or through their agents and/or supervisory employees, engaged in the foregoing conduct, which constitutes a pattern and practice of unlawful discrimination in violation of FEHA, Gov. Code §§ 12940, *et seq.* PLAINTIFF was subjected to unlawful discrimination because she is a member of a protected status, i.e., female, Latina, retired combat veteran with a disability. PLAINTIFF's protected status was a motivating and substantial reason for her unlawful discharge.

82.     PLAINTIFF suffered adverse employment action including hostility, ostracism, being chastised, removed from meetings, removed from decision-making, deprived of full knowledge of department activities, denied bonus, denied promotion, not being allowed to participate in a secret shares sale that was available only to a select few white male executives, and fired.

83.     DEFENDANTS' conduct was a substantial factor in causing PLAINTIFF's harm.

84.     As a direct and proximate result of the general discrimination and other unlawful conduct of DEFENDANT and/or Does 1-20 described above, which was

perpetrated and/or maintained by the defendants, their agents and supervisory employees, and each of them, PLAINTIFF has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress; medical expenses, including psychotherapy; and losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement, and work experience, all to her damage in excess of the minimum subject matter jurisdiction of this Court and according to proof.

85.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of DEFENDANTS. DEFENDANTS and/or Does 1-20 are therefore strictly liable for the conduct of said agents and employees.

86.     Defendants and/or Does 1-20 committed the acts herein alleged maliciously, fraudulently and oppressively in conscious disregard for PLAINTIFF's rights and such acts were committed by and/or ratified by, and/or were committed with the knowledge of employees' lack of fitness in the workplace but were allowed to proceed, by officers, directors, and/or managing agents of DEFENDANTS. PLAINTIFF is therefore entitled to recover punitive damages from DEFENDANTS and/or Does 1-20 in an amount according to proof at trial.

87.     As a result of the conduct of Defendants and/or Does 1-20 PLAINTIFF was forced to retain an attorney in order to protect her rights. Accordingly, PLAINTIFF seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial.

88.     WHEREFORE, PLAINTIFF prays for judgment as set forth below.

## Sixth Cause of Action
### FAILURE TO PREVENT DISCRIMINATION
### (Gov. Code §§12940(j)(1) &(k))
### (Against DATAROBOT and DOES 1-20)

89.     PLAINTIFF realleges and incorporates into this cause of action each and every allegation set forth in each and every paragraph of this Complaint except those which are

inconsistent with a cause of action for Failure to Prevent Discrimination (Gov. Code §§12940((j)(1) & (k)).

90.     Government Code §§ 12940(j)(1) and (k) require an employer to take all reasonable steps to prevent harassment and discrimination.

91.     DEFENDANTS and/or Does 1-20 failed to take all reasonable steps to prevent harassment, discrimination and retaliation based on PLAINTIFF's gender, ethnicity, age, retired veteran status, and disability. PLAINTIFF was subjected to unlawful discrimination in the course of her employment with defendants substantially because of her protected characteristics. PLAINTIFF was thereby harmed, and DEFENDANTS and/or Does 1-20's failure to take reasonable steps to prevent harassment, discrimination and retaliation was a substantial factor in causing PLAINTIFF's harm. DEFENDANTS and/or Does 1-20's failures include all allegations enumerated in the factual allegations above and additionally:

a. failing to provide training on preventing abusive conduct training to all supervisors, as required by amendment AB 2053. Amendment AB 2053 applies to all employers operating in California. Under the amendment, "abusive conduct" means "conduct of an employer or employee in the workplace, with malice, that a reasonable person would find hostile, offensive, and unrelated to an employer's legitimate business interests. Abusive conduct may include repeated infliction of verbal abuse, such as the use of derogatory remarks, insults, and epithets, verbal or physical conduct that a reasonable person would find threatening, intimidating, or humiliating, or the gratuitous sabotage or undermining of a person's work performance.   failing to take meaningful steps to end abusive conduct;

b.      creating and fostering an atmosphere that ratifies unlawful conduct that occurred when Elise Cole, the Chief People Person at DATAROBOT, described PLAINTIFF repeatedly as "a toxic bitch;"

c.      failing to consider Damon Fletcher's criminal background as a potential ongoing form of intimidation to women in the workplace who were aware of it and were uncomfortable working with him because of it;

d.      Terminating PLAINTIFF because she is a female Latina with an authoritative manner influenced by her military background.

