1    ANDREW R. LIVINGSTON (SBN 148646)
     alivingston@orrick.com
2    RACHEL CAPLER (SBN 307582)
     rcapler@orrick.com
3    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
4    405 Howard Street
     San Francisco, CA  94105-2669
5    Telephone:    +1 415 773 5700
     Facsimile:    +1 415 773 5759
6

7    Attorneys for Defendant
     DATAROBOT, INC.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11   RAQUEL VAZQUEZ,                          Case No. 3:22-cv-07619-LB

12              Plaintiff,                     **DEFENDANT DATAROBOT, INC.'S
                                               OPPOSITION TO PLAINTIFF'S
13        v.                                   MOTION TO REMAND**

14   DATAROBOT, INC.; DAN WRIGHT; and          Judge:  Hon. Laurel Beeler
     DOES 1 through 20, inclusive,             Crtrm:  B
15                                             Date:   March 2, 2023
                Defendants.                    Time:   9:30 a.m.
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................II

II.     RELEVANT PROCEDURAL HISTORY..........................................................................1

III.    RELEVANT FACTUAL BACKGROUND........................................................................2

        A.      PLAINTIFF'S EMPLOYMENT AT DATAROBOT ...........................................2

        B.      DATAROBOT'S BOSTON HEADQUARTERS ..................................................3

        C.      DATAROBOT'S EXECUTIVE LEADERSHIP TEAM .....................................4

        D.      DATAROBOT'S BOARD OF DIRECTORS .......................................................5

        E.      DATAROBOT'S SAN FRANCISCO OFFICE ....................................................5

IV.     ARGUMENT ...................................................................................................................6

        A.      COMPLETE DIVERSITY EXISTS BETWEEN PLAINTIFF AND
                DATAROBOT ........................................................................................................6

                1.      DATAROBOT'S PRINCIPAL PLACE OF BUSINESS IS ITS
                        BOSTON HEADQUARTERS ..................................................................7

                2.      PLAINTIFF'S OUTDATED AND IRRELEVANT EVIDENCE
                        MUST BE DISREGARDED ......................................................................9

                3.      PLAINTIFF MISAPPLIES *HERTZ* AND THE NERVE CENTER
                        TEST .......................................................................................................10

                4.      PLAINTIFF IS NOT ENTITLED TO JURISDICTIONAL
                        DISCOVERY ..........................................................................................11

        B.      DATAROBOT'S REMOVAL BEFORE SERVICE WAS
                PROCEDURALLY PROPER ...............................................................................11

        C.      WRIGHT'S CITIZENSHIP IS IRRELEVANT BECAUSE HE WAS
                FRAUDULENTLY JOINED ...............................................................................13

                1.      WRIGHT WAS FRAUDULENTLY JOINED TO PLAINTIFF'S
                        FRAUD CLAIMS ...................................................................................13

                        A.      PLAINTIFF CANNOT POSSIBLY PLEAD
                                DETRIMENTAL RELIANCE....................................................14

                        B.      PLAINTIFF CANNOT POSSIBLY PLEAD THAT
                                WRIGHT OWED HER A DUTY OF DISCLOSURE................16

                        C.      PLAINTIFF CANNOT POSSIBLY PLEAD
                                ACTIONABLE MISREPRESENTATION .................................18

                2.      WRIGHT WAS FRAUDULENTLY JOINED TO PLAINTIFF'S
                        IIED CLAIM...........................................................................................19

                        A.      EXTREME AND OUTRAGEOUS CONDUCT.........................20

                        B.      WORKERS' COMPENSATION ACT PREEMPTION .............22

V.      CONCLUSION..............................................................................................................24

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*3123 SMB LLC v. Horn*,
880 F.3d 461 (9th Cir. 2018).................................................................. 7, 8, 11

5

*Alliance Mortgage Co. v. Rothwell*,
6   10 Cal.4th 1226 (1995) ..................................................................................... 14

7

*In re American Apparel, Inc. Shareholder Litigation*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012).......................................................... 19
8

9

*Bell v. Fed. Home Loan Mortg. Corp.*,
No. 11-CV-2514-MMA RBB, 2012 WL 1581075 (S.D. Cal. May 4, 2012) ........................ 17

10

*Bigler-Engler v. Breg Inc.*,
11   7 Cal. App. 5th 276 (2017)................................................................................ 17

12

*Borschetto v. Hansing*,
539 F.3d 1011 (9th Cir. 2008)........................................................................... 11
13

14

*Cansino v. Bank of Am.*,
224 Cal. App. 4th 1462 (2014)......................................................................... 18

15

*Carrico v. CAN Ins.*,
16   No. LA CV18-01445 ........................................................................................ 21

17

*Christensen v. Sup. Ct.*,
54 Cal.3d 868 (1991) ........................................................................................ 20
18

19

*Clarence E. Morris, Inc. v. Vitek*,
412 F.2d 1174 (9th Cir. 1969)........................................................................... 12

20

*Collins v. Virtela Tech. Svcs., Inc.*,
21   No. C 12-613 CW, 2012 WL 4466551 (N.D. Cal. Sept. 26, 2012) ......................... 8

22

*Colmenares v. Paedae, Inc.*,
No. CV 21-5221-DMG, 2021 WL 4934976 (C.D. Cal. Oct. 22, 2021) ..................... 8
23

24

*Dias v. Burberry Ltd.*,
No. 21-cv-192-MMA (JLB), 2021 WL 2349730 (S.D. Cal. June 9, 2021)........................ 21

25

*Duran v. DHL Express (USA), Inc.*,
26   No. CV 15-09965-BRO (Ex), 2016 WL 742864 (C.D. Cal. Feb. 24, 2016) ..................... 23

27

*Elias v. Spotify USA Inc.*,
No. 2:20-cv-08530-JFW, 2020 WL 11884715 (C.D. Cal. Nov. 24, 2020) ..................... 22

28

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

*Ferrer v. Host Internat'l, Inc.*,
No. CV16-06798 JAK, 2017 WL 902848 (C.D. Cal. Mar. 7, 2017) ..................................... 23

*Global Industrial Investment Ltd. v. Chung*,
No. 19-CV-07670-LHK, 2020 WL 2027374 (N.D. Cal. April 28, 2020) ............................ 12

*Graham v. Bank of Am., N.A.*,
226 Cal. App. 4th 594 (2014) ...................................................................................... 16, 19

*Grancare, LLC v. Thrower by & through Mills*,
889 F.3d 543 (9th Cir. 2018) ................................................................................. 13, 14, 15

*Hall v. FedEx Freight, Inc.*,
No. 1:13-cv-01711-SKO, 2015 WL 574177 (E.D. Cal. Feb. 11, 2015) ............................... 15

*Hearn Pacific Corp. v. Second Generation Roofing, Inc.*,
247 Cal. App. 4th 117 (2016) ...................................................................................... 16, 20

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) .................................................................................................... *passim*

*Immobiliare, LLC v. Westcor Land Title Ins. Co.*,
424 F. Supp. 3d 882 (E.D. Cal. 2019) .............................................................................. 16

*Ivanoff v. Bank of America, N.A.*,
9 Cal. App. 5th 719 (2017) ............................................................................................. 16

*J. Doe v. Mitchell*,
No. 18-cv-06261-HSG, 2019 WL 1749521 (N.D. Cal. April 19, 2019) .............................. 12

*Janken v. GM Hughes Electronics*,
46 Cal. App. 4th 55 (1996) ............................................................................................. 19

*Kaldis v. Wells Fargo Bank, N.A.*,
No. 2:16-cv-06407-ODW-GJS, 2016 WL 6407377 (C.D. Cal. Oct. 28, 2016) ..................... 23

*Kroeger v. L3 Tech., Inc.*,
No. 2:17-cv-08489-JFW-AGR, 2018 WL 1357363 (C.D. Cal. Mar. 15, 2018) .................... 20

*Kuchta v. Nat'l Railroad Passenger Corp.*,
No. 22-cv-02198-JCS, 2022 WL 3650734 (N.D. Cal. Aug. 24, 2022) ................................ 12

*Langston v. T-Mobile US, Inc.*,
No. LA CV18-01972 JAK, 2018 WL 2382464 (C.D. Cal. May 24, 2018) ............................. 9

*Larson v. UHS of Rancho Springs, Inc.*,
230 Cal. App. 4th 336 (2014) ......................................................................................... 16

*Lawler v. Montblanc N. Am., LLC*,
704 F.3d 1235 (9th Cir. 2013) ........................................................................................ 19

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

*LiMandri v. Judkins*,
    52 Cal. App. 4th 326 (1997)...................................................................................... 17

*Livitsanos v. Sup. Ct.*,
    2 Cal.4th 744 (1994) ............................................................................................... 22

