John D. Winer, Esq. (SBN: 91078)
Matthew P. Vandall, Esq. (SBN: 196962)
WINER, BURRITT & SCOTT, LLP
1901 Harrison Street, Suite 1100
Oakland, CA 94612
Tel: 510.543.1000
Fax: 510.433.1001
Email: matthew@wmlawyers.com

Attorneys for Plaintiff
RAQUEL VAZQUEZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAQUEL VAZQUEZ, | Case No. 3:22-cv-07619 |
| Plaintiff, | **REPLY TO OPPOSITION TO MOTION FOR REMAND** |
| vs. | |
| DATAROBOT, INC.; DAN WRIGHT; and DOES 1 through 20, inclusive, | Judge: Hon. Laurel Beeler<br>Crtrm: B<br>Date: March 2, 2023<br>Time: 9:30 a.m. |
| Defendants. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

II. LEGAL ARGUMENT ........................................................................ 1

    A.  DATAROBOT'S PRINCIPAL PLACE OF BUSINESS IS SAN FRANCISCO BECAUSE THAT'S WHERE ITS HIGH-LEVEL OFFICERS DIRECT, CONTROL, AND COORDINATE ITS ACTIVITIES ........................................................ 1

    B.  WRIGHT AND VAZQUEZ ARE BOTH CALIFORNIA RESIDENTS, DEFEATING DIVERSITY JURISDICTION ................................................ 6

    C.  VAZQUEZ DID NOT CONCEDE THAT WRIGHT WAS FRAUDULENTLY JOINED TO HER PROMISSORY FRAUD CLAIM ...................................... 6

    D.  VAZQUEZ CAN ESTABLISH ACTUAL RELIANCE BECAUSE ROCHLIS IS DISTINGUISHABLE ................................................................................ 7

    E.  WRIGHT OWED VAZQUEZ A DUTY OF DISCLOSURE DESPITE THE LACK OF A FIDUCIARY RELATIONSHIP .......................................................... 9

    F.  VAZQUEZ SUFFICIENTLY ALLEGED ACTUAL RELIANCE UPON WRIGHT'S FRAUDULENT MISREPRESENTATIONS ............................... 11

    G.  VAZQUEZ CONCEDES THAT THE IIED CLAIM AS TO WRIGHT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND ……………………………….... 12

    H.  IF ANY OF VAZQUEZ'S CAUSES OF ACTION ARE INSUFFICIENTLY PLED, SHE IS ENTITLED TO LEAVE TO AMEND THEM ..................................... 12

III. CONCLUSION ................................................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Fed. Home Loan Mortg. Corp.*, 2012 WL 4576584 (2012) ……………………………… 10

*Carpenter v. Hamilton*, 18 Cal.App.2d 69 (1936) …………………………………………….... 8

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (2003) ……………………………… 12

*Foman v. Davis*, 371 U.S. 178 (1962) …………………………………………………………… 13

*Gaus v. Miles, Inc.*, 980 F.2d 564 (1992) ……………………………………………………… 5

*Hall v. FedEx Freight, Inc.*, 2015 WL 574177 (2105) …………………………………………… 9

*Hertz Corp. v. Friend*, 559 U.S. 77 (2010) …………………………………………………… 1,3

*Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315 (2003) ……………………………… 9, 11

*Mercer v. Elliott*, 208 Cal.App.2d 275 (1962) ………………………………………………..... 8

*National Council of La Raza v. Cegavske*, 800 F.3d 1032 (2015) ……………………………… 12

*Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201 (1993) …………….…………………….7, 8, 9

*Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773 (1979) ……………………………………………… 9, 10


**Statutes**

28 U.S.C. **§** 1332 …………………………………………………………………………………… 6

28 U.S.C. **§** 1447 …………………………………………………………………………………… 6

Civil Code **§** 1572 ……………………………………………………………………………… 10, 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## I.    INTRODUCTION

