1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

RAQUEL VAZQUEZ,

Plaintiff,

v.

DATAROBOT, INC., DAN WRIGHT, and
DOES 1 through 20, inclusive,

Defendants.

Case No. 22-cv-07619-LB

**ORDER DENYING MOTION TO
REMAND AND GRANTING MOTIONS
TO DISMISS IN PART**

Re: ECF Nos. 13, 30, 33

**INTRODUCTION**

The plaintiff, who was a senior director at DataRobot from May 2021 until May 2022, sued DataRobot and its former CEO Dan Wright for discrimination (based on gender, ethnicity, veteran status, and PTSD disability status), wrongful termination, retaliation, fraud, intentional and negligent misrepresentation, and intentional infliction of emotional distress. The fraud claims are based on Mr. Wright's allegedly inducing the plaintiff to join DataRobot by misrepresenting the company's ability to go public.

The plaintiff filed her complaint in state court, and DataRobot removed the case to federal court, asserting diversity jurisdiction on the ground that the plaintiff is a citizen of California, DataRobot is a Delaware corporation with its headquarters and principal place of business in Boston, and Mr. Wright — while a California citizen — is a sham defendant who was fraudulently joined. The plaintiff moved to remand the case to state court for lack of diversity jurisdiction, asserting that

DataRobot's principal place of business is in California and Mr. Wright is not a sham defendant. The defendants moved to dismiss the fraud and emotional-distress claims.

The court denies the motion to remand. DataRobot is incorporated in Delaware, its headquarters is in Boston, and its leadership is divided across multiple locations. Although the executive team is dispersed across the San Francisco Bay Area and Boston and mostly works from home, the jurisdictional facts establish that DataRobot's principal place of business is Boston, not the Bay Area. And Mr. Wright was fraudulently joined because his alleged misrepresentations are not actionable as a matter of law. The court thus has diversity jurisdiction.

The plaintiff concedes dismissal of the fraud claim with prejudice. The court grants the motion to dismiss the misrepresentation and emotional-distress claims asserted against DataRobot with leave to amend.

**STATEMENT**

**1.  Factual Background and Procedural History**

The plaintiff, who has significant experience as a financial strategist, is a single mother of Latin descent and an Air Force combat veteran with residual PTSD. After her honorable discharge in 2004 from the Air Force (after six years of service), she earned her college degree in business and began a successful career at Cisco, where she was promoted repeatedly, ultimately assuming the position of Chief of Staff and Director, Performance Center of Excellence. While she was at Cisco, "she was recruited to come to work for" DataRobot and began working there in May 2021.[1] DataRobot is a software-as-a-service company, and Mr. Wright was its CEO during the plaintiff's tenure. Mr. Wright previously was DataRobot's President and COO (since January 2020), but when DataRobot ousted its founder Jeremy Achin in February 2021 (two months before the plaintiff started working there), he became its CEO.[2]

The plaintiff's job was senior director for business management and operations (with a functional title of Chief of Staff to the Chief Marketing Officer). She took the job after being

---

[1] Compl. – ECF No. 1 at 19–20 (¶¶ 9–12). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 20 (¶ 12).

assured that DataRobot would soon undergo an initial public offering. That assurance was premised on Mr. Wright's statement at a public meeting "within days of becoming CEO" [in February 2021] that DataRobot "was ready and able to fast-track an IPO by the end of 2021," about ten months away, and his projecting revenue growth in the future.[3] He also told recruiters "to provide information about the company that he knew or should have known to be false," including the following: (1) DataRobot's finances "looked solid for an IPO," which was false because at the time, DataRobot had not started an external audit or "SOX [Sarbanes-Oxley] compliance," and there was no basis for the assertion; (2) recruiters should use the expression "fast tracking an IPO," when the foundational prerequisites for an IPO were not in place; and (3) the IPO would make employees "incredibly wealthy" and provide "life-changing wealth," even though at the time, DataRobot "had not taken substantial enough steps to knew whether an IPO was even a reasonable possibility."[4] "Money that companies in the process of making an [IPO] set aside for marketing, re-branding, and PR was not set aside, despite what [the plaintiff] had been told about [an] imminent IPO." When the plaintiff arrived, "she was surprised that basically nothing seemed to be going on in service to the 'imminent' IPO."[5]

In sum, DataRobot's business practices "were not consistent with the promise of an imminent IPO."[6] After starting at DataRobot, the plaintiff "immediately set about fixing" the "longstanding operational chaos" she observed, and over time she "report[ed] failures in basic accounting" and refused requests to "cook the books." In response, she was allegedly discriminated against based on her gender, ethnicity, veteran status, and disability. For example, she was excluded from planning meetings, but male employees were not. An executive commented "about her status as a single mother with PTSD," such as by saying during a planning conversation "[l]et's breathe, we don't want to disturb your PTSD and stress," despite that comment's having "no bearing on the issues

---

[3] Compl. – ECF No. 1 at 21 (¶ 13); Vazquez Decl. – ECF No. 30-7 at 1 (¶ 2); Suchanek-Vacca Decl. – ECF No. 35-1 at 5–6 (¶ 15); Offer Letter, Ex. A to Suchanek-Vacca Decl. – ECF No. 35-1 at 8–11.

[4] Compl. – ECF No. 1 at 21 (¶ 13), 23–24 (¶ 18).

[5] *Id.* at 30 (¶ 29(m)).

[6] *Id.* (¶ 29(o)).

being discussed." Bonuses were given out by white men to other white men "on the spot," but when the plaintiff was nominated for a bonus, it was denied.[7]

In February 2022, the plaintiff "was informed" that DataRobot was laying off seven percent of its workforce and "she had been chosen for termination." Before she "was chosen" for termination, "as part of the layoff selection process, she was shown a spreadsheet of employees in the company" with employee name, salary, rank, performance, and the effect of termination (if it occurred) on DataRobot. The spreadsheet described her work as "exceptional" and her importance to the company as "critical."[8] Her termination thus was pretextual and "was substantially motivated by animus towards [her] gender, ethnicity and as retaliation for reporting serious accounting deficiencies and resisting efforts to commit fraud in her own department."[9] "[A]ggressive and unpleasant white males . . . were not only retained but allowed to participate in a secret deal to sell millions of dollars in stock[.]" "[H]igh-performing authoritative women," including the plaintiff, "were viewed as 'toxic' and terminated." DataRobot terminated seventy employees, including the plaintiff, on May 13, 2022.[10]

The plaintiff filed the complaint in state court on November 15, 2022.[11] DataRobot timely removed the case on December 2, 2022.[12] There are nine claims: (1) promissory fraud; (2) intentional misrepresentation, Cal. Civ. Code § 1710(1); (3) misrepresentation by concealment, *id.*; (4) negligent misrepresentation, *id.* § 1710(2); (5) discrimination based on sex, race, national origin, veteran status, and disability under the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(a); (6) failure to prevent discrimination, *id.* § 12940(j)(1) & (k); (7) wrongful termination in violation of public policy; (8) whistleblower retaliation, Cal. Lab. Code § 1102.5;

---

[7] *Id.* at 27–33 (¶¶ 29–30), 42 (¶ 81).