92.      As a direct and proximate cause of the conduct alleged herein, PLAINTIFF has suffered and continues to suffer losses in earnings, bonuses, deferred compensation, employment benefits and earning capacity, and opportunities for employment advancement; embarrassment, humiliation, mental anguish and distress; all to her damage in excess of the minimum subject matter jurisdiction of this Court and according to proof.

93.      The unlawful conduct alleged above was engaged in by the officers, directors, supervisors, managing agents, and members of the Board of Directors of DATAROBOT. DEFENDANTS and/or Does 1-20 are therefore strictly liable for said conduct.

94.      The acts of every DEFENDANT and/or Does 1-20 alleged above were committed maliciously, oppressively, and/or fraudulently. DEFENDANTS and/or Does 1-20 either intentionally personally engaged in such outrageous misconduct, as alleged herein, or had advance knowledge of the unlawful conduct of the other agents and supervisory employees but nevertheless failed to take action to abate the unlawful conduct, with conscious disregard of the rights and safety of PLAINTIFF and other employees, and/or otherwise authorized or ratified the unlawful conduct of the offenders. As a result, PLAINTIFF is entitled to recover punitive damages.

95. WHEREFORE, PLAINTIFF prays for relief as set forth below.

//

//

//

//

### Seventh Cause of Action
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Gov. Code §§12940 *et seq;* Federal and State Constitutions)
### (Against DATAROBOT and DOES 1-20)

96.    The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein except those that are inconsistent with a cause of action for wrongful termination in violation of public policy.

97.    PLAINTIFF was wrongfully terminated because she is an authoritative Latina female with a military background who suffers from PTSD, all protected categories. PLAINTIFF's termination was in violation of public policies contained within the Federal and State Constitutions and statutory law, including but not limited to the Fair Employment and Housing Act.  Plaintiff was also terminated for resisting efforts to commit fraud in her department which she believed to be illegal in violation of California's proscription against retaliation as established in Section 1102.5 of the Labor Code.

98.    DEFENDANTS and/or Does 1-20's termination of PLAINTIFF was unlawful, in violation of these and other public policies, and caused PLAINTIFF harm.

99.    The acts and/or omissions and/or attempts of DEFENDANTS and/or Does 1-20, which had the effect of violating the FEHA and other public policies, constitute unlawful conduct on the part of the defendants and/or Does 1-20, and each of them, separately and apart from the harassing, retaliatory, and discriminating behavior itself.

100.    As a direct and proximate result of the conduct of all DEFENDANTS and/or Does 1-20, PLAINTIFF suffered and will continue to suffer embarrassment, humiliation, mental anguish, and severe emotional and physical distress, medical expenses, losses in earnings, including wages, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement, and work experience, all to her damage in an amount according to proof.

101.    As a further direct and proximate result of defendants and/or Does 1-20's conduct, PLAINTIFF was compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment and contractual relationships with

DEFENDANTS and/or Does 1-20, and PLAINTIFF has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to PLAINTIFF. PLAINTIFF is therefore entitled to reasonable attorneys' fees and costs of suit as provided by Gov. Code §12965(b).

102.    Defendants and/or Does 1-20's conduct was a substantial factor in causing PLAINTIFF's harm.

103.    The acts of DEFENDANTS were done maliciously, oppressively, and/or fraudulently. DEFENDANTS either intentionally personally engaged in such outrageous misconduct, as alleged herein, or had advance knowledge of the harassing, discriminatory conduct of the other agents and supervisory employees, but nevertheless failed to take action to abate the wrongful conduct, with conscious disregard of the rights and safety of the PLAINTIFF and other employees, and/or otherwise authorized or ratified the wrongful conduct of the offenders. As a result, PLAINTIFF is entitled to recover punitive damages against defendants.