*Mireles v. Wells Fargo Bank, N.A.*,
    845 F. Supp. 2d 1034 (C.D. Cal. 2012)................................................................... 13

*Mohammed v. American Airlines, Inc.*,
    No. C 19-01946 WHA, 2019 WL 3577160 (N.D. Cal. Aug. 6, 2019) ................... 21

*Moncada v. West. Coast Quartz Corp.*,
    221 Cal. App. 4th 768 (2013)................................................................................... 20

*Morris v. Princess Cruises, Inc.*,
    236 F.3d 1061 (9th Cir. 2001).................................................................................. 18

*OCM Principal Opportunities Fund v. CIBC World Markets Corp.*,
    157 Cal. App. 4th 835 (2007)................................................................................... 14

*Plummer v. Tesoro Refining and Marketing Co.*,
    No. CV 16-02044 SJO, 2016 WL 3180327 (C.D. Cal. June 3, 2016)..................... 23

*Renteria v. County of Orange*,
    82 Cal. App. 3d 833 (1978)...................................................................................... 22

*Ritchey v. Upjohn Drug Co.*,
    139 F.3d 1313 (9th Cir. 1998).................................................................................. 13

*Rochlis v. Walt Disney Co.*,
    19 Cal. App. 4th 201 (1993)............................................................................... 15, 16

*Rubinstein v. SAP AG*,
    No. C 11-06134 JW, 2012 WL 726269 (N.D. Cal. Mar. 1, 2012).......................... 15

*Sherman v. Haynes & Boone*,
    No. 5:14-CV-01064-PSG, 2014 WL 4211118 (N.D. Cal. Aug. 22, 2014)............. 12

*Stuto v. GE Healthcare, Inc.*,
    No. 19-cv-02093-PJH, 2019 WL 2423512 (N.D. Cal. June 10, 2019)..................... 6

*Tang v. Rosenwald*,
    2016 WL 1715183 (C.D. Cal. April 27, 2016) ....................................................... 15

*Terral v. Burke Construction Co.*,
    257 U.S. 529 (1922)................................................................................................. 12

*Tervon, LLC v. Jani-King of California, Inc.*,
    No. 14-cv-2648 BAS (JMA), 2015 WL 4135162 (S.D. Cal. July 8, 2015)............ 21

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

*Tijerna v. Alaska Airlines,*
  22-CV-203 JLS, 2022 WL 3135913 (S.D. Cal. Aug. 5, 2022) ................................... 9

*Trerice v. Blue Cross of California,*
  209 Cal. App. 3d 878 (1989) ................................................................................. 20

*Turner v. Anheuser-Busch, Inc.,*
  7 Cal.4th 1238 (1994) ........................................................................................... 15

*Yau v. Santa Margarita Ford, Inc.,*
  229 Cal. App. 4th 144 (2014) ............................................................................... 22

*Zucco Partners, LLC v. Digimarc Corp.,*
  552 F.3d 981 (9th Cir. 2009) ................................................................................ 14

**Statutes**

28 U.S.C. § 1332 ........................................................................................... 2, 6, 12

28 U.S.C. § 1441(b)(2) .......................................................................................... 11

Cal. Civ. Code § 1572 ........................................................................................... 17

Cal. Civ. Code § 1710 ........................................................................................... 17

Cal. Lab. Code § 3600 ........................................................................................... 22

Cal. Lab. Code § 1102.5 ........................................................................................ 15

**Other Authorities**

Federal Rule of Civil Procedure 9(b) ..................................................................... 13

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 13, 14

## I.     **INTRODUCTION**

Try as she may, Plaintiff proffers no valid basis to remand this case back to state court. She first attempts to challenge Defendant DataRobot, Inc.'s ("DataRobot") citizenship by claiming its principal place of business is somewhere in California, but her motion is based on a misunderstanding of the "nerve center" test and an outdated and misinformed understanding of how the company presently functions.  The only competent evidence shows that DataRobot's principal place of business is its Boston headquarters.  Plaintiff next tries to challenge DataRobot's pre-service (or "snap") removal by characterizing it as an improper attempt to circumvent the Court's jurisdictional requirements.  But her argument is based on a misreading of DataRobot's grounds for removal, and is otherwise riddled with unfounded and unjustified inflammatory language and disparaging remarks about DataRobot's motivations for pre-service removal.  DataRobot's removal was procedurally proper and there are no grounds for remand on that basis.  Finally, Plaintiff contends she can amend her fraud and intentional infliction of emotional distress ("IIED") claims against Defendant Dan Wright ("Wright") and add additional detail to them, heading off the argument that he was fraudulently joined.[1]  But critically, Plaintiff does not offer *any* additional facts to save her defective claims against Wright, and the record shows that it would be impossible for her to do so.  Wright is a quintessential sham defendant and removal was proper.

## II.     **RELEVANT PROCEDURAL HISTORY**

On November 15, 2022, Plaintiff filed a Complaint in the Superior Court of California for the County of San Francisco.  (ECF No 1 at ¶ 1.)[2]  The Complaint asserts various claims against DataRobot related to Plaintiff's employment and selection for layoff as part of a 70-person reduction in force, including discrimination, retaliation, and wrongful termination.  (Compl. ¶¶ 36-122.)  Plaintiff curiously named DataRobot's former CEO Wright as a defendant, asserting

---

[1] Plaintiff does not even challenge DataRobot's assertion that Wright was fraudulently joined to her promissory fraud claim, accordingly conceding that he was.

[2] Hereinafter, references to Plaintiff's Complaint, which is attached the DataRobot's Notice of Removal as Exhibit A, will be to "Compl."

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1    four threadbare fraud claims and a similarly thin IIED claim against him (and DataRobot).[3]   (*Id.*)

2    The Complaint alleges that Plaintiff is a resident of California, that Wright is domiciled in

3    California, and that DataRobot is incorporated in Delaware and conducts some business in

4    California.  (*Id.* at ¶¶ 1, 3-5.)

5           On December 2, 2022, DataRobot removed the case to this Court on the ground that

6    diversity jurisdiction exists under 28 U.S.C. § 1332(a).  (ECF No. 1 at ¶¶ 6-11.)  Specifically,

7    DataRobot asserted that Plaintiff is a resident of California, that DataRobot is a citizen of

8    Delaware and Massachusetts, and that Wright's citizenship is irrelevant because he is a sham

9    defendant.  (*Id.* at ¶¶ 6-10.)  Thereafter, DataRobot timely filed its responsive pleading, moving to

10   dismiss Plaintiff's four overlapping fraud claims (Counts One-Four), IIED claim (Count Nine),

11   and claim for punitive damages against it.  (ECF No. 13.)  Plaintiff filed her Opposition,

12   conceding her claim for promissory fraud should be dismissed without leave to amend,

13   acknowledging her other fraud claims and IIED claim are likely to fail as pled, and praying for

14   leave to amend.  (ECF No. 29.)  Defendant Wright also filed a Motion to Dismiss the claims

15   asserted against him.  (ECF No. 33.)  On January 6, 2023, Plaintiff filed the instant Motion to

16   Remand.  (ECF No. 30.)  By stipulation of the parties, all three motions are set for hearing on

17   March 2, 2023.

18   **III.    RELEVANT FACTUAL BACKGROUND**

19          **A.    Plaintiff's Employment at DataRobot**

20          Plaintiff began working at DataRobot on May 3, 2021.  (Suchanek-Vacca Decl. ¶ 15.)

21   Plaintiff was a Senior Director, and her functional title was Chief of Staff to the Chief Marketing

22   Officer.[4]   (*Id.*)  Plaintiff initially reported to DataRobot's Chief Marketing Officer, Nick King,

23   who had joined the company in April 2021.  (*Id.* at ¶ 17.)  After King left DataRobot on January

24   7, 2022, Plaintiff began reporting to DataRobot's newly-promoted interim CMO and Senior Vice

25   _____

26   [3] Specifically, Plaintiff alleges claims for promissory fraud (Count 1), intentional
     misrepresentation (Count Two), fraudulent concealment (Count Three), and negligent
     misrepresentation (Count Four).  (ECF No. 1 at ¶¶ 1-3.)

27   [4] DataRobot's hierarchy of corporate titles, starting at the most junior position, is Manager, Senior
28   Manager, Director, Senior Director, Vice President, Senior Vice President, and Executive Vice
     President.  (*Id.* at ¶ 5.)

President ("SVP") of Marketing, Jennifer Hewlette, who had joined the company in June 2021. (*Id.*)  In May 2022, Plaintiff's position was terminated as part of a 70-person reduction in force. (Compl. ¶ 36.)