Plaintiff Raquel Vazquez's motion to remand should be granted because diversity jurisdiction does not exist.  Vazquez and Defendants DataRobot and Daniel Wright are all citizens of the state of California and there is no federal question presented by Plaintiff's complaint for damages.  Hence, the Court lacks subject matter jurisdiction and the removal of the complaint based on diversity jurisdiction was improper.  Even if the Court disagrees with Plaintiff about the citizenship of DataRobot, the fact remains that Wright is a California citizen who has been served with the summons and complaint and his presence in the lawsuit destroys complete diversity.  Moreover, Wright was not fraudulently joined to the Complaint.  He made actionable misrepresentations of fact and directed that they be communicated to prospective employees like Vazquez.  The misrepresentations were communicated to Vazquez and she relied upon them to her detriment in accepting employment with DataRobot.  The misrepresentations were about the current financial status of DataRobot and its current action of fast-tracking an IPO, both of which turned out to be false and materially misleading and caused harm to Vazquez.  Finally, Vazquez deserves an opportunity to amend her complaint if the Court determines that any of her claims for relief are insufficiently pled.

## II.    LEGAL ARGUMENT

### A.    DATAROBOT'S PRINCIPAL PLACE OF BUSINESS IS SAN FRANCISCO BECAUSE THAT'S WHERE ITS HIGH-LEVEL OFFICERS DIRECT, CONTROL, AND COORDINATE ITS ACTIVITIES

As the U.S. Supreme Court clarified, "the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend,* 559 U.S. 77, 80-81 (2010). As DataRobot admits, when the complaint in this matter was filed and removed, the highest concentration of DataRobot's Executive Leadership Team ("ELT"), including its Chief Executive Officer, was located in San Francisco and not Boston:

> As of November 15, 2022 and December 2, 2022, DataRobot's ELT was comprised of the following individuals at the following locations:

    a. *Chief Executive Officer Debanjan Saha (San Francisco);*

    b. Chief Technology Officer Michael Schmidt (Washington, DC);

    c. President of Worldwide Field Operations Chris Riley (Boston/Remote from Florida);

    d. Chief Customer Officer Jay Schuren (Boston);

    e. *General Counsel Brian Brown (San Francisco);*

    f. EVP Engineering Rob Hickey (Boston);

    g. *SVP Marketing Jennifer Hewlette (San Francisco);*

    h. *SVP Alliance and Partnerships Sirisha Kadamalakalva (San Francisco);*

    i. SVP People Amy Suchanek-Vacca (Boston);

    j. SVP Strategic Finance Chris Merwin (Remote from Connecticut);

    k. SVP Finance & Operations Matt Nelson (Remote from Washington);

    1. SVP Product Venky Veerarghavan (Remote from Washington); and

    m. SVP Global Sales Rich Hoyland (Remote from Pennsylvania).

ECF No. 35-1 (Suchanek-Vacca dec.). ¶ 8, emphasis added.

    While the Suchanek-Vacca declaration indicates that Chris Riley was also located in Boston (which would bring the Boston number of ELT members to four as well), she admits that he split his time in Florida and only spent 9 days in the Boston office between October 1, 2022 and January 30, 2023. *See* ECF No. 35-1, ¶¶ 8(c) & 14(c). There are 180 days during this time period and Riley spent just 5% of his time working out of the Boston office. He should not be counted as a local presence given that he appears to spend most of his time working remotely from Florida where he presumably resides. DataRobot offers no evidence that Riley resides in the Boston area or that he has a remote location there from which he works. Without Riley, the balance of power amongst the DataRobot ELT shifts to San Francisco with 4 ELT members as of the date the complaint and notice of removal were filed as compared to Boston's 3 ELT members that were actually based in Boston. Because there are more ELT members working out of San

Francisco, the Court should conclude that DataRobot directs, controls, and coordinates the corporation's activities from San Francisco and not Boston.[1]