[8] *Id.* at 33–34 (¶¶ 31–32). The use of the passive voice in quotes connotes that the plaintiff does not identify who made the statements.

[9] *Id.* at 34 (¶¶ 33, 36).

[10] *Id.* (¶¶ 34, 36).

[11] *Id.* at 17–51.

[12] Notice of Removal – ECF No. 1 at 1–15.

1   and (9) intentional infliction of emotional distress. All claims are against DataRobot, and claims

2   one through four and nine also are against Mr. Wright.[13]

3       The plaintiff concedes dismissal of claim one (promissory fraud) with prejudice (for both

4   defendants) and claim nine (intentional infliction of emotional distress) with prejudice (for Mr.

5   Wright) and without prejudice (for DataRobot).[14]

6

7   **2.   The Parties' Citizenship**

8       The plaintiff and Mr. Wright are citizens of California. DataRobot is incorporated in

9   Delaware,[15] and the parties submitted evidence about its presence in Massachusetts and California.

10      The plaintiff declares that while she was at DataRobot, she mostly telecommuted but was

11  assigned to the company's San Francisco office. The same was true of the Chief Marketing Officer

12  and Senior Vice President of Marketing, who each came into the San Francisco office for meetings

13  "regularly."[16] During the plaintiff's tenure, "a majority of the executive leadership at DataRobot

14  lived and worked in the San Francisco Bay Area." For example, the CEO, the Chief Revenue

15  Officer, the Chief Product Officer, and eleven other executives were assigned to the San Francisco

16  office, although they worked from home. The plaintiff is "not aware of more than one . . . C-Suite

17  officer actually working at or near the Boston office" during her tenure.[17]

18      The plaintiff also declares that board meetings during Mr. Wright's tenure were held in the San

19  Francisco Bay Area. She recounts two particular board meetings and one "business review"

20  meeting (a board meeting to assess business performance outside of the quarterly board meetings),

21  that were held at hotels in San Francisco.[18]

22

23  _____

24  [13] Compl. – ECF No. 1 at 35–50 (¶¶ 37–121).

25  [14] Opp'n to DataRobot Mot. to Dismiss – ECF No. 29 at 7, 10–11; Opp'n to Wright Mot. to Dismiss –
    ECF No. 37 at 7, 14.

26  [15] Compl. – ECF No. 1 at 18 (¶¶ 1, 3).

    [16] Vazquez Decl. – ECF No. 30-7 at 1–2 (¶ 2).

27  [17] *Id.* at 2 (¶ 3).

28  [18] *Id.* at 2–4 (¶¶ 4–7).

The plaintiff submitted a declaration by Roy Ballard, who worked at DataRobot from August 2018 until "April or early May" 2022, first in the sales department and then in the CEO's office.[19] Mr. Ballard declares that under former CEO Jeremy Achin (who preceded Mr. Wright), the "C-Suite executives were not centralized in any one specific location," and DataRobot held three out of four quarterly meetings at or near the Boston office. When Mr. Wright became CEO, "DataRobot systematically moved" its executive team to the Bay Area.[20] Mr. Wright told Mr. Ballard that "the future of the company was in San Francisco" and encouraged Mr. Ballard to relocate to San Francisco, which Mr. Ballard did. The Boston office "became minimized in importance" as a result. Mr. Ballard has "no reason to believe" that this migration to San Francisco reversed after his departure.[21]

During the time that Mr. Ballard's and Mr. Wright's tenures overlapped, most of the executive leadership team was located near San Francisco. This included Mr. Wright and current CEO Debanjan Saha, the General Counsel, the Chief People Officer, and eleven others. Other executives were in Washington, D.C. (the Chief Technology Officer) and the United Kingdom (the former Chief Customer Officer). Two executives, including the current Chief Customer Officer, were near the Boston office. Board meetings were held in California, five board members lived in California, and there are no longer any board members near Boston.[22]

The plaintiff also submitted twenty-six LinkedIn profiles of "executives and higher level employees" of DataRobot, including the current and former CEOs and four board members, who are all allegedly based in the San Francisco area.[23]

DataRobot submitted a declaration by its Senior Vice President of People, Amy Suchanek-Vacca. She is "the highest-ranking employee in DataRobot's human resources function." She

---

[19] Ballard Decl. – ECF No. 30-8 at 1–2 (¶ 2).

[20] Id. at 2 (¶¶ 3–6).

[21] Id. at 2 (¶ 5), 5 (¶ 14).

[22] Id. at 3–5 (¶¶ 7–8, 11–13).

[23] LinkedIn Profiles, Exs. D–AC to Vandall Decl. – ECF Nos. 30-2 to -6.