104.    WHEREFORE, PLAINTIFF prays for relief as set forth below.

**Eighth Cause of Action**
**RETALIATION UNDER LABOR CODE SECTION 1102.5**
**(Against DATAROBOT and DOES 1-20)**

105.    The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein.

106.    DEFENDANTS and/or Does 1-20's ostracism and termination of PLAINTIFF violated Labor Code Section 1102.5. Under Labor Code Section 1102.5, employers are prohibited from retaliating against an employee for reporting information, conduct, behavior, or other activities that the employee reasonably believes may violate a local, state, or federal law, rule, or regulation. It is additionally illegal for employers to punish an employee for refusing to participate in an activity that would result in a violation of a local, state, or federal rule or law. PLAINTIFF engaged in a protected activity by regularly reporting irregularities in

operations that she reasonably believed could violate local, state, federal law, or regulation and by resisting a directive to commit fraud.

107.    Specifically, Plaintiff was asked to "cook the books" by changing entries that predated her employment on certain financial records.  Plaintiff reasonably believed this violated California law.  The next time she connected with Finance on a call, Plaintiff told Lucas that they were not going to go back and change records.  She said, "The spend is what it is; we weren't here.  We are not going to cook the books."

108.    Under Section 1102.5(c) of the California Labor Code, "an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation of or noncompliance with a local, state, or federal law or regulation.  The instruction to cook the books in the marketing department did just that and such conduct violated Civil Code sections 1709 and 1710 by encouraging her to engage in unlawful and/or fraudulent misrepresentation in the performance of her job duties.  She was encouraged to engage in intentional misrepresentation and actively resisted doing so and refusing to do so.

109.    As a result of Plaintiff's resistance to breaking the law and cooking the books, among other things, she was included in the mass layoff despite being viewed as a critical employee with exceptional performance.

110.    PLAINTIFF suffered adverse employment action which included hostility, ostracism, being chastised, removed from meetings, removed from decision-making, deprived of full knowledge of department activities, denied bonus, denied promotion, not being allowed to participate in a secret shares sale that was available only to a select few white male executives, and fired.

111.    A causal connection existed between PLAINTIFF's protected activity and the adverse employment action.  The errors and omissions called out by PLAINTIFF were embarrassing and irksome to key executive team members, who were motivated to get rid of her.

112.    The acts and/or omissions and/or attempts of DATAROBOT and/or Does 1-20, constitute unlawful conduct on the part of the defendants and/or Does 1-20, and each of them, separately and apart from the sexual harassing, retaliatory, and discriminatory conduct itself.

113.    As a direct and proximate result of the conduct of DATAROBOT and/or Does 1-20, PLAINTIFF suffered and will continue to suffer embarrassment, humiliation, mental anguish, and severe emotional and physical distress, medical expenses, losses in earnings, including wages, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement, and work experience, all to her damage in an amount according to proof.

114.    As a further direct and proximate result of DATAROBOT's and/or Does 1-20's conduct, PLAINTIFF was compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment and contractual relationships with DATAROBOT and/or Does 1-20, and PLAINTIFF has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to PLAINTIFF. PLAINTIFF is therefore entitled to reasonable attorneys' fees and costs of suit as provided by Gov. Code §12965(b).

115.    DATAROBOT and/or Does 1-20's conduct was a substantial factor in causing PLAINTIFF's harm.

116.    The acts of DATAROBOT and/or DOES 1-20 were done maliciously, oppressively, and/or fraudulently. DATAROBOT either intentionally personally engaged in such outrageous misconduct, as alleged herein, or had advance knowledge of the harassing, discriminatory conduct of the other agents and supervisory employees, but nevertheless failed to take action to abate the wrongful conduct, with conscious disregard of the rights and safety of the PLAINTIFF and other employees, and/or otherwise authorized or ratified the wrongful conduct of the offenders. As a result, PLAINTIFF is entitled to recover punitive damages against defendants.

117.    WHEREFORE, PLAINTIFF prays for relief as set forth below.

### Ninth Cause of Action
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants and DOES 1-20)

118.    The allegations set forth in paragraphs above are realleged and incorporated herein by reference as though fully set forth herein.

119.    DEFENDANTS' and/or Does 1-20's conduct alleged herein was intentional, outrageous, malicious, and committed for the purpose of causing PLAINTIFF to suffer humiliation, mental anguish, and severe physical and/or emotional distress, or with reckless disregard to the probability that humiliation, mental anguish, severe physical and/or emotional distress would occur. PLAINTIFF was in fact harmed, and Defendants' conduct was a substantial factor in causing PLAINTIFF harm.