### B.    DataRobot's Boston Headquarters

When DataRobot was founded in 2012, it established its headquarters and principal place of business in Boston, Massachusetts.  (Suchanek-Vacca Decl. ¶ 3.)  DataRobot currently leases nearly 60,000 square feet of office space at 225 Franklin Street, 13th Floor, Boston, MA 02110 to house its headquarters.  (*Id.*)  DataRobot began leasing this office space in or around February 2019 after it outgrew its former headquarters at One International Place, 5th Floor, Boston, MA 02110.  (*Id.*)  Prior to the onset of the COVID-19 pandemic, employees were generally expected to report to the Boston office for work.  (*Id.* at ¶ 10.)  During 2020 and 2021, however, employees primarily worked remotely due to the pandemic.  (*Id.*)  At this same time, DataRobot greatly increased its hiring for fully remote roles to accommodate its rapid growth.  (*Id.*)  DataRobot now has a hybrid work policy, whereby employees who live near a DataRobot office are free to choose whether and to what extent they work from the office.  (*Id.*)  As of November 15, 2022 and December 2, 2022, more than 100 of DataRobot's employees reside in the Boston area.  (*Id.* at ¶ 11.)

DataRobot has always publicly reported its Boston office as its headquarters and principal executive office.  For example, DataRobot's filings with the California Secretary of State reflect that its principal office is its Boston headquarters.  (*Id.* at ¶ 21.)  DataRobot's filings with the U.S. Securities and Exchange Commission similarly state that its principal place of business is its Boston office.  (*Id.* at ¶ 22.)  Employee offer letters, confidentiality agreements, and wage statements (including Plaintiff's) list DataRobot's headquarters in Boston as the company's address, regardless of the employee's location.  (*Id.* at ¶¶ 15-16.)  DataRobot's LinkedIn page, which the company maintains, lists its headquarters as Boston in the "About" section.  (*Id.* at ¶ 25.)  DataRobot's Master Subscription Agreement, Partner Agreement, and Tool and Utility Agreement, all of which are publicly available on its website, provide that its principal place of business is its Boston office.  (*Id.* at ¶ 23.)  DataRobot's press releases cite Boston as the location

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1   (except for a single press release from August 2021 that lists both Boston and San Francisco as

2   the location).  (*Id.* at ¶ 24.)  DataRobot's corporate counsel and independent auditors are also

3   located in Boston.  (*Id.* at ¶ 26.)

4        **C.**      **DataRobot's Executive Leadership Team**

5        Like many companies, DataRobot's operations are divided into different business units

6   (e.g., marketing, legal, engineering).  (*Id.* at ¶ 6.)  Each business unit (or function) has a

7   functional leader, who, along with DataRobot's officers, comprise DataRobot's Executive

8   Leadership Team ("ELT").  (*Id.* at ¶ 6.)  The ELT makes strategic decisions affecting the business

9   and otherwise directs, controls, and coordinates its activities, including setting corporate policy

10   and engaging in strategic decision-making regarding DataRobot's business activities, such as

11   decisions regarding its financial model, budgeting, operations, sales and marketing strategies, and

12   staffing plan.  (*Id.* at ¶ 6.)

13        DataRobot's senior leadership largely turned over by Fall 2022, with the majority of its

14   corporate officers and executives leaving the company.  (*Id.* at ¶ 7.)  As of November 15, 2022

15   (the Complaint filing date) and December 2, 2022 (the removal date), the ELT was comprised of

16   13 individuals.  (*Id.* at ¶ 8.)  DataRobot's CEO Debanjan Saha, SVP Marketing Jennifer Hewlette,

17   General Counsel Brian Brown, and SVP Alliance and Partnerships Sirisha Kadamalakalva all

18   reside in the San Francisco Bay Area and primarily telework.[5]  (*Id.* at ¶¶ 8, 14.)  DataRobot's

19   Chief Customer Officer Jay Schuren, Executive Vice President of Engineering Rob Hickey, SVP

20   People Amy Suchanek-Vacca, and President of Worldwide Field Operations Chris Riley all

21   reside in the Boston area and divide their time between teleworking and working on-site at the

22   Boston office.[6]  (*Id.* at ¶¶ 8, 14.)  DataRobot's Chief Technology Officer Michael Schmidt resides

23   and works in Washington, DC, but works from the Boston office on occasion.  (*Id.* at ¶¶ 8, 14.)

24   DataRobot's SVP Strategic Finance Chris Merwin, SVP Finance & Operations Matt Nelson, SVP

25   Product Venky Veerarghavan, and SVP Global Sales Rich Hoyland are fully remote employees

26

27   _____

[5] Ms. Kadamalakalva left DataRobot on January 5, 2023.  (Suchanek-Vacca Decl. ¶ 8.)

28   [6] Mr. Riley splits his time between residences in both Florida and Boston and, when in Boston, he appears in-person at DataRobot's Boston office approximately 2-3 times per week.  (*Id.* at ¶ 11.)

who telework from their respective residences in Connecticut, Washington, and Pennsylvania, but work in the Boston office from time to time.  (*Id.* at ¶¶ 8, 14.)

DataRobot holds weekly ELT meetings where the leadership makes strategic decisions affecting the business and otherwise directs, controls, and coordinates its activities.  (*Id.* at ¶ 12.) The ELT meetings are held virtually; however, at all relevant times, its leaders in Boston (Schuren, Suchanek-Vacca, Hickey, and Riley) typically use this day as their in-office "collaborative day," so they will join the meetings together from a conference room at the Boston office.  (*Id.* at ¶¶ 12-13.)  From October 1, 2022 to January 30, 2023, DataRobot's records reflect that its ELT members worked from the Boston office on a total of 109 occasions.  (*Id.* at ¶ 14.)

### D.    DataRobot's Board of Directors

As of November 15, 2022 and December 2, 2022, DataRobot's Board of Directors was comprised of the following individuals: Board Chairman Mark Hawkins, CEO Debanjan Saha, Jai Das, Tony Florence, Amit Sinha, Dev Ittycheria, and Tracey Newell.  (*Id.* at ¶ 9.)  Hawkins resides in Texas.  (*Id.*)  Newell, Sinha, and Das reside in California.  (*Id.*)  Florence and Ittycheria reside in New York.  (*Id.*)  DataRobot's board meetings have been held virtually since the onset of the COVID-19 pandemic, although some board members/attendees have elected to join the virtual meeting together from the same location from time to time.  (*Id.*)

### E.    DataRobot's San Francisco Office

DataRobot opened its San Francisco office in November 2021.  (*Id.* at ¶ 18.)  As of November 15, 2022 and December 2, 2022, fewer than 50 employees reside in the Bay Area.  (*Id.* at ¶ 11.)  Employees primarily telework (including Saha, Brown, Hewlette, and Kadamalakalva) but some may work or attend a meeting in-person at the San Francisco office on occasion.[7]  (*Id.* at ¶¶ 11, 14.)  From October 1, 2022 through January 27, 2022, DataRobot's records reflect that ELT members only worked from the San Francisco office on a total of occasions.  (*Id.* at ¶ 14.)

---

[7] Although Plaintiff resided in the San Francisco Bay Area, she was required to work 100% remotely and to attend all meetings and events virtually.  (*Id.* at ¶ 19.)

1    **IV.    ARGUMENT**

2           **A.    Complete Diversity Exists Between Plaintiff and DataRobot**

3           Federal courts have original jurisdiction over cases where the matter in controversy

4    exceeds $75,000 and is between citizens of different States.  28 U.S.C. § 1332(a).  In the Ninth

5    Circuit, when a defendant removes a case on the basis of diversity jurisdiction, "complete

6    diversity is determined (and must exist) as of the time the complaint is filed <u>and</u> removal is

7    effected."  *Stuto v. GE Healthcare, Inc.*, No. 19-cv-02093-PJH, 2019 WL 2423512, at *1 (N.D.

8    Cal. June 10, 2019) (original emphasis) (citing *Strotek Corp. v. Air Transp. Ass'n. of Am.*, 300

9    F.3d 1129, 1131-32 (9th Cir. 2002)).

10          For diversity purposes, a corporation is deemed to be a citizen of its state of incorporation

11   and the state in which it maintains its principal place of business.  28 U.S.C. § 1332(c)(1).  In

12   *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), the United States Supreme Court adopted a uniform

13   test for determining a corporation's "principal place of business."  The Court held that a

14   corporation's principal place of business (or "nerve center"), is "the place where a corporation's

15   officers direct, control, and coordinate the corporation's activities."  *Id.* at 92-93.  "In practice

16   [the nerve center] should normally be the place where the corporation maintains its

17   headquarters—provided that the headquarters is the actual center of direction, control, and

18   coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its

19   board meetings (for example, attended by directors and officers who have traveled there for the

20   occasion)."  *Id.* at 93.