Further, the bulk of the information offered by DataRobot to "establish" that Boston is the corporate headquarters is located in documents that pre-date the filing of the complaint and cannot be relied upon to establish that the Boston office is actually DataRobot's nerve center. *See Hertz Corp. v. Friend* (2010) 559 U.S. 77, 97 ("when faced with such a challenge, we reject suggestions … that the mere filing of a form like the Securities and Exchange Commission's Form 10-K listing a corporation's "principal executive officers" would, without more, be sufficient to establish a corporation's nerve center."); *see also Benchmark Invs. V. PAVmed Inc.* (S.D.N.Y. 2021)  2021 WL 5967918, at *2 ("[C]ourts have found irrelevant the situs of things like 'strategic meetings,' 'tax filings,' and 'corporate records,' since what matters is the situs from where the corporation's high-level officers and directors 'oversee and control' corporate activities." (citations omitted) (collecting cases)); *Zurich Am. Life Ins. Co. v. Nagel*, 20-cv-11091 (JSR), 2021 WL 3077861, at *3 (S.D.N.Y. July 20, 2021) (finding that the location of the majority of employees and the domicile stated in the company's marketing materials and tax forms were immaterial for the purpose of determining its nerve center).

Here, <u>all</u> of the corporate documentation submitted via the Suchanek-Vacca declaration predates the November 15, 2022, filing date of the complaint and the notice of removal by significant margins.  *See* ECF No. 35-1, Exh. A (Offer letter dated 4/16/21); Exh. B (Proprietary Agreement dated 4/16/21);  Exh. C (Paystub dated 5/13/22); Exh. D (Statement of Information Corporation dated filed 4/19/22 containing another Statement of Information that is dated

---

[1] Suchanek-Bacca also introduces a red herring into her declaration as an attempt to sway the Court by stating that approximately 110 employees "reside" in the Boston area while "fewer than 50 employees reside in the San Francisco Bay Area."  ECF No. 35-1, ¶ 11.  This is a red herring because it is not the number of employees that controls the "nerve center" test, but the number of employees in executive leadership positions that controls.  San Francisco has the greater number of ELT members and that should establish that DataRobot's nerve center is located in San Francisco regardless of the number of lower level employees that work near the respective offices.

12/28/18);  Exh. E (SEC Forms dated 8/30/21, 8/11/21, 12/10/20, 11/02/18, 11/03/17, 7/27/17, & 2/18/16);  Exh. F (Subscription Agreement dated 2/14/22);  Exh G (a blank unsigned Partner agreement dated 02/21);  Exh H (Tool and Utility Agreement dated 07/21).  The migration of corporate leadership to San Francisco began after most of  these documents were created.  *See* ECF No. 30-8 (Ballard Decl.) (noting that the migration of leadership occurred after Dan Wright became CEO).  If citizenship must be determined by evidence as of the date the complaint and notice of removal are filed, these corporate documents prove nothing about DataRobot's "nerve center" as of November 15, 2022 or December 2, 2022, and, hence, they should be ignored.  Moreover, the two press releases attached as Exhibits I and J to the **Suchanek-Vacca** declaration merely use the word "Boston" once and do not comment at all on the location of DataRobot's headquarters.  Even if they did, they would not constitute relevant, admissible evidence upon which this Court could rely to establish DataRobot's citizenship. These articles prove nothing when it comes to the actual location of DataRobot's nerve center.

It is no doubt challenging to ascertain the location of DataRobot's "nerve center" because so many of its ELT leaders telecommute.  But the card swipe evidence submitted by Suchanek-Vacca fails to prove that DataRobot's high level officers direct, control, and coordinate the corporation's activities from Boston over San Francisco.  Suchanek-Vacca argues that the card swipes show that ELT members worked from the Boston office on a total of 109 occasions, but only 58 occasions from the San Francisco office. ECF No. 35-1, ¶ 14.  However, 70 of those 109 occasions were worked by just two ELT members (Schuren and Hickey).  They are the Chief Customer Officer and the EVP Engineering.  There is no indication in the declaration that these positions direct, control or coordinate the corporation's major activities in a way comparable to the CEO, General Counsel, and SVPs of Marketing and Alliance and Partnerships.  Nor is there any evidence presented that their mere presence in the Boston office meant that they were directing, controlling or coordinating the corporation's activities on those dates.  The card swipe data also covers a broad period of time (October 1, 2022 through January 30, 2023) which dates may artificially inflate the presence of the various ELT members at each location.  Going back

1    to October 1, 2022, and intentionally excluding the former ELT members that were still employed

2    by DataRobot in October 2022 likely skews the results in favor of DataRobot and, hence, the

3    statistics are not reliable to prove that the majority of directing, controlling, and coordinating

4    activity stemmed from the Boston office during the time period of the swipe data.