United States District Court
Northern District of California

declares that DataRobot's executive leadership team "directs, controls, and coordinates [DataRobot's] activities." That team "largely turned over on or before November 1, 2022."[24]

As of November 15, 2022, and December 2, 2022, the executive leadership team had thirteen members, including four based in San Francisco, three based in Boston, and one based partly in Boston and partly in Florida. Their roles, working locations, and number of days spent in the Boston and San Francisco offices (based on security-badge records) from October 1, 2022, through January 30, 2023, were as follows:[25]

| Name | Role | Primary Location | Days in Boston | Days in S.F. |
|------|------|-----------------|----------------|--------------|
| Debanjan Saha | CEO | San Francisco | 1 | 9 |
| Michael Schmidt | Chief Technology Officer | Washington D.C. | 6 | 2 |
| Chris Riley | President of Worldwide Field Operations | Boston/Remote from Florida | 9 | 1 |
| Jay Schuren | Chief Customer Officer | Boston | 48 | 2 |
| Brian Brown | General Counsel | San Francisco | 0 | 17 |
| Rob Hickey | Executive Vice President of Engineering | Boston | 22 | 2 |
| Jennifer Hewlette | Senior Vice President of Marketing | San Francisco | 0 | 8 |
| Sirisha Kadamalakalva | Senior Vice President of Alliance and Partnerships | San Francisco | 0 | 0 |
| Amy Suchanek-Vacca | Senior Vice President of People | Boston | 7 | 2 |
| Chris Merwin | Senior Vice President of Strategic Finance | Remote from Connecticut | 6 | 6 |
| Matt Nelson | Senior Vice President of Finance & Operations | Remote from Washington | 1 | 4 |
| Venky Veerarghavan | Senior Vice President of Product | Remote from Washington | 7 | 5 |
| Rich Hoyland | Senior Vice President of Global Sales | Remote from Pennsylvania | 2 | 0 |
| | | | Total: 109 | Total: 58 |

---

[24] Suchanek-Vacca Decl. – ECF No. 35-1 at 2–3 (¶¶ 2, 6–7).

[25] *Id.* at 3–4 (¶ 8), 5 (¶ 14).

The executive leadership team holds weekly virtual meetings. If multiple team members are working from the same location on a given day, they usually join the meeting together from a conference room. The Boston-area executives "frequently" attend these meetings in person in the Boston office, and they have a weekly "collaborate day" where they "generally try" to work together in person in the Boston office.[26]

As of November 15, 2022, and December 2, 2022, DataRobot had seven board members: three resided in California and none resided in Massachusetts. They attended board meetings remotely but some joined the virtual meeting together from the same location "from time to time."[27]

DataRobot now has a hybrid work model under which employees, including members of the executive leadership team, can work from home at their own discretion. Under this model, DataRobot's employees "primarily telework" but some come into an office "from time to time." As of November 15, 2022, and December 2, 2022, less than fifty employees resided in the San Francisco Bay Area and about 110 resided in the Boston area.[28]

DataRobot's headquarters has been in Boston since the company's founding in 2012. DataRobot leases about 60,000 square feet of office space there and lists its Boston address as its headquarters in documents and websites: SEC filings, California Secretary of State filings, customer contracts, the LinkedIn company page, employment agreements (regardless of the employee's location), confidentiality agreements, wage statements, and press releases (except one from August 2021 that listed both Boston and San Francisco).[29]

## STANDARDS OF REVIEW

### 1. Removal Jurisdiction

A defendant may remove a case to federal court if the plaintiff could have filed the case here, meaning, if the court has federal question or diversity jurisdiction. 28 U.S.C. § 1441(a); *Caterpillar*

---

[26] *Id.* at 4–5 (¶¶ 12–13).

[27] *Id.* at 4 (¶ 9).

[28] *Id.* (¶¶ 10–11).

[29] *Id.* at 2 (¶ 3), 6–7 (¶¶ 15–16, 21–25); Exs. A–J to *id.* – ECF No. 35-1 at 8–82.

United States District Court
Northern District of California

*Inc. v. Williams*, 482 U.S. 386, 392 (1987). Because district courts are courts of limited jurisdiction, courts construe the removal statute strictly and reject federal jurisdiction if there is any doubt as to the right of removal. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Corral v. Select Portfolio Servicing, Inc.*, 878 F.3d 770, 773–74 (9th Cir. 2017); *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Thus, "the court resolves all ambiguity in favor of remand." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009). The removing party has the burden of establishing the court's jurisdiction. *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988). That burden must be carried by a preponderance of the evidence. *See, e.g.*, *Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1106–07 (9th Cir. 2010).

For diversity jurisdiction, the amount in controversy must "exceed[] the sum or value of $75,000," and there must be complete diversity of citizenship between opposing parties. 28 U.S.C. § 1332(a)(1). There is "complete diversity" when each plaintiff is a citizen of a different state than each defendant. *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). In the removal context, these requirements are "determined (and must exist) as of the time the complaint is filed and removal is effected." *Strotek Corp. v. Air Transp. Ass'n. of Am.*, 300 F.3d 1129, 1131 (9th Cir. 2002). Here, those dates are November 15, 2022, and December 2, 2022.

## 2.   Motion to Dismiss — Rules 12(b)(6) and 9(b)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned

up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

Fraud allegations elicit a more demanding standard. "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "The plaintiff must [also] set forth what is false or misleading about a statement, and why it is false." *Id.* (cleaned up). Like the basic "notice pleading" demands of Rule 8, a driving concern behind Rule 9(b) is that defendants be given fair notice of the charges against them. *In re Lui*, 646 F. App'x 571, 573 (9th Cir. 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.") (cleaned up); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare an adequate answer").

If a court dismisses a complaint because of insufficient factual allegations, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook,*

1    *Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court

2    dismisses a complaint because its legal theory is not cognizable, the court should not give leave to

3    amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see*

4    *Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to

5    amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal

6    theory if given the opportunity").

**ANALYSIS**

7

8      The defendants moved to dismiss the fraud and IIED claims under Rules 12(b)(6) and 9(b),

9    and the plaintiff moved to remand for lack of diversity jurisdiction.[30] The court denies the motion

10   to remand and grants the motion to dismiss.

11

12   **1.  Motion to Remand**

13      Because the motion to remand involves the court's jurisdiction, the court addresses it first.

14   *Toumajian v. Frailey*, 135 F.3d 648, 657–58 (9th Cir. 1998). The plaintiff is a citizen of

15   California, Mr. Wright is too, and the plaintiff contends that DataRobot is a citizen of California

16   because its principal place of business is here. DataRobot counters that its principal place of

17   business is its Boston headquarters, and both defendants contend that Mr. Wright was fraudulently

18   joined because the claims against him fail as a matter of law.[31] The court denies the motion to

19   remand because DataRobot has established that there is diversity jurisdiction: its principal place of

20   business is in Boston, and Mr. Wright was fraudulently joined.