120.    As a direct and proximate result of DEFENDANTS' conduct as herein above alleged, PLAINTIFF was injured in her strength, health, and activity, sustaining shock and injury to her nervous system, all of which have caused and continue to cause PLAINTIFF severe emotional distress, and to incur medical expenses, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for employment advancement and work experience, and other damages to be proven at the time of trial.

121.    The acts of DEFENDANTS were done maliciously, oppressively, and/or fraudulently. DEFENDANTS either intentionally personally engaged in such outrageous misconduct, as alleged herein, or had advance knowledge of the misconduct alleged herein of the other agents and supervisory employees, but nevertheless failed to take action to abate the wrongful conduct, with conscious disregard of the rights and safety of the PLAINTIFF and other employees, and/or otherwise authorized or ratified the wrongful conduct of the offenders. As a result, PLAINTIFF is entitled to recover punitive damages against defendants.

122.    WHEREFORE PLAINTIFF prays for judgment as set forth below.

//

//

## PRAYER FOR RELIEF

PLAINTIFF prays for judgment against defendants, and each of them, for:

1. Special damages according to proof at the time of trial, against each defendant;

2. General damages for physical and mental pain and suffering and emotional distress in a sum to be proved at the time of trial, against each defendant;

3. Punitive damages;

4. For past and future lost wages and bonuses, and other earnings, in a sum to be proved at the time of trial, against each defendant;

5. Reasonable Attorney's fees and costs;

6. Interest at the legal rate of interest on all sums;

7. Costs of suit;

8. Declaratory and/or injunctive relief; and

9. Such other relief as the Court finds proper.

**A trial by jury is hereby demanded.**

DATED: November 15, 2022

**WINER, BURRITT& SCOTT, LLP**

By: _____
         Matthew P. Vandall, Esq.
         Attorneys for Plaintiff
         RAQUEL VAZQUEZ

# EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                                    KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

July 12, 2022

Raquel Vazquez
1990 N. California Blvd., #20
Walnut Creek, CA 94596

RE:     **Notice of Case Closure and Right to Sue**
        DFEH Matter Number: 202207-17566712
        Right to Sue: Vazquez / DATAROBOT

Dear Raquel Vazquez:

This letter informs you that the above-referenced complaint filed with the Department of
Fair Employment and Housing (DFEH) has been closed effective July 12, 2022 because
an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for DFEH's Small Employer Family Leave Mediation
Pilot Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Government Code section 12945.2, has the right to
participate in DFEH's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in DFEH's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation. The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. Contact
DFEH's Small Employer Family Leave Mediation Pilot Program by emailing
DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number
indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**          KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Raquel Vazquez                                          DFEH No. 202207-17566712

                                    Complainant,

vs.

DATAROBOT
140 New Montgomery Street
San Francisco, CA 94105

                                    Respondents

_____

**1.** Respondent **DATAROBOT** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Raquel Vazquez**, resides in the City of **Walnut Creek,** State of **CA.**

**3**. Complainant alleges that on or about **May 13, 2022**, respondent took the following adverse actions:

**Complainant was discriminated against** because of complainant's national origin (includes language restrictions), religious creed - includes dress and grooming practices, sex/gender, disability (physical or mental), military and veteran status, age (40 and over), marital status and as a result of the discrimination was terminated, denied hire or promotion, reprimanded, denied equal pay, denied any employment benefit or privilege, denied work opportunities or assignments.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, requested or used a religious accommodation, participated as a witness in a discrimination or harassment complaint and as a result was terminated, denied hire or promotion, denied equal pay, denied any employment benefit or privilege.

-1-

Date Filed: July 12, 2022

Form DFEH-ENF 80 RS (Revised 02/22)

1

**Additional Complaint Details:**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-2-

*Complaint – DFEH No. 202207-17566712*

27

Date Filed: July 12, 2022

28

VERIFICATION

I, **Judith C. Wolff**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On July 12, 2022, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Walnut Creek, California**

-3-

*Complaint – DFEH No. 202207-17566712*

Date Filed: July 12, 2022

Form DFEH-ENF 80 RS (Revised 02/22)