21          The test is intended to be simple.  The Court recognized that "complex jurisdictional tests

22   complicate a case, eating up time and money as the parties litigate, not the merits of their claims,

23   but which court is the right court to decide those claims" and "produce appeals and reversals,

24   encourage gamesmanship, and . . . diminish the likelihood that results and settlements will reflect

25   a claim's legal and factual merits."  *Id.* at 94.  The Court expressly rejected the complex "general

26   business activities test" which "led some courts . . . to look, not at a particular place within a

27   State, but incorrectly at the State itself, measuring the total amount of business activities that the

28   corporation conducts there and determining whether they are 'significantly larger' than in the

DATAROBOT'S OPPOSITION TO PLTF'S
                         MOTION TO REMAND [3:22-cv-07619-LB]

1    next-ranking State." *Id.* at 93.  And while the Court recognized that "in this era of

2    telecommuting, some corporations may divide their command and coordinating functions among

3    officers who work at several different locations, perhaps communicating over the Internet[,]" the

4    nerve center approach "nonetheless points courts *in a single direction*, toward the center of

5    overall direction, control, and coordination.  Courts do not have to try to weigh corporate

6    functions, assets, or revenues different in kind, one from the other." *Id.* at 95-96 (emphasis

7    added).

8         The time-of-filing rule requires the Court to look at the facts that existed at the time the

9    Complaint and Notice of Removal were filed, not at any of DataRobot's alleged past (or future)

10   conduct.  *See 3123 SMB LLC v. Horn*, 880 F.3d 461, 467 (9th Cir. 2018) (recognizing "diversity

11   jurisdiction depends upon the state of things at the time of the action brought" when determining

12   a corporation's principal place of business) (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541

13   U.S. 567, 570 (2004)).  At the time Plaintiff's Complaint was filed (November 15, 2022) and

14   DataRobot's Notice of Removal was filed (December 2, 2022), Plaintiff was domiciled in

15   California and DataRobot was a citizen of Delaware and Massachusetts.  DataRobot and Plaintiff

16   are thus completely diverse.

17            **1.      DataRobot's Principal Place of Business is its Boston Headquarters**

18        DataRobot's "nerve center" is its Boston office.  In support, DataRobot submits the

19   declaration of Amy Suchanek-Vacca.  Although Plaintiff inappropriately derides Ms. Suchanek-

20   Vacca as a "lower level employee," she is a Senior Vice President, a member of the ELT, and

21   DataRobot's highest-ranking human resources employee.  (Suchanek-Vacca Decl. ¶ 2.)  As set

22   forth above, there is substantial and competent evidence to satisfy DataRobot's burden of

23   showing that its senior leadership directs, controls, and coordinates the company's activities from

24   its headquarters.

25        That some of DataRobot's executives and board members lived in California during the

26   relevant time period is of no moment.  The Ninth Circuit, considering *Hertz* (in the context of a

27   holding company), stated that assuming the "principal place of business is in the state where its

28   officers reside is problematic for several reasons" including because it "looks to the state as a

DATAROBOT'S OPPOSITION TO PLTF'S
                          MOTION TO REMAND [3:22-cv-07619-LB]

whole rather than the specific place within the state from which the officer presumably directs the company's activity" and "[c]orporations aren't usually directed from their managers' homes." *3123 SMB LLC*, 880 F.3d at 469.  Moreover, "[a] corporation's 'nerve center' . . . is a *single* place" and "companies often have more than one decision-maker living in more than one state" and any rule to try and select among them would be "unworkable." *Id.* (citing *Hertz*, 559 U.S. at 93) (original emphasis).  And "[e]qually problematic is the assumption that a corporation's principal place of business can shift over time without any change to the corporation's structure or operation" which would "invite[] greater litigation and can lead to strange results" because "the district court's subject matter jurisdiction would turn on happenstance." *Id.* (citing *Hertz*, 559 U.S. at 94).  District courts in California have also found the residence of a handful of executives or board members not to control after *Hertz*.  *E.g.*, *Colmenares v. Paedae, Inc.*, No. CV 21-5221-DMG (KSx), 2021 WL 4934976, at *4 (C.D. Cal. Oct. 22, 2021) (finding principal place of business is corporation's Ohio office even though chairman, CEO, and CFO all lived outside of Ohio because it "is home to a plurality of its officers with strategic, decision-making, and financial authority, and is the only single place home to more than one of them"); *Collins v. Virtela Tech. Svcs., Inc.*, No. C 12-613 CW, 2012 WL 4466551, at *7 (N.D. Cal. Sept. 26, 2012) (finding corporation's nerve center was its Colorado office, despite its CEO and five board members residing in California, because Colorado was where "almost all of the high level officers, including the Chief Technology Officer, the Senior Vice President of Engineering and Operations, and the Human Resources Director, directed, controlled and coordinated the corporate activities.").

Moreover, as set forth above, DataRobot has always publicly reported (and held itself out to be) a Boston-based company.  This includes its filings with federal and state agencies, press releases, master contracts, LinkedIn profile, employee offer letters, employee confidentiality agreements, and employee wage statements.  (Suchanek-Vacca Decl. ¶¶ 21-26.)  And while public filings may not be sufficient on their own to establish a corporation's principal place of business, they can be considered to reinforce other evidence of direction and control.  *Hertz*, 559 U.S. at 96 ("the mere filing of a form . . . *without more* [is not] sufficient proof to establish a

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1    corporation's 'nerve center.'") (emphasis added); *see also Langston v. T-Mobile US, Inc.*, No. LA

2    CV18–01972 JAK (ASx), 2018 WL 2382464, at *3 n.2 (C.D. Cal. May 24, 2018) (considering

3    the defendant's SEC filing as additional evidence, as "*Hertz* did not determine that public filings

4    should not receive any weight, particularly if there were other supporting evidence of the location

5    of a nerve center").

6                    **2.      Plaintiff's Outdated and Irrelevant Evidence Must Be Disregarded**

7            Plaintiff's Motion challenges DataRobot's allegations of jurisdictional facts by claiming

8    its principal place of business is actually somewhere in California, but she relies on outdated and

9    irrelevant information, and misapplies the "nerve center" test.  DataRobot has satisfied its burden

10   to support its allegations with competent proof, and Plaintiff has not provided any evidence to

11   controvert this proof.

12           To start, Plaintiff's counsel submitted a declaration that attaches the LinkedIn profiles of

13   26 supposed current and former DataRobot executives, board members, and "higher-level"

14   employees.  (ECF No. 30-1 at ¶ 5.)  These unverified LinkedIn profiles are not evidence of

15   anything, let alone where DataRobot's "nerve center" is.  *See Tijerna v. Alaska Airlines*, 22-CV-

16   203 JLS (BGS), 2022 WL 3135913, at *3 (S.D. Cal. Aug. 5, 2022) (recognizing "LinkedIn is not

17   a source whose accuracy cannot be reasonably questioned") (citations omitted).  Moreover,

18   Suchanek-Vacca's declaration is clear that of these 26 individuals, only Saha, Brown,

19   Kadamalakalva, and Hewlette were on the ELT during the relevant time period, and they all

20   primarily telework.  (Suchanek-Vacca Decl. ¶¶ 8, 14.)  Of those remaining, over half left

21   DataRobot long before the Complaint was even filed, including Wright and DataRobot's former

22   Chief People and Administrative Officer, Chief Product Officer, Chief Legal Officer, Chief

23   Accounting Officer, Chief GTM Officer, Chief Customer Officer, and Chief Revenue Officer.[8]

24   (*Id.* at ¶ 7.)  These haphazard (and largely illegible) snips of LinkedIn profiles should not be

25   afforded more weight than Suchanek-Vacca's declaration signed under the penalty of perjury.

26           Moreover, Plaintiff's and Ballard's declarations are wholly irrelevant because they only

27   attest to the supposed state of affairs during *their* employment, not at the time relevant for

28   ─────────────────
     [8] Aside from CEO, these "Chief Officer" roles were eliminated.  (*Id.* at ¶ 8.)

1    determining whether diversity exists.  Both Plaintiff and Ballard left DataRobot by May 2022.

2    (ECF No. 30-7 ¶ 2; ECF No. 30-8 ¶ 2.)  As their limited declarations make clear, neither have

3    personal knowledge as to DataRobot's operations in the November-December 2022 time period.

4    Instead, the only relevant and competent evidence is Suchanek-Vacca's declaration, which is

5    clear that the makeup of nearly the entire ELT had changed by November 1, 2022, and that

6    members of the new ELT frequently meet in-person at the Boston office for their weekly ELT

7    meetings and to collaborate.