5         Moreover, four of DataRobot's Board members (Saha, Newell, Sinha and Das) reside in

6    California while no Board members reside in Boston.  *Id.*, ¶ 9.  While DataRobot claims all of

7    its Board meetings have been held virtually since the onset of the COVID-19 Pandemic,

8    DataRobot did not contest that Board meetings were held at physical locations near the San

9    Francisco on August 18 and December 9, 2021, and that members of the ELT (including Schuren

10   from Boston on at least one occasion) were scheduled to physically attend the meetings and group

11   functions planned afterwards.  *See* ECF 30-7 (Vazquez Decl.), ¶ 6.  DataRobot merely states that

12   all Board meetings are now held virtually with some board members/attendees "elect[ing] to join

13   the virtual meeting together from the same location (e.g., a shared conference room)." ECF No.

14   35-1, ¶ 9.  This vague statement does not sufficiently counter the detailed allegations contained

15   in the Vazquez declaration about Board meetings and their attendance.  For example, Suchanek-

16   Vacca fails to explain which ELT and Board members from California choose to gather in San

17   Francisco for the virtual board meetings or the virtual ELT meetings and focuses instead on such

18   common gathering exclusively in Boston. This does not mean that the Board members did not

19   attend meetings in California in close proximity to the San Francisco office.  The evidence is

20   intentionally vague. In this sense, the Suchanek-Vacca Declaration is materially misleading and

21   should not be relied upon to establish that DataRobot's "nerve center" is actually in Boston and

22   not San Francisco because it does not provide comparable data from which an evidentiary

23   conclusion can be based.

24        There exists a "'strong presumption' against removal jurisdiction [which] means that the

25   defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.,* 980

26   F.2d 564, 566 (9th Cir. 1992). DataRobot has failed to establish by a preponderance of the

27   evidence that its "nerve center" is located in Boston and not San Francisco.  Because DataRobot's

principal place of business, i.e. nerve center, was in California where Vazquez resides, this Court lacks subject matter jurisdiction over this case and it must be remanded to the Superior Court for want of diversity jurisdiction.

Alternatively, Vazquez requests the opportunity to engage in jurisdictional discovery to determine the true location of DataRobot's nerve center because of the fact that so many ELT members telecommute and DataRobot claims that there are four ELT members in both the San Francisco and Boston offices.  More information is needed in order to demonstrate which office is truly the "nerve center" and this discovery is necessary because if Plaintiff is correct, this Court does not have jurisdiction over this case and it must be remanded to the State Court.

**B.     WRIGHT   AND   VAZQUEZ   ARE   BOTH   CALIFORNIA   RESIDENTS, DEFEATING DIVERSITY JURISDICTION**

As Vazquez explained in her remand motion, it's undisputed that both Wright (now served) and Vazquez are domiciled in California. Motion 6:25-7:20. This precludes complete diversity of citizenship which is required for a proper removal based on diversity jurisdiction. 28 U.S.C. § 1332(a)(1). The district court *shall* remand the case back to the state court "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Unless this Court finds that Wright was fraudulently joined—which he was not—it must remand this case back to state court.

**C.     VAZQUEZ DID NOT CONCEDE THAT WRIGHT WAS FRAUDULENTLY JOINED TO HER PROMISSORY FRAUD CLAIM**

In her opposition to DataRobot's motion to dismiss, Vazquez conceded that her cause of action for Fraud in the Inducement should be dismissed. She did not concede that it was because Wright was fraudulently joined; the claim itself was fatally flawed. Yet DataRobot argues that "Plaintiff does not even challenge DataRobot's assertion that Wright was fraudulently joined to her promissory fraud claim, accordingly conceding that he was." Opp. 1:26, Fn. 1. DataRobot twists the facts to mislead the Court and unfairly prejudice Vazquez.  Vazquez merely

1    reevaluated the entire claim in light of DataRobot's arguments and agreed that the entire claim,

2    not just Wright, should be dismissed without leave to amend.  This was done to conserve judicial

3    resources and was not a concession of any kind.