21   **1.1  DataRobot's Principal Place of Business**

22      The first issue is DataRobot's principal place of business.

23      A corporation is "a citizen of every state and foreign state by which it has been incorporated and

24   of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Its

25   "principal place of business" is its "nerve center," or the place where its "officers direct, control,

26

27   [30] Mots. – ECF Nos. 13, 30, 33. The parties consented to magistrate-judge jurisdiction. Consents – ECF Nos. 17, 18, 22.

28   [31] Mot. – ECF No. 30; Opp'n – ECF No. 35; Joinder – ECF No. 36.

United States District Court
Northern District of California

1  and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010); *see*

2  *also Harris v. Rand*, 682 F.3d 846, 851 (9th Cir. 2012). The nerve center is the only principal place

3  of business: "[f]or example, if the bulk of a company's business activities visible to the public take

4  place in New Jersey, while its top officers direct those activities just across the river in New York,

5  the 'principal place of business' is New York." *Hertz*, 559 U.S. at 96.

6      *Hertz* has other guidance about how to identify a corporation's nerve center. It "should

7  normally be the place where the corporation maintains its headquarters — provided that the

8  headquarters is the actual center of direction [and] control . . . and not simply an office where the

9  corporation holds its board meetings (for example, attended by directors and officers who have

10  traveled there for the occasion)." *Id.* at 93. Also, "the mere filing of a form like the [SEC's] Form

11  10–K listing a corporation's 'principal executive offices'" does not, "without more," establish a

12  corporation's nerve center. *Id.* at 97. Otherwise, corporations would be enabled to engage in

13  "jurisdictional manipulation." *Id.* Thus, "if the record reveals attempts at manipulation — for

14  example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a

15  computer, or the location of an annual executive retreat — the courts should instead take as the

16  'nerve center' the place of actual direction, control, and coordination." *Id.*

17      The present case raises the difficult question of how to apply the nerve-center test in the post-

18  pandemic telecommuting context.

19      The *Hertz* Court adopted the nerve-center test because, at least usually, it is "simple to apply."

20  *Id.* at 94–95. "A corporation's 'nerve center,' usually its main headquarters, is a single place. The

21  public often (though not always) considers it the corporation's main place of business. And it is a

22  place within a State." *Id.* at 93. By contrast, the "business activities test" that the *Hertz* Court

23  rejected looked "at the State itself, measuring the total amount of business activities that the

24  corporation conducts there." *Id.* The benefit of the nerve-center test is that "[c]ourts do not have to

25  try to weigh corporate functions, assets, or revenues different in kind, one from the other." *Id.* at 96.

26      The *Hertz* Court acknowledged that "under the 'nerve center' test we adopt today, there will be

27  hard cases. For example, in this era of telecommuting, some corporations may divide their

28  command and coordinating functions among officers who work at several different locations,

United States District Court
Northern District of California

perhaps communicating over the Internet." *Id.* at 95–96. In that situation, the nerve-center test "points courts in a single direction, toward the center of overall direction, control, and coordination." *Id.* at 96.

The Ninth Circuit provided some relevant guidance — albeit in the different context of a holding company — in *3123 SMB LLC v. Horn*, 880 F.3d 461 (9th Cir. 2018). There, the court addressed the principal place of business of a holding company that, at the time the complaint was filed, had done nothing other than to incorporate in Missouri. *Id.* at 463. At that time, the company had one board member, who resided in California. *Id.* at 464. The company's "fundamental business operation was to hold a [board] meeting each year in [Missouri]." *Id.* at 465. The district court held that the principal place of business was California because the board member resided there and when the case was filed, there hadn't yet been any meetings in Missouri; thus, the board member must have directed and controlled the company from California. *Id.* at 468–69.

The Ninth Circuit reversed, observing that "[t]he assumption that a holding company's principal place of business is in the state where its officers reside is problematic." *Id.* at 469. "To begin with, [that] approach looks to the state as a whole rather than the specific place within the state from which the officer presumably directs the company's activity." *Id.* "Corporations aren't usually directed from their managers' homes," and there was "no evidence that [the California-based officer] directed activity from her home as opposed to some other location in her home state." *Id.* "In addition, a corporation's nerve center is a single place," and "holding companies often have more than one decision-maker living in more than one state. How is a district court to choose among them?" *Id.* "More generally, the connection between the state where a holding company conducts its business, on the one hand, and the states where its officers and directors reside, on the other, is tenuous." *Id.* "Equally problematic is the assumption that a corporation's principal place of business can shift over time without any change to the corporation's structure or operation." *Id.*

In light of these considerations, the court adopted "a rule presuming that from inception a holding company directs its business from the place where it holds board meetings." *Id.* at 470. After all, "[s]traightforward jurisdictional rules . . . offer greater predictability for corporations

making business and investment decisions and for plaintiffs deciding whether to sue in state or federal court." *Id.*

District-court decisions provide further guidance for the situation where the corporation's direction and control is divided across multiple states. Three examples will suffice.

In *Pool v. F. Hoffman-La Roche, Ltd.*, four of the defendants' acting officers were based in Little Falls, New Jersey, and two were based in South San Francisco, California. 386 F. Supp. 3d 1202, 1220–21 (N.D. Cal. 2019). The "sheer numbers" weighed in favor of Little Falls, "[b]ut sheer numbers are not dispositive." *Id.* at 1220. The CEO, whose "governance role would appear to be highly significant," was based in South San Francisco. *Id.* at 1220–21. Given that the court was addressing diversity in the removal context, the court concluded that there were "doubts about the propriety of removal" and therefore remanded. *Id.* at 1221. Put another way, "the [r]emoving [d]efendants failed to meet their burden of proving that the nerve center [was] in fact Little Falls." *Id.*; *see also Sheets v. F. Hoffmann-La Roche Ltd.*, No. 18-cv-04565-JST, 2018 WL 6428460, at *2–3 (N.D. Cal. Dec. 7, 2018) (same outcome against one of the same defendants in the removal context).