8    ### 3.   Plaintiff Misapplies *Hertz* and the Nerve Center Test

9    Even if Plaintiff's and Ballard's declarations contained evidence that was relevant—they

10   do not—the declarations do not negate DataRobot's competent proof that its "nerve center" is its

11   Boston headquarters.  Instead, Plaintiff's evidence is more akin to the evidence submitted in

12   support of the "business activities test" that the Supreme Court in *Hertz* roundly rejected.  *See*

13   *Hertz*, 559 U.S. at 93.

14   Accepting Plaintiff's declaration as true, she and her supervisor teleworked, but were

15   assigned to DataRobot's San Francisco office, and King and Hewlette occasionally reported to

16   the office for meetings.  (ECF No. 30-7 at ¶ 2.)  According to Plaintiff, this means "all major

17   marketing decisions" were "made directly out of or approved by employees working for the San

18   Francisco office location."  (*Id.*)  But this is precisely the type of "weighing corporate functions"

19   that *Hertz* rejected.  *See Hertz*, 559 U.S. at 95-96.

20   Plaintiff's evidence regarding the residence of executives and board members and the

21   location of board meetings is equally impertinent to the matter at hand.  As set forth above, the

22   residence of an executive or board member is not determinative of DataRobot's principal place of

23   business.  And while Plaintiff apparently believes that some board meetings in 2021 were held at

24   various hotels in the Bay Area, this runs counter to *Hertz*'s express instruction that a

25   corporation's principal place of business is a *single place* within a state, not the state itself.  *Id.* at

26   93.  In any event, the location of a corporation's board meeting is not particularly meaningful

27   given that the Supreme Court in *Hertz* made clear that a principal place of business is "not simply

28   an office where the corporation holds its board meetings (for example, attended by directors and

officers who have traveled there for the occasion)." *Hertz*, 559 U.S. at 93. *Cf. 3123 SMB LLC*, 880 F.3d at 468 (the principal place of business for a holding company that "engages in little activity . . . is the place where it has its board meetings . . . unless evidence shows that the corporation is directed from elsewhere").

While Plaintiff's evidence may be pertinent to venue and considerations of convenience, these factors do not alter the location of DataRobot's "nerve center." DataRobot has satisfied its burden to show that, at the time of the filing of this lawsuit and its removal, its Boston headquarters is where its executives directed, controlled, and coordinated its activities.

### 4.   Plaintiff is Not Entitled to Jurisdictional Discovery

There are no grounds for jurisdictional discovery. DataRobot has presented competent proof, by way of sworn declaration, that its principal place of business is its Boston office. Plaintiff has not provided any competent contradictory evidence, and she should not be allowed to conduct a fishing expedition to assure herself that there is no evidence to refute DataRobot's position. *See Borschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (recognizing that jurisdictional discovery is properly denied where it is "based on little more than a hunch that it might yield jurisdictionally relevant facts"). The "nerve center" test is intended to be one of administrative simplicity so that party and court resources are not needlessly consumed by litigating the proper court rather than the dispute on its merits. *Hertz*, 559 U.S. at 94. Simply put, Plaintiff's request for jurisdictional discovery is unnecessary and contrary to Supreme Court law and should be denied.

### B.   DataRobot's Removal Before Service Was Procedurally Proper

Where a case is otherwise removable based on diversity of citizenship, the "forum defendant rule" prohibits removal where a defendant is a citizen of the forum state. *See* 28 U.S.C. § 1441(b)(2). The rule applies only where a forum defendant has been "properly joined and served" at the time of removal. *Id.* To show removal was improper, Plaintiff must show Wright and/or DataRobot were citizens of California at the time she filed her Complaint on November 15, 2022, and were "properly joined and served" at the time DataRobot filed its Notice of Removal on December 2, 2022. Plaintiff cannot show either.

Plaintiff's Motion challenges DataRobot's removal at undue length, arguing that DataRobot cannot use pre-service removal to defeat the core diversity requirements of 28 U.S.C. § 1332.  But DataRobot does not contend otherwise.[9]  Rather, DataRobot's Notice contends that Wright's presence in the lawsuit should be disregarded for purposes of whether the forum defendant rule was triggered because he had not been "properly joined and served."[10]  (ECF No. 1 at ¶ 9.)  Wright was not "properly served" at the time of removal, which Plaintiff concedes.  (ECF No. 30 at 3:17-25.)  As to whether Wright was "properly joined" at the time of removal, DataRobot's Notice asserts that he was fraudulently joined.  (ECF No. 1 at ¶ 10).  As such, Wright was not properly joined or served at the time of removal, and the forum defendant rule did not bar removal.

Contrary to Plaintiff's suggestion, DataRobot's pre-service removal was not procedural gamesmanship, nor was it done to cause delay.  DataRobot, a nonresident corporation, has the constitutional right to resort to the federal courts.  *See Terral v. Burke Construction Co.*, 257 U.S. 529, 532 (1922).  DataRobot is not required to sit on its hands and wait for Plaintiff to effect service of the summons and complaint before invoking its constitutional rights.  The Northern District of California has repeatedly affirmed the availability of pre-service removal.  *E.g.*, *Kuchta v. Nat'l Railroad Passenger Corp.*, No. 22-cv-02198-JCS, 2022 WL 3650734, at *4 (N.D. Cal. Aug. 24, 2022) ("a complaint need only be filed to be removable") (citations omitted); *Global Industrial Investment Ltd. v. Chung*, No. 19-CV-07670-LHK, 2020 WL 2027374, at *4 (N.D. Cal. April 28, 2020) ("this Court and other courts in this district have held that 'a defendant may remove an action prior to receiving proper service . . .'") (citing cases); *Sherman v. Haynes & Boone*, No. 5:14-CV-01064-PSG, 2014 WL 4211118, at *1 & n.8 (N.D. Cal. Aug. 22, 2014)

---

[9] For this reason, *Clarence E. Morris, Inc. v. Vitek*, 412 F.2d 1174, 1176 (9th Cir. 1969) and the other cases cited in Plaintiff's Motion are inapposite.  None of these cases stand for the proposition that snap removal is improper to avoid the forum defendant rule; rather, they reject snap removal *as the basis for jurisdiction*.  *See, e.g.*, *J. Doe v. Mitchell*, No. 18-cv-06261-HSG, 2019 WL 1749521, at *3 (N.D. Cal. April 19, 2019) ("Whether the forum defendant rule bars or allows removal is thus distinct from the foundational question of whether there is complete diversity, which must exist for the Court to have subject matter jurisdiction at all.").

[10] Again, Plaintiff's Complaint did not allege that DataRobot was a forum defendant, only that it was a citizen of Delaware and conducted business in California.

1  ("a defendant may remove an action prior to receiving proper service . . .") (citing cases).

2  Plaintiff's inclusion of Wright as a sham defendant is the only evidence of gamesmanship in this

3  case.

4         **C.**    **Wright's Citizenship is Irrelevant Because He Was Fraudulently Joined**

5       When "determining whether there is complete diversity, district courts may disregard the

6  citizenship of a non-diverse defendant who has been fraudulently joined." *Grancare, LLC v.*

7  *Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (citation omitted).  Joinder is

8  fraudulent if "the plaintiff fails to state a claim against a resident defendant, and the failure is

9  obvious according to the settled rules of the state." *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313,

10  1318 (9th Cir. 1998) (quoting *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir.

11  1987)).  The fraudulent joinder analysis is somewhat different from the traditional Rule 12(b)(6)

12  analysis.  *Grancare*, 889 F.3d at 549-50.  If the court determines the complaint fails to state a

13  claim against a non-diverse defendant, it must then consider "whether a deficiency in the

14  complaint can possibly be cured by granting the plaintiff leave to amend."  *Id.* (citing *Hunter v.*

15  *Philip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009)).  It is not enough for a plaintiff to

16  merely tender a fanciful or theoretical possibility of sufficiently pleading a claim.  *Mireles v.*

17  *Wells Fargo Bank, N.A.*, 845 F. Supp. 2d 1034, 1062 (C.D. Cal. 2012) (joinder is not fraudulent

18  where there is a "non-fanciful possibility that plaintiff can state a claim under [state] law against

19  the nondiverse defendants") (quoting *Macey v. Allstate Property & Cas. Ins. Co.*, 220 F. Supp. 2d

20  1116, 1117 (N.D. Cal. 2002)) (brackets in original).