4    **D.    VAZQUEZ CAN ESTABLISH ACTUAL RELIANCE BECAUSE ROCHLIS IS
         DISTINGUISHABLE**

5

6        DataRobot argues that Vazquez "cannot establish actual reliance as a matter of law,"

7    citing *Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 215-16 (1993) and its progeny. Opp.

8    15:8-25. However, that misrepresents *Rochlis*. There, the plaintiff was a senior executive under

9    contract to the Walt Disney Company until April 1988. *Id.* at 215. Sometime prior to October

10   1987, Rochlis became unhappy with his position and requested a new one. *Id.* at 207. In response,

11   Disney offered him a position as the executive vice president of Walt Disney Imaging ("WDI").

12   *Ibid.* On October 6, 1987, Rochlis began his new job. By January 1988, while he was still under

13   contract, Rochlis learned that he had been misled about the WDI job. *Id.* at 215. Rochlis later

14   complained about his pay and was given a $100,000 special bonus and, later, his salary was

15   increased to $250,000 plus a discretionary bonus. *Id.* at 209. On January 27, 1989, Rochlis

16   resigned. *Ibid.* The following year he took a job with King World, which was significantly more

17   financially lucrative than his job at Disney. *Ibid.* After just seven months in that job, he resigned,

18   claiming that he had been constructively discharged. He settled with King World then filed this

19   action against Disney on October 31, 1990, claiming that it had fraudulently misled him about

20   the WDI position. *Ibid.* The *Rochlis* court found that Rochlis could not have relied upon the

21   misrepresentations because, even after learning of their falsity, he remained there for nine months

22   beyond the expiration of his contractual commitment. *Ibid.* It was the Rochlis' affirmative act of

23   remaining after his contract expired and profiting from the new position that deprived him of

24   reliance. Nowhere did the *Rochlis* court state—or even infer—that a misled employee must quit

25   their job in order to have relied upon pre-employment misrepresentations, as defendants argue.

26       DataRobot attempts to analogize *Rochlis* by arguing that Vazquez sought "bonuses and a

27   promotion just like the *Rochlis* plaintiff." Opp. 16:11-12. However, DataRobot fails to proffer

any evidence in support of its argument, and none exists. Vazquez alleged that "Nick King nominated PLAINTIFF for a quarterly bonus ... which Elise Cole denied." Complaint ¶ 30(c). And that "Nick King approved PLAINTIFF for a promotion, which Elise Cole denied." Complaint ¶ 30(d). However, there is no evidence that Vazquez *sought* such benefits. Many companies automatically promote employees, absent problems with their work. Additionally, Rochlis received both a salary increase and a bonus (*Rochlis v. Walt Disney Co., supra,* 19 Cal. App. 4th 201 at 209) along with a promotion to Executive Vice President, the second highest position at WDI (*Id.* at 207). In contrast, Vazquez does not allege receiving a bonus or a promotion, but she does allege that she was wrongfully terminated. DataRobot also cites *Rubinstein v. SAP AG,* 2012 WL 726269, at *6 (N.D. Cal. Mar. 1, 2012). However, *Rubinstein* merely cites *Rochlis.*