Similarly, in *Benchmark Invs., Inc. v. PAVmed Inc.*, the issue was whether Benchmark's principal place of business was in New York or Georgia. No. 20-CV-10888 (VSB), 2021 WL 5967918, at *3 (S.D.N.Y. Dec. 16, 2021). The court started with the premise that "a corporation's 'nerve center' . . . is where the lion's share of corporate decisionmaking and direction occurs at the time a lawsuit is initiated." *Id.* at *2. "[T]he lion's share of Benchmark's corporate decisionmaking [was] clearly made in New York," because its entire management team worked there, including its CEO who "ha[d] been working remotely from New York State since the COVID-19 pandemic started, with approximately 10 days a month spent in Benchmark's New York branch office." *Id.* at *3 (cleaned up). And "Benchmark's references to the address that has appeared on its governmental filings [was], without more, irrelevant." *Id.* at *4 (cleaned up).

In *Colmenares v. Paedae, Inc.*, the (removing) defendant corporation's direction and control was more divided than in the preceding cases. No. CV 21-5221-DMG (KSX), 2021 WL 4934976 (C.D. Cal. Oct. 22, 2021). The parties disputed whether the defendant's principal place of business was in Granville, Ohio, or Los Angeles, California. *Id.* at *1. The court looked to "who [the]

[d]efendant's principal officers are and where they work." *Id.* at *3. Of the nine high-ranking officers, three lived in Ohio and worked out of the Granville office, two lived in California (one worked in the Los Angeles office and one worked from home in San Diego), two worked from home in Minnesota, "and the other two work[ed] in New York and Florida." *Id.* at *3–4 & n.4. The plaintiff disputed who the high-ranking officers really were and pointed out that the chairman spent a lot of time in California. *Id.* at *3. Because the plaintiff had "some personal knowledge of the inner workings of the company (albeit from before the relevant time period) and because doubts as to removability should be construed against the removing party," the court allowed the plaintiff to conduct jurisdictional discovery before deciding the diversity issue. *Id.*

In the end, the evidence showed that "a plurality of [the] officers with strategic, decision-making, and financial authority" worked in the Granville office, and that office was "the only single place home to more than one of them." *Id.* at *4. By the time the complaint was filed, the CEO worked almost exclusively in Florida and "over 80% of the company's employees report[ed] directly to" one of the Granville executives. *Id.* The court thus held that Granville was the principal place of business. *Id.*

Here, DataRobot is a citizen of Delaware and Massachusetts and thus is diverse from the plaintiff.

DataRobot is incorporated in Delaware.[32] As for its principal place of business, the relevant facts are (1) the evidence that Boston is DataRobot's headquarters and (2) the evidence DataRobot submitted about its thirteen-member executive leadership team in the Suchanek-Vacca declaration. The plaintiff's declarations are about events before fall 2022, when DataRobot's leadership team largely turned over. (The plaintiff admits as much in her reply brief, where she observes that the relevant time period is "when the complaint in this matter was filed and removed" (November 15, 2022, and December 2, 2022) and where she does not meaningfully rely on her own evidence.[33]) The parties' other evidence — about DataRobot's board and board meetings and its executives and

---

[32] Compl. – ECF No. 1 at 18 (¶ 3).

[33] Reply – ECF No. 38 at 4–9.

employees whose positions are below those on the thirteen-member "executive leadership team" — is insignificant because it is the executive leadership team that "directs, controls, and coordinates [DataRobot's] activities."[34]

The relevant evidence about the executive leadership team, by itself, is ambiguous as to whether DataRobot's principal place of business is in Boston or San Francisco. The number of executives based in each location is roughly equal (four in each, but on the Boston side, one is partly Boston-based and partly Florida-based). Boston has the Chief Customer Officer, the Executive Vice President of Engineering, the Senior Vice President of People, and the (partly Florida-based) President of Worldwide Field Operations, and San Francisco has the CEO, General Counsel, Senior Vice President of Marketing, and Senior Vice President of Alliance and Partnerships.[35] During the relevant time period, these executives mostly worked from home.[36] Because courts shouldn't "try to weigh corporate functions, assets, or revenues different in kind, one from the other," *Hertz*, 559 U.S. at 96, the executive leadership team's distribution makes Boston and San Francisco roughly "tied" as DataRobot's principal place of business.

That Boston is DataRobot's headquarters breaks the tie, though. DataRobot holds its Boston office out as its headquarters (or its "principal executive office") to its customers, its employees, the government, and the public. It has done so since it was founded in 2012.[37] And there is no evidence of jurisdictional manipulation such that the court should look exclusively to the executive leadership team's location. *Id.* at 97. To the contrary, during the relevant time period, the executive leadership team was in the Boston office about twice as often as the San Francisco office. The Boston-based executives also try to work in the office together on weekly "collaborate days."[38] This is not a truly distributed company: it has a headquarters office that "[t]he public often . . . considers [to be] the corporation's main place of business" and that should "usually" be

---

[34] Suchanek-Vacca Decl. – ECF No. 35-1 at 2–3 (¶ 6).

[35] *Id.* at 3–4 (¶ 8).

[36] *Id.* at 4 (¶ 11), 5 (¶ 14).

[37] *Id.* at 2 (¶ 3), 6–7 (¶¶ 15–16, 21–25); Exs. A–J to *id.* – ECF No. 35-1 at 8–82.

[38] Suchanek-Vacca Decl. – ECF No. 35-1 at 5 (¶¶ 13–14).

the nerve center. *Id.* at 93. In this scenario, courts should favor "[s]traightforward jurisdictional rules" because they "offer greater predictability for corporations making business and investment decisions and for plaintiffs deciding whether to sue in state or federal court." *See 3123 SMB*, 880 F.3d at 470. Thus, DataRobot's Boston headquarters is dispositive on this record, and DataRobot has shown by a preponderance of the evidence that its principal place of business is in Boston. That makes DataRobot and the plaintiff diverse.

The plaintiff asks for jurisdictional discovery to more definitively establish DataRobot's principal place of business.[39] Jurisdictional discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). But DataRobot has already provided thorough evidence about its executive leadership team and its Boston headquarters. More details about the executive leadership team wouldn't help because the court shouldn't try to weigh different corporate functions. The leadership team is roughly divided between Boston and San Francisco, and the Boston headquarters is dispositive.

### 1.2   Fraudulent Joinder

The next issue is whether Mr. Wright — a citizen of California like the plaintiff — defeats diversity jurisdiction or is a sham defendant who was joined fraudulently.