21         **1.**    **Wright Was Fraudulently Joined to Plaintiff's Fraud Claims**

22       Plaintiff's Complaint—which comes nowhere close to satisfying the heightened pleading

23  standard in Federal Rule of Civil Procedure 9(b)—exemplifies her want of a cause of action

24  against Wright, and indicates he was fraudulently joined.  Even if Plaintiff could cure these

25  defects (which the record shows she clearly cannot), her claims obviously fail as a matter of

26  settled law.[11]  Plaintiff cannot possibly amend her complaint to establish detrimental reliance,

27

28  _____

[11] Plaintiff's recognition that her claims are insufficiently pled, but refusal to file an amended complaint, appears strategic to leave open the theoretical "possibility" of curing her claims on amendment.  But the Court should not reward Plaintiff's gamesmanship, and the fraudulent

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1    which dooms each of her fraud claims.[12]  With respect to her fraudulent concealment claim,

2    Plaintiff cannot possibly allege that Wright owed her a duty of disclosure at the time of his

3    alleged statements.  And Plaintiff's intentional and negligent misrepresentation claims are

4    premised on inactionable opinions, and there is no reasonable basis for believing that she can

5    amend her complaint to introduce previously unarticulated representations.

6                    a.    **Plaintiff Cannot Possibly Plead Detrimental Reliance**

7            Detrimental reliance is a necessary element for each of Plaintiff's fraud claims.  *Alliance*

8    *Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1239 & n.4 (1995). To establish detrimental reliance,

9    Plaintiff must show: (1) she actually relied on Wright's misrepresentations, and (2) she was

10   reasonable in doing so.  *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157

11   Cal. App. 4th 835, 863-64 (2007).  The most generous reading of the record shows that Plaintiff

12   obviously cannot establish detrimental reliance to support her fraud claims against Wright.

13          Setting aside their technical defects,[13] the essence of Plaintiff's fraud claims is that Wright

14   indirectly made representations about DataRobot's financial outlook as it related to a future IPO

15   and its ability to "fast track" an IPO (allegedly through Bennani-Persechini on April 14-15,

16   2021), and Plaintiff detrimentally relied on these (and other) alleged representations when she left

17   her job at Cisco and joined DataRobot.  (Compl. ¶¶ 25; ECF No. 29 at 7:1-14.)[14]  Plaintiff claims

18

19   _____
     joinder rule cannot be so easily circumvented.  The court should assume that, through her
20   multiple filings with the Court, Plaintiff has made her "best case" against Wright.  *See Zucco*
     *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

21   [12] Plaintiff does not challenge removal on the grounds that Wright was fraudulently joined to her
     promissory fraud claim, thus conceding he was.  Moreover, Plaintiff conceded this claim against
22   DataRobot cannot be cured by amendment, which necessarily is a concession that it fails against
     Wright because they are predicated on the same alleged conduct.  (ECF No. 29 at 7:16-19.)

23   [13] As set forth in DataRobot's Reply to its Motion to Dismiss, Plaintiff does not actually allege
24   that Wright instructed recruiters to inform prospective hires that its finances "looked solid for an
     IPO," that anyone ever repeated this statement to her, or that she relied on it. (ECF No. 31 at
25   5:10-28.)  Plaintiff also fails to connect these statements to Bennani-Persechini.  Indeed,
     Suchanek-Vacca was the only employee from DataRobot's human resources function at this ELT
26   meeting; Bennani-Persechini was not there.  (Suchanek-Vacca Decl. ¶ 20.)

27   [14] While material extrinsic to the Complaint may not be considered when ruling on a Rule
     12(b)(6) motion, it is properly considered when determining whether Plaintiff could possibly
28   amend her complaint to plead a claim against Wright.  *See Grancare*, 889 F.3d at 550.  Although
     DataRobot does not dispute that the Court should rule on threshold jurisdictional issues before
     ruling on the merits of its (or Wright's) Motions to Dismiss; however, all three motions rest on

she discovered the false nature of these alleged misrepresentations shortly after she joined DataRobot, as she: (1) learned "that basically nothing seemed to be going on in service to the 'imminent' IPO," (2) discovered that DataRobot's practices "were not consistent with the promise of an imminent IPO," (3) reported serious conditions that "stood between DataRobot and any possibility of an IPO" including during an important audit, and (4) discovered errors in the employee roster, which was "factually inconsistent with the promise that DataRobot was imminently ready for an IPO." (Compl. ¶¶ 25, 29, 30.)

As set forth in DataRobot's Notice of Removal and Defendants' Motions to Dismiss, Plaintiff cannot establish actual reliance as a matter of law. (ECF No. 1 at 5:16-6:7; ECF No. 13 at 8:20-9:22; ECF No. 31 at 2:20-5:9; ECF No. 33 at 5:8-13.) In *Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 215-16 (1993) (disapproved on other grounds by *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238 (1994)), the California Court of Appeal considered whether an employee could establish that they *actually* relied on an employer's misrepresentations in accepting a job where the employee subsequently discovered the truth of the misrepresentations, but nevertheless decided to remain employed anyways. The court unambiguously held that an employee could not. Subsequent decisions are in accord. *E.g.*, *Rubinstein v. SAP AG*, No. C 11-06134 JW, 2012 WL 726269, at *6 (N.D. Cal. Mar. 1, 2012); *Hall v. FedEx Freight, Inc.*, No. 1:13-cv-01711-SKO, 2015 WL 574177 (E.D. Cal. Feb. 11, 2015). While on a motion for remand the Court must consider "whether a deficiency in the complaint can possibly be cured by granting plaintiff leave to amend," there is no deficiency here. *Grancare*, 889 F.3d at 549. Plaintiff's allegations regarding her so-called discovery were not pled by mistake; rather, they form the entire basis of her whistleblower claim against DataRobot under Labor Code section 1102.5. (Compl. ¶¶ 29-30.) This is a "categorical defect" in Plaintiff's fraud claims and requires a finding of fraudulent joinder. *See Tang v. Rosenwald*, 2016 WL 1715183, at *4 (C.D. Cal. April 27, 2016) (citing *Kruso v. Internat'l Telephone & Telegraph Corp.*, 872 F.2d 1416, 1426 & n.12. (1989)).

Moreover, the sham pleading doctrine bars any possible amendment. It is settled

---

the shared issue of whether the Complaint asserts a valid cause of action against Wright, and the Court should consider all of the papers when deciding Plaintiff's Motion. *See id.* at 549-50.

California law that a plaintiff may not later plead facts that contradict those pleaded in the

original complaint, or suppress facts which prove the pleaded facts false.  *See Larson v. UHS of*

*Rancho Springs, Inc.*, 230 Cal. App. 4th 336, 343-44 (2014) (holding that "under the sham

pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations,

without explanation, from previous complaints to avoid attacks raised in demurrers or motions for

summary judgment") (quotation marks and citation omitted); *Hearn Pacific Corp. v. Second*

*Generation Roofing, Inc.*, 247 Cal. App. 4th 117, 131-32 (2016) (recognizing that an admission in

an unverified complaint "is a waiver of proof of a fact by conceding its truth, and it has the effect

of removing the matter from the issues") (quotation marks and citation omitted).  Plaintiff is

bound by her assertion that she discovered the falsity of Wright's alleged representations, and yet

she remained employed for nearly a year (indeed, seeking bonuses and a promotion just like the

*Rochlis* plaintiff) until she was discharged as part of a reduction in force in May 2022.  *See*

*Ivanoff v. Bank of America, N.A.*, 9 Cal. App. 5th 719, 454 (2017) ("[T]he principle of 'truthful

pleading' requires us to disregard facts that contradict the facts or positions that the plaintiff

pleaded in earlier actions or in a pleading in the same action.") (quotation marks and citation

omitted).  Plaintiff thus cannot possibly state a claim for fraud against Wright.

### b.  Plaintiff Cannot Possibly Plead That Wright Owed Her a Duty of Disclosure

Plaintiff's fraudulent concealment claim requires specific allegations that Wright

concealed or suppressed a material fact that he was under a duty to disclose.  *Graham v. Bank of*

*Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014).  A duty to disclose only arises where: (1) Wright

was in a fiduciary relationship with Plaintiff, or (2) the existence of some other relationship or

transaction between Wright and Plaintiff, and Wright had exclusive knowledge of the material

fact, actively concealed the material fact, or made only partial representations while suppressing

other material facts.  *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 888

(E.D. Cal. 2019).