    *Rochlis'* distinguishability is supported by its reliance upon *Mercer v. Elliott,* 208 Cal.App.2d 275, 279 (1962) and *Carpenter v. Hamilton,* 18 Cal.App.2d 69, 71-72 (1936). *Mercer* involved representations made in the course of purchasing an airplane. The plaintiff made a limited, cursory inspection of the airplane the day before purchasing it. The next month, the plaintiff discovered the plane's true condition. The court ruled that the plaintiff was justified in relying upon the defendant's prior representations. "It is only where a party to whom a representation is made **has the means at hand for determining its truth or falsehood and resorts to such means** ... that he is precluded from asserting that he relied upon the representation." *Mercer v. Elliott, supra,* 208 Cal.App.2d 275 at 279, emphasis added. Similarly, the *Carpenter* court held that "Plaintiffs had a right to rely upon the representations made to them concerning matters of fact which were unknown to them, *without making any inquiry concerning the truth thereof.*" *Carpenter v. Hamilton, supra,* 18 Cal.App.2d 69 at 71, emphasis added. When the DataRobot recruiters repeated Wright's misrepresentations to Vazquez, she lacked the means for determining their truth. Moreover, even if she had the means, it's undisputed that she did not resort to them. Therefore, per *Mercer* and *Carpenter,* Vazquez is entitled to rely upon Wright's misrepresentations.

*Hall v. FedEx Freight, Inc.*, 2015 WL 574177 (E.D. Cal., 2015), also supports Vazquez's reliance. There, a FedEx driver remained with the company after discovering that he had been misled. FedEx argued that, under *Rochlis*, the plaintiff could not establish reliance. However, the *Hall* court distinguished *Rochlis* on the grounds that Rochlis enjoyed significant ability to negotiate his pay and bonus structure; his transfer did not negatively affect his pay; and his executive position enabled him to move into a new job in a way that Hall (and Vazquez) could not. The court concluded that Hall's decision to remain with FedEx even after discovering the "truth" did not negate actual reliance as a matter of law. *Id.* at *16.

**E.    WRIGHT OWED VAZQUEZ A DUTY OF DISCLOSURE DESPITE THE LACK OF A FIDUCIARY RELATIONSHIP**

DataRobot argues that Vazquez's cause of action for Misrepresentation by Concealment should be dismissed because "Plaintiff cannot possibly plead that Wright owed her a fiduciary duty." Opp. 16:27. However, this is another red herring because Vazquez doesn't allege that Wright's duty to disclose was based upon a fiduciary duty.

Next, DataRobot argues that "to the extent Plaintiff claims that an 'employer-prospective employee' relationship existed, that relationship was between Plaintiff and DataRobot, not Plaintiff and Wright." Opp. 17:2-4. However, DataRobot ignores the fact that "Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, but may become liable if they directly ordered, authorized or participated in the tortious conduct," *Wyatt v. Union Mortg. Co.,* 24 Cal. 3d 773, 785 (1979). "When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff." *Jamison v. Purdue Pharma Co.,* 251 F. Supp. 2d 1315, 1318 (S.D. Miss. 2003). Additionally, "Removal statutes are strictly construed, and all doubts are resolved against the finding of proper removal." *Ibid.* Thus, for the purposes of this motion, Vazquez's allegations regarding Wright's involvement must be accepted as true and her remand motion should be granted.

Next, DataRobot cites *Bell v. Fed. Home Loan Mortg. Corp.,* No. 11-CV-2514-MMA RBB, 2012 WL 4576584, *5 (S.D. Cal. Oct. 1, 2012) for the proposition that dismissal with prejudice was proper where "the plaintiff failed to 'allege any facts that suggest that [the agent] even knew of plaintiffs existence.'" Opp. 17:17-19. However, DataRobot's cherrypicked quote is misleading because the *Bell* court actually dismissed the case because, "Ultimately, there is no indication in the SAC that there was any relationship whatsoever *of any kind* between Litton and Plaintiffs. As a result, Plaintiffs' claims for fraudulent concealment and negligent misrepresentation against Litton fail." *Ibid.*, emphasis in original. First, Vazquez has alleged a relationship with Wright. He was the CEO of DataRobot who determined how potential candidates for employment should be treated and what they should be told.  He directly ordered, authorized or participated in the tortious misconduct. *Wyatt, supra,* 24 Cal. 3d at 785.  Second, Wright fails to inform the Court that *Bell* is distinguishable because there "Plaintiffs had three opportunities to allege viable claims against [the defendant]." *Id.* at *6. Since Vazquez has not been granted such opportunities, *Bell* does not support Wright's argument that Vazquez's claim should be dismissed without leave to amend, even if she inadequately pled their relationship.