An action that otherwise meets the diversity-jurisdiction criteria may not be removed "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). But despite the presence of a non-diverse or resident defendant, removal is proper when that defendant was fraudulently joined. *McCabe v. Gen. Foods*, 811 F.2d 1336, 1339 (9th Cir. 1987). If a plaintiff "fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." *Id.*

There is, however, a presumption against fraudulent joinder, and a defendant who asserts it "carr[ies] [a] heavy burden of persuasion." *Lieberman v. Meshkin, Mazandarani*, C-96-3344 SI,

---

[39] Mot. – ECF No. 30 at 31; Reply – ECF No. 38 at 9.

1    1996 WL 732506, at *2 (N.D. Cal. Dec. 11, 1996) (citing *Boyer v. Snap-on Tools Corp.*, 913 F.2d

2    108, 111 (3d Cir. 1990)). A removing defendant must therefore do more than show that the

3    complaint at the time of removal fails to state a claim against the non-diverse defendant. *See*

4    *Burris v. AT & T Wireless, Inc.*, No. C 06-02904 JSW, 2006 WL 2038040, at *2 (N.D. Cal. July

5    19, 2006). "Remand must be granted unless the defendant shows that the plaintiff 'would not be

6    afforded leave to amend his complaint to cure [the] purported deficiency.'" *Padilla v. AT & T*

7    *Corp.*, 697 F. Supp. 2d 1156, 1159 (C.D. Cal. 2009) (quoting *Burris*, 2006 WL 2038040 at *2).

8         The remaining claims against Mr. Wright (given that the plaintiff conceded the IIED claim) are

9    intentional and negligent misrepresentation (claims two and four) and misrepresentation by

10   concealment (claim three). As a matter of law, his alleged misrepresentations are not actionable, and

11   his joinder thus is fraudulent.

12        "The elements of intentional misrepresentation, or actual fraud, are: (1) misrepresentation (false

13   representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to

14   defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." *Anderson v.*

15   *Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474 (1997) (cleaned up). "Unlike fraud, a claim for

16   negligent misrepresentation 'does not require knowledge of falsity, but instead requires a

17   misrepresentation of fact by a person who has no reasonable grounds for believing it to be true.'"

18   *Beard v. Int'l Bus. Machs. Corp.*, No. C-18-06783-WHA, 2019 WL 1516592, at *2 (N.D. Cal. Apr.

19   7, 2019) (quoting *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230–31 (2013)).

20        The Statement sets forth Mr. Wright's statements: (1) at public meetings, referencing

21   DataRobot's financials, Mr. Wright said that the company was able to launch an IPO in ten months,

22   and (2) he told recruiters to push the IPO possibility.[40] In her opposition to DataRobot's motion to

23   dismiss, the plaintiff agrees that predictions of future events are not actionable but identifies two

24   statements that she characterizes as statements of DataRobot's existing financial condition: (1)

25   DataRobot's "finances looked solid for an IPO," and (2) DataRobot was "fast tracking" the IPO.[41]

26

27   [40] *See supra* Statement.

28   [41] Opp'n – ECF No. 37 at 7–8 (citing Compl. – ECF No. 1 at 23 (¶ 18(a)).

For these statements (and all of the alleged statements by DataRobot employees), the plaintiff kept working at DataRobot after she knew that the representations were untrue. Thus, the defendants contend that under *Rochlis v. Walt Disney Co.*, the plaintiff cannot establish detrimental reliance as a matter of law.[42] 19 Cal. App. 4th 201, 215–16 (1993). In *Rochlis*, a Walt Disney executive had a three-year contract that expired in April 1988. *Id.* at 207. He accepted a new position in another division in October 1987 but learned a few months later that Disney had misrepresented aspects of the job to him. *Id.* at 208. He nonetheless remained in the position until January 1989 (roughly fifteen months under his contract and another nine months after that). He never sought another position, and he negotiated for a bonus and a salary increase. *Id.* at 209. Ultimately, he resigned and claimed fraudulent misrepresentation, among other claims. *Id.* On appeal, and following summary judgment, the court held as a matter of law that because he decided to stay despite his awareness of problems that initially were not disclosed to him, he did not detrimentally rely on misrepresentations in transferring to the position. *Id.* at 215–16.

The context here is similar: by her own description, the plaintiff was a senior director (with the functional title of Chief of Staff to the Chief Marketing Officer). As soon as she arrived, she recognized business practices that were inconsistent with an imminent IPO and set about fixing them. And she stayed until she was laid off a year later.

The plaintiff distinguishes *Rochlis* on the ground that the executive there, after learning that he had been misled about the job, complained about his pay and received a $100,000 bonus and, later, a salary increase and a discretionary bonus. Put another way, the executive stayed after the misrepresentations, including for nine months after his contract expired, and profited.[43] *Id.* at 215. By contrast, the plaintiff says that — unlike the *Rochlis* plaintiff — nothing suggests that she "sought" benefits: "[m]any companies automatically promote employees."[44] Also, unlike the *Rochlis* plaintiff, she contends that nothing suggests that she had the means to determine the truth of

---

[42] *See, e.g.*, Opp'n to Mot. to Remand – ECF No. 35 at 21 (cross-referencing earlier filings).

[43] Reply – ECF No. 38 at 10–11.

[44] *Id.* at 11.

the representations.[45] But the plaintiff was a high-level employee who stayed after she learned (when she started her job) about the lack of predicates for an IPO: "[w]hen [she] arrived, she was surprised that basically nothing seemed to be going on in service to the 'imminent' IPO" and that DataRobot's "practices were not consistent with the promise of an imminent IPO."[46]

The plaintiff also cites *Hall v. FedEx Freight, Inc.*, where the district court distinguished *Rochlis*. No. 1:13-cv-01711-SKO, 2015 WL 574177, at *16 (E.D. Cal. Feb. 11, 2015).[47] The FedEx drivers there bid on their routes — including the opportunity to bid on better-paying routes — based on "job class seniority," which was lost if they transferred voluntarily to another service center. The plaintiffs transferred voluntarily after they were told (falsely) that they would retain that seniority. *Id.* at *2–3. FedEx contended that because the drivers stayed employed for several months before taking action, they could not show detrimental reliance under *Rochlis*. *Id.* at *15. The district court disagreed: the drivers were not management, their compensation was tied to seniority, and they could not quit or transfer without losing seniority. *Id.*

The plaintiff, by contrast, is a director who learned about the company's business practices when she started her job.[48] Her status as a high-level employee who continues her employment after learning about the company's financial position is like the *Rochlis* plaintiff. 19 Cal. App. 4th at 215–16. At least one other court also has found a lack of justifiable reliance when a higher-level employee continued his employment after learning that a promise was false. *Rubinstein v SAP AG*, No. C 11 06134 JW, 2012 WL 726269, at *1, *6 & n.13 (N.D. Cal. Mar. 1, 2012) (the plaintiff was hired as a contract specialist in 2005 and was promoted to the legal department in June 2007; from June 2007 to December 2008, his managers falsely promised that he would be promoted to Assistant General Counsel by the end of 2008; in mid-January 2009, another manager confirmed the earlier promises and said that the promotion could take up to six months; the plaintiff stayed

---

[45] *Id.*

[46] Compl. – ECF No. 1 at 30 (¶ 29(m)).