Plaintiff cannot possibly plead that Wright owed her a fiduciary duty at the time he

allegedly made the statements, or at the time the statements were allegedly repeated to her by

Bennani-Persechini.[15]  Plaintiff likewise cannot possibly plead the existence of "some other relationship" with Wright such that the duty to disclose attaches.  To the extent Plaintiff claims that an "employer-prospective employee" relationship existed, that relationship was between Plaintiff and DataRobot, not Plaintiff and Wright.  Nor can she possibly plead that Wright owed her a duty by virtue of his position as CEO, because the mere fact of an agency relationship is "*ipso facto* insufficient to give rise to" a duty to disclose.  *Bell v. Fed. Home Loan Mortg. Corp.*, No. 11-CV-2514-MMA RBB, 2012 WL 1581075, at *6 (S.D. Cal. May 4, 2012) (recognizing that to hold an agent liable for his own allegedly wrongful acts, the plaintiff must "allege [the agent] owed them a duty of disclosure independent of any such duty [the principal] may have owed them") (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)).  Finally, Plaintiff cannot possibly plead the existence of a transaction between her and Wright because she has asserted in multiple filings with this Court that Wright's alleged statements were repeated to her, and did not come directly from Wright.  *See Bigler-Engler v. Breg Inc.*, 7 Cal. App. 5th 276, 312 (2017) (for a transaction to give rise to a duty to disclose it "must necessarily arise from direct dealings between the plaintiff and defendant").  Plaintiff has further asserted that Wright's statements were made before she even began interviewing with DataRobot, so she cannot possibly plead that he even knew of her.  *See Bell*, 2012 WL 4576584, at *4-5 (dismissing with prejudice the plaintiff's fraudulent concealment claim against an agent where the plaintiff failed to "allege any facts that suggest that [the agent] even knew of plaintiff's existence").

Like her claim under California Civil Code section 1710, Plaintiff cannot possibly state a claim against Wright under California Civil Code section 1572.  Section 1572 sets forth the elements for fraud that is "committed by a party to the contract."  Cal. Civ. Code § 1572.  By its own terms, Section 1572 is limited to situations where the parties have a contractual relationship. *Id.; see also LiMandri*, 52 Cal. App. 4th at 337 (recognizing that Section 1572 only applies where the parties have a contractual relationship).  But Plaintiff does not allege the existence of any contractual or precontractual relationship with Wright, nor could she.  Plaintiff has made clear

---

[15] Plaintiff's Complaint seemingly acknowledges this, as she only alleges that DataRobot's board and executives "assumed a fiduciary duty of loyalty" after she was issued DataRobot stock. (Compl. ¶ 3.)

1    that Wright was not involved in her recruitment or hiring, and any possible inference of an

2    employment contract would only flow to DataRobot, not to Wright.[16]

3             c.        **Plaintiff Cannot Possibly Plead Actionable Misrepresentation**

4         To allege intentional or negligent misrepresentation, Plaintiff must sufficiently plead an

5    actionable misrepresentation. *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469-70 (2014).

6    To be actionable, a misrepresentation must "pertain to past or existing material facts" and not

7    merely "statements or predictions regarding future events" which are inactionable opinions. *Id.* at

8    1469-71. The Ninth Circuit has affirmed finding fraudulent joinder of misrepresentation claims

9    that are premised on inactionable statements. *See Morris v. Princess Cruises, Inc.*, 236 F.3d

10   1061, 1068 (9th Cir. 2001) (representation that the defendant "was a reputable cruise line and that

11   passengers in their care would be safely and adequately served" fails to state a claim "and the

12   failure is obvious according to settled [Texas] law" because it was "devoid of any meaningful

13   specificity, amounting at most to a general recommendation . . . akin to mere puffing.")

14        Plaintiff's Motion contends that two of the alleged statements attributable to Wright are

15   based on existing fact: (1) that DataRobot's finances "looked solid for an IPO," and (2) that

16   DataRobot was "fast tracking" an IPO. (ECF No. 30 at 18:3-19.) According to Plaintiff, Wright

17   made these statements at an ELT meeting that took place in March/April 2021, and instructed the

18   meeting's attendees to use these statements for recruiting purposes. (ECF No. 29 at 7:6-8; ECF

19   No. 30-8 at ¶¶ 15-17.)

20        First, Plaintiff does not allege that she was ever told "DataRobot's finances looked solid

21   for an IPO," nor does she allege that Wright instructed recruiters to tell candidates that the

22   company was in the process of "fast tracking" an IPO, only that he allegedly instructed them to

23   use the expression "fast tracking." (Compl. ¶¶ 13, 18.) Moreover, Plaintiff's characterization of

24   these alleged statements is belied by her own evidence. In his declaration, Ballard asserts that at

25   this ELT meeting, Wright showed multi-year financial revenue projections and opined that

26   DataRobot was "poised for a blockbuster IPO to happen on or around the end of 2021." (ECF

27

28   _____
     [16] Moreover, Plaintiff did not have any such contract with DataRobot, as the irrefutable evidence
     shows that she was an at-will employee. (Suchanek-Vacca Decl. ¶ 15.)

DATAROBOT'S OPPOSITION TO PLTF'S
                              MOTION TO REMAND [3:22-cv-07619-LB]

No. 30-8 at ¶¶ 15-17.)  Ballard further claims that Wright instructed the meeting's attendees to "start using [Wright's] newly shared revenue and IPO *projections* and the potential skyrocketing value of stock options as tools for employee recruitment . . ."  (ECF No. 30-8 at ¶ 17 [emphasis added].)  These *projections* are what form the basis of Plaintiff's fraud claims against Wright, which are unquestionably opinions or future predictions, not statements of existing fact.

Assuming, *arguendo*, that Plaintiff could cure these technical defects and explain the discrepancy between what Wright allegedly said and what Ballard swore to under the penalty of perjury, none of these statements are actionable as fraud.  These alleged statements are plainly expressions of opinion or judgment as to DataRobot's future prospects for an IPO.  *See Graham*, 226 Cal. App. 4th at 606-07 ("A representation is an opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value . . . or other matters of judgment").  Even considering Plaintiff's allegation that Wright instructed recruiters to tell candidates that an "IPO was being fast tracked," this is not a statement of existing fact, but instead Wright's prediction that DataRobot would IPO at some point in the future.  (Compl. ¶ 21(f).)  Moreover, these alleged statements are "couched in aspirational terms" which indicates they merely articulate Wright's ambitions for DataRobot to IPO in the future, and are not factual statements about the company's current status.  *See In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) (recognizing that "the repeated use of words like 'pursuing,' 'looking to build,' 'going to be' and 'committed to' indicates that the company was articulating goals it was trying to meet, not making factual statements).

### 2.    Wright Was Fraudulently Joined to Plaintiff's IIED Claim

To state a claim for IIED, Plaintiff must show, *inter alia*, "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress."  *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1245 (9th Cir. 2013) (quoting *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009)).  A "simple pleading of personnel management activity is insufficient . . ."  *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996).  Plaintiff's claim fails as pled, and she cannot possibly save it by amendment because:

1    (1) there is no evidence of outrageous conduct, (2) personnel management activity cannot serve as

2    the basis for her claim, and (3) the claim is preempted by the Workers' Compensation Act

3    ("WCA").

4    ### a.    Extreme and Outrageous Conduct

5        Plaintiff alleges that Wright: (1) indirectly represented to her that DataRobot's finances

6    "looked solid for an IPO" and it was "fast tracking" an IPO, and (2) allegedly told Elise Cole that

7    "everyone hates" Plaintiff.  (Compl. ¶ 30(m).)  This is not a close call: none of this alleged

8    conduct is "extreme and outrageous" under California law.

9        *First*, for conduct to be actionable, it must be "directed at the plaintiff, or occur in the

10   presence of a plaintiff of whom the defendant is aware."  *Christensen v. Sup. Ct.*, 54 Cal.3d 868,

11   903 (1991).  Plaintiff's assertions in this case make clear that Wright's alleged statements were all

12   directed at other DataRobot employees.  This is insufficient, as "[t]he requirement that the

13   defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes

14   intentional infliction of emotional distress from the negligent infliction of such injury."

15   *Christensen*, 54 Cal.3d at 904.  Where the conduct is directed primarily at another, recovery is

16   permitted only in "the most extreme cases of violent attack" for which Wright's alleged conduct

17   obviously does not qualify.  *Id.* at 905.  To the extent Plaintiff's claim is premised on Wright's

18   alleged reckless disregard of the probability of causing her emotional distress, she cannot possibly

19   state a claim because none of the alleged conduct occurred in her presence.  *Id.* at 906; *see also*

20   *Kroeger v. L3 Tech., Inc.*, No. 2:17-cv-08489-JFW-AGR, 2018 WL 1357363, at *5 (C.D. Cal.

21   Mar. 15, 2018) (a "single remark to a third party is not a sufficient" to allege "the requisite intent

22   to harm or even *reach* Plaintiff.").