Next, DataRobot argues that "plaintiff cannot possibly state a claim against Wright under California Civil Code section 1572 "because "Section 1572 is limited to situations where the parties have a contractual relationship … But Plaintiff does not allege the existence of any contractual or precontractual relationship with Wright, nor could she." Opp. 17:20-26, citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997). However, as is its practice, DataRobot misquotes *LiMandri* by omitting a key phrase that directly applies to this case. Section 1572 actually applies to acts committed by a party to the contract "*or with his connivance.*" Emphasis added. That phrase is critical because Vazquez alleges that the fraud was committed with Wright's connivance. "Connivance is an agreement or consent, directly or indirectly given, that something unlawful shall be done by another."  *Oakland Bank of Sav. v. Wilcox* 60 Cal. 126, 137 (1882).  That is exactly what happened here.  Wright instructed recruiters to convey unlawful misrepresentations to potential candidates like Vazquez and she relied on the connivance to her

detriment. Per *Jamison, supra,* "When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff." Additionally, the *LiMandri* court ruled that even without a fiduciary relationship, parties to a transaction, such as an employment relationship, have a duty to disclose information not known to the other party. "**A duty to disclose may arise from the relationship between** seller and buyer, **employer and prospective employee**, doctor and patient, or parties entering into any kind of contractual agreement. (Civ.Code, § 1572, subd. 3.)" *Id.* at 337, emphasis added. Since Vazquez has sufficiently alleged a relationship with Wright, her motion for remand should be granted.

## F. VAZQUEZ SUFFICIENTLY ALLEGED ACTUAL RELIANCE UPON WRIGHT'S FRAUDULENT MISREPRESENTATIONS

DataRobot argues that "the essence of Plaintiffs fraud claims is that Wright indirectly made representations about DataRobot's financial outlook as it related to a future IPO and its ability to 'fast track' an IPO." Opp. 14:13-15. However, the phrase "looks solid" is a statement about the present, not the future. Vazquez does not allege that the fact that an IPO didn't occur renders the phrase fraudulent. But "looks solid for an IPO" and "fast tracking an IPO" are statements about the present financial condition of the company, not the future. DataRobot's repeated denials should be disregarded.

DataRobot argues that "Plaintiff does not allege that she was ever told 'DataRobot's finances looked solid for an IPO'" (Opp. 14:23-24, Fn. 13; 18:20-21) despite Vazquez's unambiguous allegation that she was told that "DATAROBOT's finances looked solid for an IPO." Complaint ¶ 18(a). DataRobot similarly argues that "nor does [Vazquez] allege that Wright instructed recruiters to tell candidates that the company was in the process of 'fast tracking' an IPO, only that he allegedly instructed them to use the expression 'fast tracking.'" Opp. 18:21-23. Once again, DataRobot's attempt to mislead the Court is belied by merely reading Vazquez's complaint, wherein she alleged "WRIGHT told recruiters to use the expression 'fast tracking an IPO.'" Complaint ¶ 18(b).

DataRobot further argues that "Even considering Plaintiffs allegation that Wright instructed recruiters to tell candidates that an 'IPO was being fast tracked,' this is not a statement of existing fact, but instead Wright's prediction that DataRobot would IPO at some point in the future." Opp. 19:12-15. But DataRobot fails to proffer any bases for that conclusion. When someone refers to how something looks, that refers to its then-current look, not how it might look in the future. Similarly, when a person states that something "is being done" it refers to something happening currently, not a future potential. DataRobot cites *In re American Apparel, Inc. Shareholder Litigation,* 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012), for the proposition that "repeated use of words like 'pursuing,' 'looking to build,' 'going to be' and 'committed to' indicates that the company was articulating goals it was trying to meet, not making factual statements." Opp. 19:17-21. However, that is merely a red herring because Vazquez doesn't allege that Wright used such terms.