[47] Reply – ECF No. 38 at 12.

[48] Compl. – ECF No. 1 at 27–30 (¶ 29).

employed until he was terminated in March 2010; held that as a matter of law, this was not justifiable reliance).[49]

In the FedEx context, of course it is unpalatable to deem continued employment as acquiescence to an employer's alleged misrepresentations. It is less so here: duties and risks are allocated differently for higher-level employees.

In any event, Mr. Wright's statements cannot be divorced from their context, are not statements of fact, instead are opinions about future events and goals, and are not actionable misrepresentations.

Whether a statement is an actionable misrepresentation is a question of law. *See Cook, Perkiss & Liehe*, 911 F.2d at 246. "Representations of opinion . . . are ordinarily not actionable representations of fact." *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014). "A representation is an opinion if it expresses only (a) the belief of the maker . . . or (b) his judgment as to quality, value[,] or other matters of judgment." *Id.* at 606–07 (cleaned up).

Statements that are predictions of future events or commitments to take some action in the future generally are not actionable fraud. *Grouse River Outfitters, Ltd. v. NetSuite, Inc.*, No. 16-cv-02954-LB, 2018 WL 306719, at *4 (N.D. Cal. Jan. 5, 2018) (citing *Tarmann v. State Farm Mut. Auto Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991)); *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469–71 (2014) (forecasts of future events are "mere opinions," not actionable misrepresentations); *In re Am. Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) (use of

---

[49] Another issue in *Rubinstein* was that the amended complaint's allegations were inconsistent with the earlier complaint's; the later complaint alleged that the plaintiff was told many times in 2009 that the promotion would occur in the near future, but the original complaint alleged that he was told multiple times that the promotion would not take place in the near future. Thus, the court ordered the plaintiff to explain the inconsistency if he amended his fraud claim. 2012 WL 726269, at *6. This is consistent with California law precluding plaintiffs from pleading facts that contradict those in an earlier complaint. *Larson v. UHS of Rancho Springs, Inc.*, 230 Cal. App. 4th 336, 343–44 (2014) ("under the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment") (cleaned up). The relevance here is that the plaintiff said that she knew when she started work that she recognized the "operational chaos" and financial issues, including the IPO issues, and began fixing them. Compl. – ECF No. 1 at 27–30 (¶ 29) (reviewing all issues and flagging the IPO issues in subparagraphs (m) and (o)). She is bound by her assertions and cannot assert new facts that contradict these facts about her knowledge.

words such as "pursuing," "looking to build," "going to be," and "committed to" are articulations of goals not facts); *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statements about a "high priority" placed on product development are not actionable misrepresentations because the "statements were generalized, vague and unspecific assertions").

Statements of value also are matters of opinion, not fact. *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 835 (2002) (the "vague, highly subjective" phrase "worth its weight in gold" is a nonactionable opinion); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (strong, robust, well positioned, solid, and improved are all words that are too vague to be actionable); *Tabletop Media, LLC v. Citizen Sys. of Am. Corp.*, No. CV 16-7140 PSG (ASx), 2017 WL 10591885, at *6 (C.D. Cal. Mar. 3, 2017) (statement that a printer was robust and was designed for heavy use was puffery).

Mr. Wright's statements — that the "finances looked solid for an IPO" and DataRobot was "fast tracking" the IPO — are forecasts about the company, not statements of facts. *Cansino*, 224 Cal. App. 4th at 1470 ("Any future market forecast must be regarded not as fact but as prediction or speculation. As a matter of law, defendants' alleged misrepresentations — that plaintiffs' property would continue to appreciate in the future and that plaintiffs could then sell or refinance their home based on this forecasted future appreciation — are not actionable in fraud.") (cleaned up). That is apparent from their plain language.

This conclusion is reinforced by the allegations in the complaint about DataRobot's business, the plaintiff's job there, and the fuller recounting of Mr. Wright's statements. Paragraph 29 describes the business practices that needed addressing, which is why the plaintiff was "surprised" "when she arrived that basically nothing seemed to be going on in service to the 'imminent' IPO."[50] DataRobot recruited her from Cisco because she was an experienced financial strategist with a track record of discovering millions of dollars in accounting errors.[51] Her "skill set" was what the

---

[50] Compl. – ECF No. 1 at 27–30 (¶ 29, including subparagraph (m)).

[51] *Id.* at 19–20 (¶¶ 9–10).

company "need[ed] as we go IPO."[52] "Within the performance of her job duties, Plaintiff . . . set about fixing" the issues in paragraph 29, including accounting, budgeting, expense, and personnel issues.[53] She did a good job: her work was "exceptional" and her importance to the company was "critical."[54] Her work was consistent with the known goal of launching an IPO, which is all that Mr. Wright articulated.[55] Put another way, the plaintiff's allegations about why she was hired and what she did are consistent with the conclusion that Mr. Wright's two statements — whether considered narrowly as the plaintiff casts them in her opposition or (more appropriately) in the context of when he said them — were forecasts.