23       *Second*, false representations or promises of monetary gains do not constitute extreme or

24   outrageous conduct under settled California law.  *E.g.*, *Moncada v. West. Coast Quartz Corp.*,

25   221 Cal. App. 4th 768, 772-73, 780-81 (2013) (holding that an employer's false promise to pay

26   employees a retirement bonus in order to induce them to remain at the job, and thus to forego

27   other job opportunities, is not extreme and outrageous); *Trerice v. Blue Cross of California*, 209

28   Cal. App. 3d 878, 885 (1989) (no liability for IIED where the allegations show the defendant "has

1   merely pursued its own economic interests"); *Tervon, LLC v. Jani-King of California, Inc.*, No.

2   14-cv-2648 BAS (JMA), 2015 WL 4135162, at *8 (S.D. Cal. July 8, 2015) (allegations that the

3   defendants "have allegedly undermined [the plaintiffs] financial wellbeing for their own

4   economic gain" is "not the type of personal attack necessary to support [an IIED] claim.").

5   Wright's alleged statement that DataRobot's finances "looked solid" for an IPO and that it was

6   "fast tracking" an IPO, even if made and repeated to Plaintiff, do not constitute extreme and

7   outrageous conduct under settled law.

8           *Third*, personnel management actions cannot form the basis of an IIED claim, and courts

9   have found fraudulent joinder in similar circumstances.  In *Mohammed v. American Airlines, Inc.*,

10  No. C 19-01946 WHA, 2019 WL 3577160, at *2-5 (N.D. Cal. Aug. 6, 2019), the court denied

11  remand and found the individual supervisor was fraudulently joined where the IIED claim was

12  predicated on personal management action.  In so doing, the *Mohammed* court expressly rejected

13  the plaintiff's claim that his allegations met the "lower standard for remand" and that he "could

14  amend his complaint to meet this lower standard" because these were "classic supervisory

15  decisions," and the plaintiff *did not offer any additional facts* to support amendment.  *Id.* at *4.

16  Similarly, in *Dias v. Burberry Ltd.*, No. 21-cv-192-MMA (JLB), 2021 WL 2349730, at *5-6

17  (S.D. Cal. June 9, 2021), the court denied remand and found the plaintiff's non-diverse supervisor

18  was fraudulently joined to the IIED claim because the allegations "fall under personnel

19  management actions" that it was therefore "not possible for the plaintiff to plead her [IIED] cause

20  of action" against the individual defendant.  *Id.*  Likewise, in *Carrico v. CAN Ins.*, No. LA CV18-

21  01445 JAK (JPRx), 2020 WL 5797698, at *10 (C.D. Cal. June 1, 2020), the court found the

22  plaintiff's supervisor was fraudulently joined because the plaintiff pled only "personnel

23  management activity," and "[n]either the allegations nor the evidence shows a non-fanciful

24  possibility that Plaintiff could recover against [the supervisor] for IIED."  The record here

25  demands the same result.  Wright's alleged directive to recruiters and remark that Plaintiff is

26  disliked is quintessential personnel management activity and cannot support an IIED claim.

27          Plaintiff's claim that she should be granted leave to amend to allege more specific facts is

28  based on nothing more than a fanciful possibility that she can somehow do so.  But Plaintiff

1  already set forth her "additional facts" in her Opposition to DataRobot's Motion to Dismiss, and

2  she came up empty.  Moreover, Plaintiff cannot possibly state an IIED claim against Wright

3  because he was never her supervisor, any interactions she may have had with him were limited to

4  group settings, and she was a 100% remote employee who was *required* to attend all meetings

5  and events virtually.  (Suchanek-Vacca Decl. ¶¶ 17-19.); *see Elias v. Spotify USA Inc.*, No. 2:20-

6  cv-08530-JFW (ASx), 2020 WL 11884715, at *2 (C.D. Cal. Nov. 24, 2020) (denying remand and

7  finding fraudulent joinder where the individual defendant was not the plaintiff's supervisor, had

8  few (if any) interactions with the plaintiff, and any interactions were limited to group settings).

9  ### b.    Workers' Compensation Act Preemption

10  In any event, Plaintiff cannot possibly state an IIED claim against Wright because any

11  claim would be preempted by WCA exclusivity.  An employer's alleged "intentional misconduct

12  in connection with actions that are a normal part of the employment relationship" are

13  "encompassed within the worker's compensation bargain, even if the misconduct could be

14  characterized as manifestly unfair, outrageous, harassment, or intended to cause emotional

15  disturbance."  *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 162 (2014).  Conduct

16  such as "demotions, promotions, criticism of work practices, and frictions in negotiations as to

17  grievances" are "normal part[s] of the employment relationship."  *Id.*

18  Plaintiff cannot avoid WCA exclusivity by claiming she only suffered emotional injuries.

19  In *Livitsanos v. Sup. Ct.*, 2 Cal.4th 744, 749 (1994) the plaintiff asserted various claims against

20  his former employer, including IIED.  The plaintiff, relying on *Renteria v. County of Orange*, 82

21  Cal. App. 3d 833 (1978), argued that because he did not allege any physical injury, his IIED

22  claim was not barred by WCA exclusivity.  *Livitsanos*, 2 Cal.4th at 749-50.  In *Renteria*, the court

23  had concluded an IIED claim "constituted an implied exception to workers' compensation

24  exclusivity under conditions where the 'essence of the tort, in law, [was] non-physical . . .'"  *Id.* at

25  751 (quoting *Renteria*, 82 Cal. App. 3d at 842).  The California Supreme Court rejected *Renteria*,

26  and held that workers' compensation is normally the exclusive remedy for an employer's

27  intentional misconduct, even where the employee's injury is only emotional.  *Id.* at 754 ("So long

28  as the basic conditions of compensation are otherwise satisfied (Lab. Code, § 3600), and the

employer's conduct neither contravenes fundamental public policy [cite] nor exceeds the risks inherent in the employment relationship [cite], an employee's emotional distress injuries are subsumed under the exclusive remedy provisions of workers' compensation").  Thus, Plaintiff's injury, even if purely emotional, is normally encompassed by WCA's exclusive remedy provisions unless one of these exceptions applies.

Plaintiff asserts, in passing reference, that her claim falls within an exception because it is premised on conduct that is not "a normal part of the employment relationship."  (ECF No. 30 at 21:21-23.)  But Wright's alleged conduct—a recruiting directive and a comment that other employees "hate" Plaintiff—falls squarely within the normal employment relationship and thus the workers' compensation bargain.  Courts have found fraudulent joinder in similar circumstances.  *E.g.*, *Ferrer v. Host Internat'l, Inc.*, No. CV16-06798 JAK (ASx), 2017 WL 902848, at *5-6 (C.D. Cal. Mar. 7, 2017) (denying remand where the "only misconduct related to alleged disability discrimination that the Complaint attributes to [the non-diverse defendant] is that [p]laintiff was terminated following her medical leave," because hiring/firing decisions are "clearly a normal part of the employment relationship") (citation omitted); *Plummer v. Tesoro Refining and Marketing Co.*, No. CV 16-02044 SJO (JEMx), 2016 WL 3180327, at *4 (C.D. Cal. June 3, 2016) (holding IIED claim preempted because the alleged conduct—a negative review and denial of leave—was "a normal part of the employment relationship"); *Kaldis v. Wells Fargo Bank, N.A.*, No. No. 2:16-cv-06407-ODW-GJS, 2016 WL 6407377, at *1, *5 (C.D. Cal. Oct. 28, 2016) (finding IIED claim predicated on the defendant's questioning of the plaintiff's performance and comment that manager will "always ... promote the guys over you" was preempted); *Duran v. DHL Express (USA), Inc.*, No. CV 15-09965-BRO (Ex),  2016 WL 742864, at *8 (C.D. Cal. Feb. 24, 2016) (finding IIED claim predicated on the defendant's alleged denial of a reasonable accommodation was preempted).

Because of WCA exclusivity, Plaintiff cannot possibly amend her complaint to state a claim against Wright.  Any new alleged conduct would still have occurred as part of her employment and thus in the normal course of the employment relationship.[17]  Thus, any future

---

[17] And if it was not, it would be a separable controversy for the purpose of removal.

DATAROBOT'S OPPOSITION TO PLTF'S
MOTION TO REMAND [3:22-cv-07619-LB]

1  amendment would also be preempted by WCA exclusivity.

2  **V.**     **CONCLUSION**

3     Plaintiff's Motion to Remand should be denied with prejudice.

4  Dated: January 31, 2023                   ANDREW R. LIVINGSTON
                                             RACHEL CAPLER
5                                            Orrick, Herrington & Sutcliffe LLP

6

7                                   By:         */s/ Andrew R. Livingston*
8                                             ANDREW R. LIVINGSTON
                                             Attorneys for Defendant
9                                             DATAROBOT, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATAROBOT'S OPPOSITION TO PLTF'S
                                             MOTION TO REMAND [3:22-cv-07619-LB]