## G.   VAZQUEZ CONCEDES THAT THE IIED CLAIM AS TO WRIGHT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND

Unlike DataRobot, Vazquez is willing to concede to a valid argument. She agrees that she cannot meet the requirements for a claim for Intentional Infliction of Emotional Distress against Wright and that such claim should be dismissed without leave to amend as against Wright. It is not necessary to evaluate this claim for the motion to remand.

## H.   IF ANY OF VAZQUEZ'S CAUSES OF ACTION ARE INSUFFICIENTLY PLED, SHE IS ENTITLED TO LEAVE TO AMEND THEM

"It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *National Council of La Raza v. Cegavske* 800 F.3d 1032, 1041 (9th Cir. 2015), citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003) ["Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment."] As the U.S. Supreme Court expressly stated, "Rule 15(a) declares that

leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Supreme Court explained that:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

DataRobot argues that Vazquez should be denied leave to amend because of her "refusal to file an amended complaint." Opp. 13:28, Fn. 11. However, that's another attempt to mislead the Court because Vazquez hasn't been granted leave to file an amended complaint. DataRobot also argues that Vazquez should be denied leave to amend, citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F .3d 981, 1007 (9th Cir. 2009). However, Zucco is distinguishable because there the plaintiff was granted leave to amend twice before it was denied. "The fact that Zucco failed to correct these deficiencies in its Second Amended Complaint is 'a strong indication that the plaintiffs have no additional facts to plead.'" *Id.* at 1007. In contrast, this is Vazquez's first request for leave to amend. Given that there is no evidence of undue delay, bad faith or dilatory motive on Vazquez's part nor undue prejudice to Wright, and DataRobot has failed to demonstrate that she cannot successfully amend her complaint, Vazquez should be granted leave to amend.

## III.  CONCLUSION

For all of the above reasons, this honorable Court should grant Vazquez's motion and remand this case back to state court.

DATED: February 7, 2023

WINER, BURRITT & SCOTT, LLP

By: _____

Matthew P. Vandall, Esq.
Attorneys for Plaintiff
RAQUEL VAZQUEZ

1 | *Raquel Vazquez vs. DataRobot, Inc., et al.*
2 | *USDC Northern District of California Case No. 3:22-cv-07619-LB*

3

<u>**PROOF OF SERVICE**</u>

4

I, the undersigned, declare that I am employed in the County of Alameda, California.  My business address is 1901 Harrison Street, Suite 1100, Oakland, California 94612.  I am over the age of eighteen (18) years and am not a party to the within action.

5

6

On the date below, I served the following documents:

7

- **REPLY TO OPPOSITION TO MOTION FOR REMAND**

8

on the parties listed below, by placing a true and correct copy thereof addressed as follows:

9

| | |
|---|---|
| ANDREW R. LIVINGSTON, ESQ.<br>alivingston@orrick.com<br>RACHEL CAPLER, ESQ.<br>rcapler@orrick.com<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669<br>Telephone: +1 415 773 5700<br>Facsimile: +1 415 773 5759<br><br><br>***Counsel for Defendant***<br>***DataRobot, Inc.*** | MOE FODEMAN, ESQ.<br>WILSON SONSINI GOODRICH & ROSATI<br>1301 Avenue of the Americas, 40th Floor<br>New York, NY 10019<br>direct: 212.497.7704 \| mobile: 646.208.4387<br>e-mail: mfodeman@wsgr.com<br><br>ULRICO S. ROSALES, ESQ.<br>WILSON SONSINI GOODRICH & ROSATI<br>650 Page Mill Road<br>Palo Alto, CA 94304<br>Tel:  650.493.9300; Fax: 650.565.5100<br>Email: rrosales@wsgr.com<br><br>***Counsel for Defendant***<br>***Dan Wright*** |

10

11

12

13

14

15

16

17

18

19

20 | ☒      BY ELECTRONIC TRANSMISSION - I caused the documents to be sent to the persons at the e-mail addresses listed above on the dates and at the times stated thereon.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

21

22 | I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

23

24 | Dated:  February 7, 2023

*Linda M. Carcamo-Rios*
_____
Linda M. Carcamo-Rios

25

26

27

28