Claim three is for misrepresentation based on concealment. Mr. Wright did not owe the plaintiff a fiduciary duty when he made the statements at the offsite meeting, before DataRobot hired the plaintiff.[56] The plaintiff concedes this point.[57] There was no other transactional relationship between Mr. Wright and the plaintiff at the time he made the statements that gives rise to a duty to disclose. *Deteresa v. Am. Broad. Cos.*, 121 F.3d 460, 467 (9th Cir. 1997) (the plaintiff must show "the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise;" this happens when there are transactions between the parties "from which a duty to disclose facts material to the transaction can arise under certain circumstances") (quoting in part *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336–37 (1997)); *Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 312 (2017) ("[A] duty to disclose arises in this context only where there is already a sufficient relationship or transaction between the parties. Where . . . a sufficient relationship or transaction does not exist, no duty to disclose arises even when the defendant

---

[52] *Id.* at 24 (¶ 21(a).

[53] *Id.* at 27 (¶ 29).

[54] *Id.* at 33–34 (¶¶ 31–32).

[55] *See* Statement (setting forth full allegations in the complaint); *see also* Ballard Decl. – ECF No. 30-8 at 5–6 (¶¶ 15–17) (submitted in support of the plaintiff's motion to remand; at an offsite Executive Leadership Meeting in March/April 2021, executive leaders including Mr. Wright discussed revenue projections; the prior CEO did not share projections; Mr. Wright told those in attendance to use the revenue and IPO projections to recruit and retain employees and to obtain new business).

[56] Compl. – ECF No. 1 at 20 (¶ 11), 21 (¶ 13); Ballard Decl. – ECF No. 30-8 at 5–6 (¶¶ 15–17).

[57] Opp'n – ECF No. 37 at 10.

speaks.") (cleaned up). The plaintiff does not contend that Mr. Wright was a party to the contract and instead rests her argument on his job as CEO to direct recruitment practices.[58] But the concealment claim requires a duty to the plaintiff, and the weight of the authority supports the conclusion that without that predicate, which is absent here, there is no claim for fraudulent concealment. Moreover, if the statements were conveyed jot for jot, they are not misrepresentations (as set forth above). If there were different representations, as discussed in the next section, then any claims for misrepresentation lie against the recruiters who made them.

In sum, the plaintiff's claims against Mr. Wright fail for lack of detrimental reliance and because his statements were unactionable forecasts. Thus, the court denies the plaintiff's motion for remand and grants Mr. Wright's motion to dismiss with prejudice.

## 2.  DataRobot's Motion to Dismiss

The remaining claims at issue in DataRobot's motion to dismiss are intentional and negligent misrepresentation, misrepresentation based on concealment, and intentional infliction of emotional distress (claims two through four and nine). The court's analysis above applies to the claims of misrepresentations against the recruiters: the plaintiff argues only that they repeated Mr. Wright's (non-actionable) statements.[59] If that is all that the plaintiff can allege, then she cannot state claims based on those misrepresentations. That said, the court gives leave to amend to allege other misrepresentations. The plaintiff also did not allege who made the misrepresentations and when, which she must to state a claim. *Vess*, 317 F.3d at 1106.

The plaintiff also offers to supplement her IIED claim to allege additional facts.[60] The court grants that leave.

---

[58] *Id.* at 7–8, 11–13; Reply – ECF No. 39 at 14 (making the point that the plaintiff did not ground her claim in contract and is unable to).

[59] Compl. – ECF No. 1 at 24–25 (¶ 21); Opp'n – ECF No. 29 at 7–8 (identifying only the two statements — the "finances looked solid for an IPO" and DataRobot was "fast tracking" the IPO — as statements of existing fact that are actionable).

[60] Opp'n – ECF No. 29 at 11.

The next issue thus is whether the IIED claim is — as DataRobot contends — barred by the exclusivity provision of the California Worker's Compensation Act, Cal. Labor Code § 3600(a).[61] The court defers consideration of the issue until amendment. Some managerial decisions may be normal aspects of the employment relationship, and the Labor Code provides the exclusive remedy for them. *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987) (Labor Code provides the exclusive remedy "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances"); *see Saba v. Unisys Corp.*, 114 F. Supp. 3d 974, 983–984 (N.D. Cal. 2015) (discussing issue in the context of claims for wrongful termination). On the other hand, the plaintiff claims discrimination, which is not subject to the Labor Code's exclusivity provision because discrimination is "neither a 'normal part of the employment relationship' nor is it a risk 'inherent' in that relationship." *Rockymore v. Eurofins Donor & Prod. Testing, Inc.*, No. 3:22-cv-00176-WHO, 2022 WL 1188859, at *12 (N.D. Cal. Apr. 20, 2022) (collecting cases and citing *Cole*, 43 Cal. 3d at 160).

The final issue is punitive damages. DataRobot contends, and the court agrees, that to the extent that the claim for punitive damages is predicated on the fraud claims, it must be dismissed too.[62] But the plaintiff also claims discrimination and failure to prevent discrimination in violation of FEHA, and those claims allow punitive damages. *Commodore Home Sys., Inc. v. Super. Ct.*, 32 Cal. 3d 211, 221 (1982).

"California Civil Code § 3294(a) allows for the recovery of punitive damages only where a plaintiff shows the defendant acted with malice, oppression, or fraud in connection with the tortious conduct at issue. Under § 3294(b), malice is defined as either: (1) conduct which is intended by the defendant to cause injury to the plaintiff or (2) 'despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.'" *Rhynes v. Stryker Corp.*, No. 10-5619 SC, 2011 WL 2149095, at *5 (N.D. Cal. May 31,

---

[61] Mot. – ECF No. 13 at 23–24.

[62] Reply – ECF No. 31 at 15.

2011) (quoting Cal. Civ. Code § 3294(b)). "California courts have defined 'despicable conduct' as conduct which is 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary people.'" *Id.* (quoting *Mock v. Mich. Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306, 331 (1992)). "In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, since the degree of punishment depends on the peculiar circumstances of each case." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009) (cleaned up).

To the extent that the claim for punitive damages is predicated on the discrimination claims, the court does not dismiss the claim at the pleadings stage.

## CONCLUSION

The court denies the plaintiff's motion to remand, grants Mr. Wright's motion to dismiss with prejudice, and grants DataRobot's motion to dismiss with leave for the plaintiff to amend the misrepresentation claims and the IIED claim. Any amended complaint must be filed within four weeks and must attach as an exhibit a blackline compare of the amended complaint against the operative complaint.

This resolves ECF Nos. 13, 30, and 33.

**IT IS SO ORDERED.**

Dated: September 28, 2023

_____
LAUREL BEELER
United States Magistrate Judges